**IN THE UNITED STATES DISTRICT COURT,
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| A.T. and O.T., individually and on behalf of A.T., <br> *Plaintiffs,* <br> v. <br><br><br> FREEHOLD REGIONAL HIGH SCHOOL DISTRICT BOARD OF EDUCATION, <br> *Defendant.* | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Case No.  3:25-cv-1728 |

**PLAINTIFFS' REPLY BRIEF TO DEFENDANT'S BRIEF IN OPPOSITION**

**MONTGOMERY LAW GROUP**
Bradley R. Flynn, Esq.
NJ ID 173362016
1420 Locust Street, Suite 420
Philadelphia, PA 19012
Phone: 215-650-7563
Bradley@ed-law.com

Attorneys for the Plaintiff

**TABLE OF CONTENTS**

1

I. INTRODUCTION.................................................................................................................1

II. ARGUMENT AND AUTHORITIES.................................................................................2

    1. The District and the Administrative Law Judge Failed to Consider that the Least-Restrictive Environment for A.T. is ICR and, therefore, that the ICR Classroom is the Appropriate Placement........................................................................................................2

    2. The District Denied Parents Meaningful Participation when it Refused to Provide Albanian Translation and Interpretation.................................................................................8

    3. Parents Never Rejected the August 2022 IEP; Rather, the District Never Presented it to Them.......................................................................................................................................11

    4. Stay Put Did Not Prevent the District from Amending the IEP...........................................11

    5. Because the District Denied A.T. a FAPE, together with its Substantive-Procedural Violations of the IDEA, He is Entitled to Compensatory Education.......................................13

III. CONCLUSION................................................................................................................15

**TABLE OF AUTHORITIES**

**Cases**

C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59 (3d Cir. 2010) ................................ 11, 14, 15, 16
Ferren C. v. Sch. Dist. of Phila., 612 F.3d 712 (3d Cir. 2010) ........................................ 15
G.L. v. Ligonier Valley Sch. Dist. Auth., 802 F.3d 601 (3d Cir. 2015) ...................................... 15
G.N. ex rel. J.N. v. Bd. of Educ., 309 F. App'x 542 (3d Cir. 2009) ...................................... 16
Hidalgo v. N.Y.C. Dep't of Educ., No. 19-CV-2590 (RA), 2021 U.S. Dist. LEXIS 4446 (S.D.N.Y. Jan. 8, 2021) ................................................................................................................ 13
Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755 (6th Cir. 2001) .................... 11, 16
Marple Newtown Sch. Dist. v. Rafael N., No. 07-0558, 2007 U.S. Dist. LEXIS 62494 (E.D. Pa. Aug. 23, 2007) ............................................................................................................ 11
Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204 (3d Cir. 1993) ... 4–10
Reid v. Dist. of Columbia, 401 F.3d 516 (D.C. Cir. 2005) ........................................... 16
Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49 (2005) ............................................. 14

**Federal Statutes**

20 U.S.C. § 1415 ...................................................................................................... 10, 11, 13
20 U.S.C. § 1415(b)(4) ................................................................................................... 10
20 U.S.C. § 1415(d)(2) ................................................................................................... 10
20 U.S.C. § 1415(e)(3) ................................................................................................... 13
20 U.S.C. § 6312(g)(2) ............................................................................................... 10, 12

**Federal Regulations**

34 C.F.R. § 300.322(e) ................................................................................................ 10, 12
34 C.F.R. § 300.324(a)(2)(i) ............................................................................................. 9

**New Jersey Administrative Code**

N.J.A.C. 6A:14-1.3 ......................................................................................................... 11
N.J.A.C. 6A:14-2.5(c)(6) .................................................................................................. 16
N.J.A.C. 6A:14-2.7 .............................................................................................. 11, 15, 16
N.J.A.C. 6A:14-2.7(a) ...................................................................................................... 13
N.J.A.C. 6A:14-2.7(r)(iii) .................................................................................................. 13
N.J.A.C. 6A:14-2.7(s)(1) .................................................................................................. 13
N.J.A.C. 6A:14-3.7(l) ...................................................................................................... 13
N.J.A.C. 6A:14-3.8(e) .................................................................................................. 9–10
N.J.A.C. 6A:14-4.6(a)–(m) ................................................................................................ 8
N.J.A.C. 6A:14-4.6(d) ...................................................................................................... 8

## I.    INTRODUCTION

After twenty-nine pages, the District misses the mark when it argues that it provided A.T. a FAPE[1]; that it implemented the modifications in A.T. 's IEP; and that it was "Plaintiffs'

---

[1] The District's Brief claims that it offered A.T. transition services. The record, however, contains no evidence that it offered any transition, vocational, or post-graduation services to A.T. (Def. Br. at 22).

interference and recalcitrance" that somehow prevented the District from meeting A.T. 's needs. (Def. Br. at 1). As such, the theme of Defendant District's Brief in Opposition seems to be to *beat up* on the Parents, rather than focusing on the fact that, as shown below, it did not provide A.T. with a FAPE. Furthermore, the record simply does not show that Parents and A.T. interfered, in any way, with the District's ability to offer IEPs and to educate him. Quite to the contrary, as further discussed and shown in the record, it was the District that refused to address his needs; to offer an IEP; to amend the IEP, improperly citing stay put; and failing to include Parents as members of the IEP team. If anything, the record shows that it was the District, and not the Parents, that interfered with A.T.'s education. Thus, the following paragraphs, together with legal authorities herein cited, demonstrate that the ALJ's decision should be overturned.

## I.   ARGUMENT AND AUTHORITIES

**1.  The District and the Administrative Law Judge Failed to Consider that the Least-Restrictive Environment for A.T. is ICR and, therefore, that the ICR Classroom is the Appropriate Placement.**

Parents contend that the ALJ and the District failed to apply the Third Circuit's standard for determining whether the LLD class was the least-restrictive environment. Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 99 F.2d 1204, (3d. Cir. 1993). The two-prong test asserts: (1.) Can the District satisfactorily educate the student in the general education classroom with the use of supplementary aids and services; and (2.) if after considering the factors outlined under the first prong, then to what extent does the proposed placement allow for the student to interact with non-disabled students? Id. Under the first prong, hearing officers[2] consider three factors: (a.) the extent to which reasonable efforts were made to accommodate the student in the general education setting with the use of supplemental supports and services; (b.) the outcome of

---

[2] Hearing Officer and Administrative Law Judge are used interchangeably throughout the briefs, but, essentially, mean the same thing: The trier of fact in a special education due process hearing.

comparing the benefits of educating the student general education versus the more-restrictive setting; and (c.) the possible negative effects of inclusion on the general education students. Id.

The District's Brief in Opposition misapplies the Oberti standard when it alleges that A.T. should be in the LLD classroom, based on his difficulties, and not on the interventions the District failed to implement.[3] (Def. Br. at 14). While the District spends considerable time describing what it claims, albeit, incorrectly, to be A.T. 's lower-functioning ability, it fails to describe what supplementary aides and services it offered A.T. through his IEP. (Id. at 15-17). Here, applying the first Oberti factor, the District failed to make reasonable efforts to educate A.T. in the ICR class with supplementary aids and services. The record shows that the District did not even offer an IEP at all during the 2022-2023 school year. (See Vol. II at A577-592). Furthermore, the record shows that the District did not complete the FBA. Parents signed consent for an FBA on May 4, 2023. The District never conducted the May 2023 FBA, for which the District had consent, which included targeted behaviors. (See Vol. II at 847-850; See also Vol. III at A946-A956.) In 2024, the District argued through the testimony of Dr. Howland, that the Parents and District could not agree on which behaviors to target in the 2024 FBA. (Id.). Here, the District improperly places the burden of identifying target behaviors on the non-clinician Parents, when it is the Child Study Team that should be presumed to be the experts on behaviors and which has observed A.T. 's behaviors while he was at school. In fact, the very essence of an FBA is so that the District-qualified staff can gather data on A.T.'s behavior.  (Def Br. at 22). Moreover, the record contains no evidence that the District even offered a consent for an evaluation form for an FBA in 2024.

---

[3] Throughout its Brief, the District argues that the 2021 IEP, which placed A.T. in the ICR class was appropriate to provide him with FAPE, but, also, argues that the ICR classroom, which was a product of that same IEP, was not appropriate to meet his needs. Here, the District is arguing it both ways, violating a fundamental rule of logic, the law of non-contradiction. Something cannot be both appropriate and not appropriate at the same time.

Absent conducting the FBA, Parents contend that the District lacked adequate data, upon which it could make changes to A.T. 's IEP, including a behavioral intervention plan. Additionally, the record shows that the District never took steps to adjust the IEP after A.T. 's surgery, failed to account for how his pain impacted his education, did not implement the IEP, including the accommodations, assistive technology, and related services. (See Vol. I at A104). The District combats this argument stating that A.T. was frequently allowed in the nurses' room over his four years of school; however, this negates the fact that his educational needs were not being considered and accommodated due to his spinal conditions. (See Vol. II at 693-694; See also Vol. III at 976-977.)

Further, the District did not offer to make any changes to the IEP to see what, if anything, could be done to keep him in the ICR class. (See Vol. 4 at A1278;) (See Vol. V at A1521-1522, 114:3-116:20.) (See also ECF 1-3 at Findings of Fact ¶32.) (See also Vol. III at A972-976.) Before racing to offer to place him in the LLD class through the IEP, the District was required to attempt to program for A.T. in the least-restrictive environment, with appropriate support, which it failed to do when it did not make changes to his IEP. Had the District focused on the right goals and objectives in the IEP, he could have succeeded in the ICR class.

Here, the record shows that in May of 2022, Parents took A.T. to Princeton Speech Language and Learning Center for a comprehensive speech and language evaluation. Parents sought the evaluation to get an updated assessment of A.T.'s language profile and to inform academic planning. The evaluations were completed on May 24 and May 31, 2022. (See Speech and Language Evaluation by Marcie Fountaine, MS, CCC-SLP, Vol. II at A435-454.). In reviewing A.T.'s records, the evaluator reported that despite A.T. having a documented history of language/learning difficulties, there was only one objective for reading and two objectives for

6

writing for the 2021-2022 IEP. Whereas A.T. 's 2020-2021 IEP had seven objectives for reading and three for writing.  Therefore, it is clear that Defendant District was not adequately utilizing, nor preparing data, to provide A.T. with a FAPE. It is also clear that A.T. would have been successful in the least-restrictive environment had Defendant District focused on the right goals and objectives to allow him success.

The District's Brief misrepresents A.T.'s abilities and does so, seemingly, to justify the LLD placement.[4] First, the District states without any support that, "A.T., whose full scale IQ (FSIQ) is about 84, has cognitive differences that prevent him from accessing an education in a GenEd/ICR setting." (*Sic.*). (Def. Br. at 16). An  I.Q. of 84, however, as noted in the District's psychological evaluation report, "places him within the Low Average range. . .". (See Vol. II at A698). Second, the District's Brief improperly conflates I.Q. scores with academic ability. As noted in the District's psychological evaluation, the WISC-V measures overall cognitive ability, which results in an I.Q. score. (Id.).[5]

| WECHSLER INTELLIGENCE SCALE FOR CHILDREN, FIFTH EDITION | | | |
|---|---|---|---|
| In addition to providing a Full-Scale IQ score, this test of problem solving, and intelligence yields five cognitive indices that provide information regarding a child's cognitive style.  These include the Verbal Comprehension Index, Visual Spatial Index, Fluid Reasoning Index, Working Memory Index, and Processing Speed Index. The average score on these scales is 100, with a standard deviation of 15 points. | | | |
| *Index/Scale* | *Composite Score* | *95% Confidence Interval* | *Range/Percentile* |
| *Verbal Comprehension (VCI)* | 78 | 72-87 | Very Low Range 7th Percentile |
| *Visual Spatial (VSI)* | 92 | 85-100 | Average Range 30th Percentile |
| *Fluid Reasoning (FRI)* | 97 | 90-104 | Average Range 42nd Percentile |
| *Working Memory (WMI)* | 97 | 90-105 | Average Range 42nd Percentile |
| *Processing Speed (PSI)* | 69 | 64-82 | Very Low Range 2nd Percentile |
| *Full-Scale IQ (FSIQ)* | 84 | 79-90 | Low Average Range 14th Percentile |
| *Verbal Comprehension Subtests* | *Stand.Score* Avg. =8-12 | *Visual Spatial Subtests* | *Stand.Score* Avg.=8-12 |
| Vocabulary (fluency, word usage) | 5 | Visual Puzzles (analyzing and synthesizing visuals) | 6 |
| Similarities (abstract, logical thinking) | 7 | Block Design (visual-spatial perception) | 11 |

---

[4] In fact, upon information and belief, the District misrepresented A.T.'s abilities to justify their unilateral previous program change in August 2022 outside of an IEP meeting. See Vol. II at A577-592.
[5] Plaintiffs rely upon the graph below pictured.

7

(See Vol. II at A697).

The WISC-V comprises verbal comprehension,visual spatial reasoning, fluid reasoning, working memory, and processing speed. (Id.). The Brief, however, describes him as performing in the "low" and "very low" range for subtests, such as reading fluency and math facts. (Def. Br. at 16). These subtests are not contained anywhere in the psychological evaluation. (See Vol. II at A697-98). Rather, these subtests are part of the Woodcock-Johnson assessment, which is a component of the learning evaluation. (See Vol. II at A730-735). The District, in other words, conflates these two evaluations into one, and uses them to justify placing A.T. in the LLD classroom. Furthermore, the low-average I.Q. score and, especially, the weaknesses in A.T.'s academic subjects are indicative of a student that should be placed in the ICR setting, so that he can address these areas of need. N.J.A.C. 6A:14-4.6(a)-(m).[6]

The District misrepresents the extent to which A.T. 's behaviors interfered with his education, as a justification for placing him in the LLD classroom. The IDEA requires that the IEP team, in the case of a child whose behavior impedes the child's learning or that of others, to consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior. 34 CFR 300.324 (a)(2)(i). IEP teams also must include behavioral interventions in the IEP when a student requires them to receive FAPE. Id.

First, the District failed to timely complete an FBA within sixty days, even after Parents signed consent, in violation of N.J.A.C. 6A:14-3.8(e).[7] (See Ex. "A."). (See Vol. II at A845; A850). Second, despite being aware that A.T. 's behaviors were interfering with his education throughout the time he attended school in the District, it failed to expeditiously offer to conduct

---

[6] In-class resource programs and pull-out replacement resource programs are programs of specialized instruction organized around a single subject and are provided to students with disabilities by an appropriately certified teacher of students with disabilities. Instruction in more than one subject may be provided in a pull-out resource program. N.J.A.C. 6A:14-4.6(d).

[7] N.J.A.C. 6A:14-3.8(e) required the District to complete the FBA within sixty days after Parents signed consent for this evaluation.

an FBA or to modify the IEP to include positive behavior interventions. (See Vol. II, A577-592; See also Vol. III at A946-A956.) The District's Brief notes several instances of supposedly disruptive behavior; yet, it is bereft of any evidence of it taking steps to program for these behaviors through the IEP or an FBA. (Def. Br. at 19-22). Furthermore, many of these behaviors that the District documents did not even take place in the ICR class. Rather, some of these behaviors took place in the gym, the hall, and other non-ICR locations. (Id. at 20-21). Again, for the behaviors that took place in the ICR classroom, the District fails to show how it programmed for them through the IEP. The District's unequivocal failure to program for A.T. 's behavior shows that it, clearly, did not comply with the standard set forth in Oberti, which, again, required it to address the behaviors before racing and pre-determining without parental input to place him in the LLD class.

Defendant District concludes its LRE section by arguing, *ipse dixit*, that it was impossible for A.T. to learn in the general education and ICR setting because of his "profound disabilities," even with modifications and accommodations. (See Def. Br. at 16-17). First, A.T. does not have profound disabilities. There is nothing in the record to justify labeling him as *profoundly disabled*. Quite to the contrary, the District's own evaluations reveal that he is of low-average ability with an I.Q. of 84. (See Vol. II at A698). In fact, the IEPs, which quote from the neurological evaluation, affirm that A.T. is diagnosed with high-functioning autism. (See Vol. I at A459). Low-average is still within the average range and, by its definition, is not profoundly disabled. In fact, the WISC-V shows that he is mostly in the average range for most of the subtests. (Id. at A697).

Second, the District claims he could not learn in the ICR setting, even with modifications and accommodations. (Def. Br. at 16.). As discussed above, however, the District failed to make

9

any modifications to the IEP per the Parents' request, did not timely complete the FBA, and even failed to offer an IEP in August 2022. (See Vol. II, A577-592; See also Vol. III at A946-A956.) (See Ex. "A."). The District, instead, relied on the fiction that stay put precluded it from amending the IEP, despite Parents' unwavering consent to do so. Moreover, the District claims that A.T. did not learn in the ICR placement, but fails to show what actual supplementary aides and services it implemented before attempting to place him in the LLD class, per Oberti.

### 2. The District Denied Parents Meaningful Participation when it Refused to Provide Albanian Translation and Interpretation.

The IDEA requires notice to the parents of disabled children be provided in the native language of the parents. 20 U.S.C. § 1415(b)(4) and (d)(2); 20 U.S.C. § 6312(g)(2). 34 C.F.R. § 300.322(e) ensures that parents can attend and receive information about individualized education program (IEP) meetings—with translation or similar assistance if necessary to accommodate families with English language or other communicative difficulties—so that they may understand what is happening in the meeting. Courts have found that failure to provide translation services to a parent can amount to a lack of meaningful participation. Marple Newtown Sch. Dist. v. Rafael N., No. 07-0558, 2007 U.S. Dist. LEXIS 62494, at *10 (E.D. Pa. Aug. 23, 2007).

The District committed a substantive-procedural violation of the IDEA when it denied Parents the Albanian translation that they requested. If a procedural violation "causes substantive harm to the child or his parents," it may rise to the level of a denial of FAPE. C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010) (citing Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 765 (6th Cir. 2001). As the Regulations affirm, compensatory education is the appropriate remedy for a substantive procedural violation of the IDEA. N.J.A.C. § 6A:14-2.7. To that end, procedural violations may lead to a finding that a student did not receive

10

a FAPE if the violations "(1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3) caused a deprivation of educational benefits." N.J.A.C. § 6A:14-2.7.

Parents requested that the District provide documents to them in their native language, so they had the opportunity to fully understand what they were signing. The District intends to mask their failure to translate critical documents by arguing that A.T. 's Mother, a woman certified to teach special education, and A.T's father, a man who works in United States financial markets, should have been able to read the documents, especially when represented by counsel. (See Def, Resp. to Pls' Statement of Facts, at Paragraph 23.) District further argues that their representations and briefings to District throughout the years shows "robust mastery of English."[8] (Def. Br. at 26). This does not negate the District's duty under federal law to provide documents in native language when requested. 20 U.S.C. § 1415(b)(4) and (d)(2); 20 U.S.C. § 6312(g)(2). Rather, this dismisses the needs and backgrounds of the Parents and places the burden upon them to find a way to understand the documents. Although familiar with the English language, Parents needed translation of documents that they did not understand, and their request should have been met rather than dismissed.

For example, the District, on February 7, sent Parents two personal-health-information forms ("PHI") for the District and its physician to receive records from A.T. 's medical providers, which included confidential medical, psychiatric, psychological and/or sociological information. (See Vol. III at A1075-1077). These forms were to obtain records to inform the evaluations. Parents contend, however, that although Parents requested translation of the forms into Albanian,

---

[8] The District relies on a student Home Language Survey, which screens students for multilingual learner needs. That form does not determine parental language access and has no bearing on parental-language access under N.J.A.C. 6A:14-1.3. Nowhere does that form determine what the Parents' native language or what their language-access needs are. See ECF 13-1 at Page ID 141.

11

as she did not understand them, the District refused to do so, in violation of 20 U.S.C. § 1415(b)(4) and (d)(2); 20 U.S.C. § 6312(g)(2), and 34 C.F.R. § 300.322(e);[9]A1755. Having received no translation, on February 12, Parents reached out to the Director of Special Education, Dr. Jessica Howland, to revoke her consent for the forms and evaluations until the District could translate and explain the forms. (See Vol. III at A1080, 1082-1084). Moreover, by failing to translate the forms into Albanian, Parents contend that the District denied the Parents meaningful participation as members of the IEP team. Absent their informed consent, the District barred them from participating in the development of A.T. 's IEP.

3. **Parents Never Rejected the August 2022 IEP; Rather, the District Never Presented it to Them.**

Contrary to what the District alleges, Parents never rejected the August 2, 2022 IEP, as the District never presented it to them. (Def. Br. at 19). Per N.J.A.C. 6A:14-3.7(1), the child study team must keep a record of all individuals who participated in the meeting to develop the IEP. The draft IEP of August 2, 2022, notably, lacks signatures, attendees listed on page 2 of the IEP from the meeting, and a date for the IEP meeting. (See Vol. II, A577; A578; A592). Furthermore, nowhere on this IEP does it offer an LLD placement. (See Vol. II at A577-592.) Because the District never presented this IEP to Parents, they contend that there was nothing for them to reject or accept. Moreover, both the ALJ and the District overlook the fact that not only was there no IEP to reject, the District, again, failed to offer A.T. a program.  To that end, there was no IEP or LLD placement for the Parents to reject.

---

[9] C.F.R. § 300.322(e) ensures that parents can attend and receive information about individualized education program (IEP) meetings—with translation or similar assistance if necessary to accommodate families with English language or other communicative difficulties—so that they may understand what is happening in the meeting.

12

**4. Stay Put Did Not Prevent the District from Amending the IEP.**

20 U.S.C. § 1415 (e)(3) of the IDEA, the "stay put" provision, holds: "During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed." It is notable that the IDEA expressly allows for the parents and the district to revise the IEP during stay put. Hidalgo v. N.Y.C. Dep't of Educ., No. 19-CV-2590 (RA), 2021 U.S. Dist. LEXIS 4446 (S.D.N.Y. Jan. 8, 2021) at 13; 20 U.S.C. § 1415 (e)(3). The Third Circuit, notably, concluded that: "The stay-put provision was never intended to suspend or otherwise frustrate the ongoing cooperation of parents and the school district to reach an amenable resolution of a disagreement over educational services." C.H. v. Cape Henlopen Sch. Dist., at 72. More to the point, Congress intended that parents and school districts continue to work toward the resolution of disputes and the provision of appropriate educational services even after a due process request is filed. Id. See also Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005) ("The core of the [IDEA] . . . is the cooperative process that it establishes between parents and schools.").

The District, curiously, argues that stay put prevented it from amending the IEP, while also stating that he could only receive FAPE in the LLD classroom and taking no steps to change his placement. (Def. Br. at 11). The New Jersey Administrative Code allowed the District to take Parents to due process over the issue of placement. N.J.A.C. 6A:14-2.7(a). Additionally, the District could have filed a motion for emergent relief for a temporary order to change A.T.'s placement to the LLD placement during the pendency of litigation. N.J.A.C. 6A:14-2.7(r)(iii). In

13

fact, the Code specifies that emergent relief, regarding placement, may be granted when the "petitioner will suffer irreparable harm if the requested relief is not granted." N.J.A.C. 6A:14-2.7(s)(1). Here, the District argues that "it was for all intents and purposes impossible for A.T. to learn Geometry, Biology, Algebra, and Chemistry in a GenEd/ICR setting." (Def Br. at 16). The District, recognizing that A.T. was not making gains, could have at least taken Parent to due process, to say nothing of filing for emergent relief, to change A.T. 's placement, in light of the harm that the ICR class was having on his education. To that end, the District should not be permitted to use stay put *as a sword and shield* by arguing that pendency meant that he had to remain in an educationally-deficient placement, when it had the ability to change the placement through its own due process petition.

It must be emphasized that Parents, all along, requested changes to the IEP, but the District refused to do so. The Third Circuit concluded "the stay-put provision was never intended to suspend or otherwise frustrate the ongoing cooperation of parents and the school district to reach an amenable resolution of a disagreement over educational services." C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 72 (3d Cir. 2010). Again, Parents requested that the District revise the IEP to include FBA data and to accommodate A.T.'s recent spinal surgery. (See Vol. III A945; 947; 976-977.). In fact, Parents continuously requested an IEP meeting, so they could obtain an IEP for the 2022-2023 school year. (See Vol. III at 1036-1037; 1083; 1085; 1086)(See Ex. "A.").. The District, however, refused to make any changes because it improperly relied on stay put. (Def. Br. at 6). More to the Point: The District should not benefit from frustrating the IEP process because of stay put, when the Parents requested to engage with the IEP process to ensure that A.T. 's IEP met his evolving needs and to ensure that he received FAPE.

**5. Because the District Denied A.T. a FAPE, together with its Substantive-Procedural Violations of the IDEA, He is Entitled to Compensatory Education.**

Contrary to what the District argues, A.T. is entitled to compensatory education. (Def. Br. at 24). First, the District owes A.T. compensatory education for failing to implement and offer an IEP. (See Vol. IV, A1217-A1220; A1223- A1225; A1231- A1234; A1239-A1243; A1250); .(See Vol. II, A881);  (See Vol. III, A1025-A1035) As the Third Circuit has observed, compensatory education "serves to 'replace [] educational services the child should have received in the first place' and . . . such awards 'should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.'" Ferren C. v. Sch. Dist. of Phila., 612 F.3d 712, 717-18 (3d Cir. 2010). Because the District did not offer an IEP for the 2022-2023 school and because it did not implement the IEP, including A.T.'s accommodations and counseling services, it owes him compensatory education. Second, because A.T. did not make gains in the District's program, he is owed compensatory education. G.L. v. Ligonier Valley Sch Dist. Auth. 802 F. 3d 601, 624 (3d Cir. 2015); See also Reid v. Dist. of Columbia, 401 F. 3d. 516 (D.C. Cir. 2005) (Finding that compensatory education is the remedy to make the child whole.).

The District further owes compensatory education because of its ongoing substantive-procedural violations of the IDEA. The Third Circuit has concluded, if a procedural violation "causes substantive harm to the child or his parents," it may rise to the level of a denial of FAPE. C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010) (citing Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 765 (6th Cir. 2001). Furthermore, the New Jersey state regulations implementing the IDEA specify that procedural violations may entitle the student to compensatory education if the violations "(1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3) caused a deprivation of educational

15

benefits." <u>N.J.A.C.</u> § 6A:14-2.7. <u>See also</u> <u>G.N. ex rel. J.N. v. Bd. of Educ.</u>, 309 Fed. Appx. 542, 545-546 (3d Cir. 2009). As applied here, the District repeatedly refused to respond to Parents to set up IEP meetings. (<u>See</u> Vol. III at A1079; A1036; A1040); (<u>See</u> Vol. II, A753; A754; A755; A756;A751; A752). By refusing to even meet with Parents, there was no way for Parents to participate in the decision-making process regarding A.T. 's education or to discuss programmatic changes to the IEP in light of his circumstances. Compounding the substantive-procedural violation is the fact that the District refused to allow Parents' outside speech evaluator observe A.T. (<u>See</u> Vol. III at A1089 - A1095). Again, the New Jersey Department of Education found that the District was noncompliant with <u>N.J.A.C.</u> 6A:14-2.5(c)(6) when it denied Parents' outside evaluator the opportunity to observe A.T. in the classroom. (<u>See</u> Vol. III at A1107). The District further committed a substantive-procedural violation of the IDEA when it refused to offer Albanian translation and interpretation services. (<u>See</u> Vol. III at A1080, 1082-1084). This refusal, ultimately, interfered with and delayed the evaluation process for A.T. Because the District committed several substantive-procedural violations of the IDEA, which interfered with A.T.'s educational progress, he is entitled to compensatory education.

### III. CONCLUSION

Based on the foregoing reasons, Plaintiffs respectfully request that this Court deny the Defendant Freehold Regional High School District's Motion for Summary Judgement, and that Plaintiffs' Motion for Summary Judgement of the Administrative Record Should be granted.

MONTGOMERY LAW, LLC.
Attorneys for Plaintiffs

16

By     /s/Bradley R. Flynn
Bradley R. Flynn, Esq.
NJ Attorney I.D. No. 173362016

Dated: December 19, 2025.