# Exhibit C

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 2 of 146 PageID: 3124


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE

- - -

| | |
|---|---|
| A.T. and O.T. Individually and on behalf of A.T.<br>Plaintiffs,<br>v.<br>FREEHOLD REGIONAL HIGH SCHOOL DISTRICT BOARD OF EDUCATION<br>Defendant. | Civil Action No. 3:24-cv-00822 |

- - -

A.T. Meeting Transcription

- - -

Transcription of Audio of IEP Meeting A.T. on May 3, 2023 transcribed from audio file by Frances A. Valiante, a Professional Court Reporter and Notary Public, on August 19, 2025.

- - -

TJ INTERNATIONAL REPORTINC, LLC
215.880.3801

MS. REBELO: Okay, great. So we're here for a continuation of our meeting, the annual review eligibility, and a re-val plan for Student A.T.. And we're just going to go around the room, have everybody introduce themselves.

I'm Kelsey Rebelo, case manager. Nice to see everyone again.

MR. A.T.: This is A.T., Senior.

MS. FITZHENRY: I'm Kelly Fitzhenry. I'm the supervisor of special ed. I apologize there's something wrong with my camera. I'm going to try to get that fixed.

MS. FREEMAN: I'm Hillary Freeman, the client's attorney.

MS. SWICK: Libby Swick, speech therapist.

MS. L.T.: L.T., mom.

MR. D'COSTA: Curtis D'Costa, counsel for Freehold Regional High School District.

MS. DAGATO: Hi, Danielle

Dagato, occupational therapist.

MS. FREEMAN: Is anybody else having trouble hearing you? Yes, Mr. Collier, I'm sorry, we can't hear you, but we see you.

MS. REBELO: Okay, so that's Mr. Collier. He's the environmental science special education teacher. We have some feedback, so I'm going to mute myself.

MS. FREEMAN: We can't hear you.

DR. HOWLAND: I think you're going to have to log back in, Mr. Collier, I think because now the microphone doesn't work at all. I don't know what happened.

MR. COLLIER: How about now? There we go. Okay. Yeah, what I was saying is there's three of us in the same room and we're going to get a feedback loop if we're all miked up. So I'm going to turn mine off unless I'm addressed.

I'm the lab environmental science teacher and I'm here with Ms. Ryan.

MS. RYAN: Hi, I'm Kathy Ryan.

I'm English 2 teacher. Nice to see everyone.

MS. REBELO: Okay, did we get everyone? Okay, great.

So I know at the last meeting, we had reviewed all of the evaluations. We had started reviewing the speech evaluation and there was a request for Mrs. Swick to be the one that reviews that. So I'm going to let her go first and review the speech evaluation. I think that's right where we left off.

MS. SWICK: Hi, do you have any questions before I begin?

MS. L.T.: No, you can start.

MS. SWICK: Okay, great. So I gave three different assessments to Student A.T.. The first one I gave him was the expressive one word picture vocabulary test. And what happens in this test is Student A.T. looks at a picture and I just simply ask him what is this? And he gives me a one word response about the picture that he is looking at.

So in this assessment, he scored, he had a standard score of 71 with a percentile of three. So in this test, Student A.T. definitely made some strong guesses about the word that was being shown to him. He definitely picked words that were associated or maybe in the same category as the target picture, but they were not as specific. They were not the specific word I was looking for. So I'll just give you some quick examples on that.

He looked at a picture of a statue and he said it was soldiers. He looked at a picture of springs and told me it was Slinkies. Well, that all like definitely is associated, it wasn't the exact word I was looking for. A paw, he told me it was an animal foot. Well, that is exactly what it is. Again, I just needed one word. So these were examples where he lost credit on the test. I'm trying to think of another one. Clarinet, he told me it was a trumpet. A microscope, he just told me it was used for science.

So he does know the function of things. He just couldn't come up with the specific word that we were looking for.

And then the second assessment I gave him was called the receptive one word picture vocabulary test. He got a standard score of 84, which falls within the below average range and that's in the 14th percentile. So in that assessment, he is looking at four pictures and I give him a word and he has to point to the picture I'm describing. So he had a little bit of an easier time on that assessment, still in the below average range.

And then the last test I gave him was the comprehensive assessment of spoken language, and specifically the pragmatic language subtest. And what this looks at is his use of language and social context. If I give him a social situation, can you tell me the appropriate thing to say or what was the appropriate thing to do? So in this assessment he scored a standard score of 63, which is significantly below

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 8 of 146 PageID: 3130


the average range and that would be like in the first percentile.

And test items that he struggled with here were if you had to invite four friends -- if you had to invite friends to a party and you had to tell them four things like, you know, they were looking for what time is the party, what should I wear, what should I bring, where is the party? And Student A.T. could really only come up with one thing to tell friends about a party if they were going to -- if he was going to invite them to the party.

And then another example of an item that he struggled on was kind of just like giving feedback to a peer without hurting their feelings. So there was a scenario in which it was a pretend scenario where Student A.T. is out with his friend and they are looking at eyeglasses. And the glasses his friend picks out are kind of ugly, but what can Student A.T. say to his friend to say that these aren't maybe the best fit for their friend without hurting

their feelings. And he was not able to provide a statement or a comment that expressed like, you know, I don't like these, but maybe we should pick something else. These aren't the right fit for your face. So his comments still wound up being a little insulting to the person. So he lost some credit on that.

But overall, I am going to recommend speech services for Student A.T.. I did put in the report that I'm recommending one time a week, one time a cycle in a group for 30 minutes, but then I kind of reviewed everybody's assessment and I'm also going to recommend adding an additional individual session. I just think this would be really helpful in working on Student A.T.'s like significant impairments in his expressive language and in his social skills.

And I think a lot of times when I have students in an individual session, we use a lot of their classwork and I think that might be helpful to just work

on the vocabulary that's in his science class or English class, things like that. So it's functional and it's appropriate and it's the most helpful to Student A.T..

MS. FREEMAN: So we agree. Thank you for adding the, recommending the additional session because that was one of the questions that I -- request that I was going to make. But we are hoping to make that two individual rather than one group and one individual because I think he has a lot of skills to work on. And we have to teach him those skills and get him to talk through those from a social thinking, pragmatic perspective.

So I think we are in agreement with that. So I'm not sure that I need to elaborate even more. So two individual, I guess, for 30 minutes. But this is the one thing that I am not smart enough to understand. So I just -- seven-day cycles does that come out to be once, twice a week, does that come out to be sometimes once a week, sometimes three times a week? How

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 11 of 146 PageID: 3133


does that work?
MS. SWICK: Right. I guess depending on the cycle, it could be -- I could space it out, so then maybe he's averaging about three times a week. I could pick letter days that kind of -- he definitely will have two times a week for sure, but some weeks he might have three, or yeah, even it could be four depending on how I schedule it. Like it's just the way the days fall.
So I mean I guess that's up to you guys how you want to phrase it. But I definitely do agree with two individuals is perfectly okay with me and one group session. So I don't know the best way to write that, but I --
MS. FREEMAN: We want to make sure that it's not one time per week ever.
MS. SWICK: No, no, no, no.
MS. FREEMAN: Just want to make sure of that. So if we want to say a minimum of twice a week, you know, I have to kind of defer to you, your counsel on this

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 12 of 146 PageID: 3134


one. But my suggestion would be at a minimum of twice per week rather than the seven day cycles. And this is purely as an accommodation to me because I don't understand seven-day cycles.

MS. REBELO: We would have to list it in the programming, I believe just as if it's going to be two individuals, it would be two times a cycle for individual and one time a cycle for a group.

MS. FREEMAN: But I wouldn't say -- do we have to say cycle, or can we say per week?

MS. REBELO: Our schedule runs on a cycle. So instead of a five-day week, it's really like a seven-day week.

MS. FITZHENRY: Right. So to understand the cycle, each class meets five times out of seven days. So just doing the math, he will always have two days if he's going to have three different speech, two individual one group sessions. So he'll always have two because it's five days out of seven.

MS. FREEMAN: Okay.

MS. L.T.: Hi, Ms. Swick, I'm L., never met you, first time I see you introduction. You had Student A.T. last year and I believe it started sometimes around October, the sessions you had him in a group. While you had sessions, do you have any like notes from your sessions?

In those four or five sessions that you had last year with Student A.T., how was his interaction with his peers and what issues were happening in speech? My main concern that Student A.T. refused to go to speech.

MS. SWICK: I think the problem with him coming to speech is because we have to pull from electives and I was pulling him from gym. So that was the issue that he did not want to be pulled from gym because he liked to walk and spend time with the other kids in the class. So I think that was the main thing that we had numerous conversations on to get him to attend.

I think that might be our

biggest barrier to get him to come three times a week. So as long as, you know, I work with you and I work with Student A.T. coming up with a schedule that he's in agreement with because I think he doesn't want to be pulled from PE.

So I don't know what his schedule next year looks like, but I'm not comfortable taking him from his academic classes. So we'll have to have, you know, that kind of conversation with him so that he'll want to come because I think that was our biggest barrier.

But when he came, he participated, you know, after the first few minutes of negotiating with him and maybe if he finished an assignment early, I'd let him go five minutes early, five minutes early just to get him to come. But in our sessions, we were just working on conversation.

I know we did a writing activity that he did not like and I think that upset him too because maybe the

expectation previously in speech was that you didn't write, but like I needed a baseline for his abilities. So I had him write something I think about like his favorite classes and he did not want to do that.

So I think those are some things that might have been a barrier to him wanting to come. But after we, you know, him and I worked through those things, he was able to participate. So I'm hopeful that our session is, you know, three times a week.

MS. L.T.: Thank you for explaining this, Ms. Swick, because I asked several meetings to the case manager to speak to you because I wasn't getting this message that you just relayed to me. I was getting Student A.T.'s side of the message, but not your message. And I never got an explanation to why because eventually Student A.T. refused to come to school.

MS. SWICK: I'm sorry, I'm sorry, you're breaking up. Could you repeat

that for me?

MS. L.T.: I never got your side of the story, even repeatedly asked several meetings to meet because I couldn't understand. Student A.T. never refused therapy. Now, I know the side of your story, which matches Student A.T.'s side of the story and I knew his.

But eventually Student A.T. refused to come to school the days that he had speech. So not only was missing 20 minutes of speech, but Student A.T. missed the whole day of instruction. So I know you wrote here that parent took consent, consent was taken. Just for record because nobody from the district including case manager ever responded to any request when it came to speech.

But thank you for that. And I think it's very important to work a little bit with Student A.T. because one issue that arise during, I believe this was during counseling session when he was pulled from speech, from I believe it was science, he

would miss 20 minutes of science. And when he would go back, he got a zero for all these assignments that he was not present.

So this has to be a little bit better communication, so I can work with him home, put the expectations, you put your expectations and everybody's in the same page because if he's going to miss even gym and gym gives him zero for not being in gym, that's not productive.

MS. SWICK: I don't think -- at least I can speak for gym, that they typically don't give --

MS. L.T.: I'm just joking. (Inaudible) so I don't offend anybody.

MS. SWICK: You know, I think three times a week is a lot, especially at the high school level, but it's obviously a need for Student A.T.. So I mean I guess we could have the discussion would he feel comfortable coming during lunch, you know, once or twice a week would he come, I don't know what time he gets to school, but could we start a session at 8:15 and it runs a few

minutes into his first block, so then he's not missing -- he's still getting his sessions in, but he's not missing as much instructional time. So I think we can be flexible.

MS. L.T.: We need to talk about it because mornings are, Student A.T. has health issues that do interfere tremendously with his attendance and especially in the morning and that becomes an issue. But we will talk, but as long as we can communicate.

MS. SWICK: Yes.

Ms. L.T.: I have never even got a letter that you were the speech therapist, or did I have any feedback from speech therapy. So this is my first. And I appreciate your --

MS. FREEMAN: If I may, there's one suggestion that I would have in that regard, you know, if -- we're not sure based on the past, if he's really going -- if he's going to give more resistance. I know you said you're going to meet with him

to work with him on trying to find a time that everybody's in agreement.

I think another conversation, the topic that should be included in that conversation is in advance figuring out the plan as to what would happen if he missed the class, or missed parts of the class. So you can prepare him in that meeting that if you miss out on -- and ideally he's not missing out on anything, but to the extent that he does, coming up to talk to the teacher ahead of time and saying when you miss this class, this is what will happen, to prepare him for that. So he already knows what to expect, rather than trying to play catch up later and having that fear that something is going to happen.

MS. L.T.: This was reported during the evaluations when he was pulled out. If you noticed all the evaluators, including yourself, noticed that Student A.T. was kind of concerned when he was going back to class. Student A.T. is very concerned about failing the class because

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 20 of 146 PageID: 3142


Student A. T. has failed tremendously across the classes and he doesn't want to fail.

Student A. T. works really hard. Student A. T. doesn't accept failing. We don't accept failure. So Student A. T. worries about that part that he'll go back to the class and he will have to catch up. So that communication has to be cleared. And I work very well with Student A. T., I understand Student A. T..

And also in the previous IPO in the future, I would like to you to be a consulting point as the whole CST team to everybody that has contact with Student A. T.. Student A. T. has gotten one detention and one, I think it's called administrative warning, directly for his speech, for his disability. You even mentioned it, he could be insulting.

He also was pulled out of one of the classes from his aide because he, according to him, was insulting to a kid. But nobody, nobody, I guess, understands certain things or understands Student A. T..

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 21 of 146 PageID: 3143


So I would like you to be a little bit to explain. You explained it perfectly and I heard you and understood you. But we cannot put Student A.T. in a detention because Student A.T. says, but I don't --

MS. FREEMAN: I think she was disconnected or something. I just saw that she left the meeting. There you go.

MS. SWICK: I had a little connection --

MS. FREEMAN: Welcome back. If you didn't like what you had to say, you didn't have to leave right away. You can hang out a little bit longer.

MS. L.T.: You are very knowledgeable as always. I always loved my speech therapist. The speech therapist understood that his disabilities, they were very on top of it. But it's concerning to me as a parent that the child Student A.T. -- I can give you with a hundred percent, Student A.T. doesn't come with the intention to tell any of you anything mean. He says something --

MS. SWICK: Correct, I know that.

MS. L.T.: -- cross like that, And for a teacher to report him to the supervisors for something like that, I just don't think it's correct.

Another thing that I would like you to address through your goals, because it's hard in my part, I'm not in the school -- one example happened I think in October. There are kids with disabilities in the school. Student A.T. had never seen a child in a wheelchair until he came to the high school. So very generally, Student A.T. has asked why the child is in the wheelchair. Instead of a professional explaining to Student A.T. why he's in the wheelchair, he was told, don't talk, don't ask, it's inappropriate.

Not only Student A.T. didn't understand why this was inappropriate because he asked a straight question, but also he will not talk to this other child now because something is inappropriate. So

a little bit more the social cues. Yes, Student A.T. knows his grandpa is in a wheelchair and that's what he knows. So he doesn't know why a kid would be in a wheelchair, as much as we try to say.

So sometimes the adults around Student A.T. might need a little bit better understanding, especially paraprofessionals. You cannot just tell him don't talk to the kid because this is not fair even to the kid at this point --

MS. SWICK: Right.

MS. L.T.: -- because don't talk because it's not appropriate. Even with the teachers, especially the detentions, it's very disappointing to me that staff that is in charge of school education and to still punish a kid for something he says. And the last time Ms. Rebelo was part of this, I think. He came to your office and we were told from the assistant principal that you'd follow-up and we didn't get a follow-up from you or any counseling sessions coming from that.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 24 of 146 PageID: 3146


So I need this speech -- I would like, not I need, I would like the speech therapist to be involved a little bit with the pragmatics.

MS. SWICK: Absolutely. We can definitely work together, Ms. Rebelo and I, right, because Student A.T. does have significant pragmatic needs and he definitely misunderstands another person's perspective. So I'm happy to support Ms. Rebelo and Student A.T..

MS. L.T.: Thank you.

MS. FREEMAN: Is there a social thinking curriculum that you can infuse into the program?

MS. SWICK: So I don't specifically use, like I read the report from the outside evaluator and I'm familiar with Michelle Garcia Winner's, I laugh. And I definitely use components of it. I'm not officially trained in it. I definitely do use that.

And I think the other one that she recommended is a little bit more

juvenile. I believe it's like an elementary school kind of model. Definitely could be adapted for Student A.T. and his needs for sure. So I'll definitely look into that and see what aspects we could use in his sessions.

But I definitely do a lot of inferencing in my groups. We do a lot of videoing. We watch silent, commercials on silent to try to figure out what's going on, what's the dialogue, what are people, you know, what would you predict that someone would say, how would you react? What is their body language? So we do use a lot of that in my sessions already. And that's kind of part of some of the I Laugh model.

And, honestly, a lot of it is a lot of probiem solving, too. Like kids come in with an issue and we kind of work through it. So I don't have a curriculum, per se, but it's just making their day easier and just a better happier day, just so we can navigate social probiems as they come up.

MS. FREEMAN: Okay. I'm wondering if, and I haven't spoken to Mr. and Ms. T. about this, so I don't know if this is a good idea. But I'm just wondering if before putting in, if we put something into the IEP that, you know, that they talk to you before giving him a detention or giving him any type of punishment because, you know, for his -- to -- so you can assess whether it's knowing him, having worked with him, if you're working with him three days a week, you're going to know, or three times a cycle, whatever it is, you're going to know him and know what his intentions are.

So maybe they can consult with you and you can talk through it, as opposed to punishing him. Maybe they talk to you and you work through it and to explain why it was wrong and using it as a teaching opportunity rather than taking something away.

MS. SWICK: That sounds good to me.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 27 of 146 PageID: 3149


MS. REBELO: Hi. So I just want to clarify. An administrative warning is just a documentation that the student was spoken to. So the issue that you're referring to, it was Mr. Dillon, myself, and Mrs. Joworisak, the school counselor, and we all sat down and talked to Student A.T. about what happened. We talked about, he brought up that in the past people have used the expression to say it or swallow it. And we used that to kind of say, okay, is this something that we should say or swallow, and we talked through the situation.

He did not receive any punishment. An administrative warning is just a documentation that there was an issue that happened. We all sat down and talked about it and talked to Student A.T. about it, so he could understand what was going on and why those are things that we should not say.

MS. FREEMAN: Okay, so you're a student and you're in a room with somebody -- so he has perspective,

challenges with perspective taking, reading between the lines. And now he says something and he's in a room with three people, three adults, right. So think from his perspective, that's a punishment, like he did something wrong. And it might not have been an appropriate, but working through with one person is different from working through it with three people, right? It's a very -- you are sending a very different message, a message that he already has trouble interpreting.

Ms. L.T.: Ms. Rebelo, just for a little bit of perspective, because you joined recently, a lot of times the case manager was used as if you do this, you're going to go there. If you do this, you're going to go to assistant principal. So he has the perception -- I did never complain like I don't like Ms. Robelo or anything like that because Student A.T. will tell you when he doesn't like you.

It's just that the fear that if they call me, I'm in trouble. Forget

about the assistant principal, principal. He probably thinks they're going to send him to jail. That's his perception of them. So a little bit a better approach. I'm not saying if he did something wrong not to address it, but he doesn't see coming to any of your offices as a reward because none of, except Ms. Jowori sak, nobody in this office, the guidance if I'm saying her last name correctly, nobody in this office has ever treated Student A. T. nieely.

So Student A. T. doesn't feel like, okay, I'm going there because I did something good. Student A. T. was constantly punished. So you have to understand, Student A. T. went and advocated for help and was just ignored. So you have to see, like your position has to be seen a little bit -- Just we can talk how to approach Student A. T., that's the only point I'm trying to make, so you can have a relationship with Student A. T., too. If Student A. T. needs to advocate for something, right now Student A. T. has nobody that he trusts to come to.

This is where the concern starts.

So if he feels I'm going there, I'm in trouble. You called him for a session, Student A.T. texts, mom, I'm in trouble. And I'm like, just go. I asked before the evaluations what dates are the evaluations going to be, so I could prepare Student A.T., but it was sent to my attorney. And the reason I asked was because Student A.T. feels I'm going there to be punished. He doesn't think like, okay, I'm just being, you know, taking a test. That's the background.

MS. FITZHENRY: So just to clarify something that you brought up, Hillary, you know, Ms. Swick can definitely be consulted. So when any of her students that she currently has on her caseload, there's an issue with them, we always consult with her when, you know, situations arise in the classroom or in the hallway, so that she can follow-up. And, you know, unfortunately, we would have been doing that all year, but, you know, he wasn't in

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 31 of 146 PageID: 3153


speech.

As far as putting that in the IEP and what administration can do and procedures and protocols that are in place, she has no say on what goes on with administration. She gives her input, what she thinks. So that piece won't go in the IEP.

MS. L.T.: He's not in speech, he was not in speech because you all refused to respond to any e-mail that requested that I asked for meeting with speech and Student A.T. was refusing to come to school, that's a fact. And I had to pick because nobody responded, Ms. Henry, Mrs. Rojas, maybe Ms. Howland on some of these e-mails. I had to make a decision to traumatize my child, to let him segregated, to leave him home, or to take off the 30 minutes of speech.

Because as a parent, I have to make very -- I have to make decisions that do not affect my child's mental health. It's not like I didn't want speech. I never spoke to Ms. Swick. I asked Mrs. Rojas

several times on the phone or in e-mail to talk to Mrs. Swick. And also you had the paraprofessional in classroom that was completely not professional and was going to speech with Student A.T. for some reasons. I don't know why. And was harassing Student A.T. in the hallways, following him around. You know very well about this, this was written.

So Mrs. Swick is not a kind of a probiem or Student A.T. or myself, it's the communication. It was a complete disaster and Student A.T. missed speech. And I still, after I took the consent away, I asked three times for a meeting. And to this day, we do not have a response to that request.

MS. FREEMAN: So with respect to the IEP and administration, we have to put in something about the -- about what happens, what steps should be put in place before he is punished. So whether it's through a behavior plan, you know that -- that might be an idea to address that, if

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 33 of 146 PageID: 3155


it's a manifestation of his disability, he shouldn't be punished because the punishments are not working. That's just making everything worse across the board.

So I'm not saying, you know, under any circumstance he shouldn't be punished. But at least there should be a meeting, especially with the parents and attorneys if necessary to go over what happened and how, the proper way of addressing it, maybe a behaviorist, you know. But like I -- that solution is not working. So I'm not sure what you --

MS. REBELO: I just want to clarify again, an administrative warning is not a punishment.

MS. L.T.: Ms. Rebelo, you came I believe in January. Student A.T. had detention in November and two detentions in November. And a timeline of this detention, I have questions about that too. So one of them, Student A.T. got a detention letter from the assistant principal a Friday afternoon, came home traumatized because

Student A.T. had never in detention.

We sent an -- we called the assistant principal, he went Monday in detention without -- I don't know if Ms. Rebelo is here, he want Monday in detention. We still didn't know what happened. We wrote an e-mail to the case manager who send us to the attorney. Mrs. Howland sent us to the attorney for questions.

So seven days after, and I have a timeline, maybe five or seven, we got hold of Mr. Dillon to find out exactly what happened. There is more probiems. So communication is not there. It's okay. He makes a mistake, he gets a detention, we get that. We live in a world, you know, where there's rules and regulations and we have to follow. Sometimes it doesn't apply to all of us, but we all understand that. But the communication of it was very poor. So that's what we are trying to prevent.

MS. FREEMAN: So --

MS. L.T.: Sorry, I don't get like the process at all. I do not get how

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 35 of 146 PageID: 3157


some people are responsible of when they -- when those school procedures -- I just read your last two meetings in the Board of Ed of school procedures and all the regulations that passed and I wonder how it doesn't apply to anybody else but to Student A.T..

MS. FREEMAN: I guess what we're asking for is a plan, okay. So we get, you know, to a point. I mean we understand detentions happen. But under the circumstances, there were products of his disability, manifestations of his disability.

Ms. Rebelo, I know you said that that wasn't -- the administrative warning wasn't a punishment. I heard you on that. We understand, we as adults collectively understand that. Student A.T. did not.

And so if it was just you, I don't know if that would've made a difference. If it was one person, I don't know if that would have made a difference. But three adults talking to him about what

he did is not sending a message that he's not in trouble, okay. So it's -- you know, and he follows rules, right, and he's very strict on his rules. And he applies that everywhere. He doesn't read between, he has difficulty transitioning from one situation to another. These are challenges that he faces and that's evident in his speech and language evaluation.

So the point being is that, and what we are asking for through this IEP and we welcome any input from anyone, you know, right now, how can we -- what steps are -- what wording can we put in the IEP to address situations that are outside of speech that are getting him into trouble, without actually getting him into -- without punishing him?

Anyone?

MR. D'COSTA: Hillary, I want to make sure that the IEP accurately reflects the parents' concerns here. I think the concern is that the parents are requesting a consult with the department,

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 37 of 146 PageID: 3159


with the child study team, with his IEP team, before the student is spoken to in a way in which the student might misinterpret that he is being punished. Is that accurate?

MS. FREEMAN: That's one strategy that we could put into place, but that's not going to address the entire situation because that's one strategy. So what Ms. L.T. was saying is she would like, you know, to be contacted and have a contact like, you know, to prepare him for various situations that he'll be pulled out of class that might be unexpected. That's partially.

But the second piece is before punishing him, in fact, maybe we don't punish him until certain things take place. One being maybe a meeting where the parents can explain, can have some context of the situation to talk him through it. Another situation might be a meeting with Ms. Swick to talk about going through, using that as an instruction, a learning opportunity to talk about what he could have done better.

So those strategies can be put in place. But, you know, just a meeting with the parents before the detention is given, I don't think that that's going to solve the issue. Because number one, there seems to be issues with coordinating meetings with the parents and the district. And so I'm afraid that's not going to happen.

And two, I'm not sure if that is going to make a difference because if Mr. or Mrs. T. give their input, so far the history has shown it hasn't made a difference. So if that changes, that would be wonderful. But so far, it hasn't made a difference.

MR. D'COSTA: I think at this point we can move on to the programming that the district's proposing and document that as a concern at this point.

MS. FREEMAN: I am asking for some input. We're talking about this one topic, and I understand you're documenting as a parent concern, but nobody has offered

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 39 of 146 PageID: 3161


any suggestions on how to make those -- on what the solution is. So can you offer some suggestions?

DR. HOWLAND: So my concern with all of this is that students have a right to due process when there is a disciplinary incident. So calling the parent prior to even describing or exploring due process with the student, there's really nothing to call and say. Because the child is, has a right to due process for his conduct.

So to call a parent and say, listen, this is what your child did and we're going to have a conversation and the consequence is X, or there is no consequence, or the consequence is Y, is premature to even allowing the child to have part and parcel of his due process procedure. And that's outlined as well, so he has to have that.

And the other issue is since the parents do have representation, the district is also entitled to representation.

So that is not going to change. That is how the district proceeds. So that is going to be an issue if we're waiting for the parent to get representation to have conversations with us, waiting to get representation. It's not conducive to any flow of the day.

And we also, we can't have, when Student A.T. is in his class, have parents reaching out to him, talking to him, like get ready, they are going to bring you down to the office. That's not an appropriate use of his technology when he's supposed to be sitting in class and learning.

So we need to consider the request as a team. And, again, none of us have the right at this time based on his eligibility classification and the fact that he does not have a BIP, to tell the administration you can't meet with him until you've spoken with a parent. That is not an option.

So what we need to do, and I know that you are saying well then we should

do an FBA and come up with a BIP, but at the same time --

MS. L.T.: (Inaudible.)

DR. HOWLAND: Well, that was the last meeting. So at the same time, as I look at his conduct in two almost full years of school, to have two lunch detentions and there's an administrative warning marked, you know that doesn't rise to any warrant of really looking at a manifestation determination because he's not been removed from his program in any way, shape or form due to any of his perceived misconduct.

MS. FREEMAN: I think the request is not being -- I might not be clear on the request. So what I'm asking for is I'm saying he's misinterpreting different situations, okay. We can anticipate that there will be more situations that he's misinterpreting because that's a product of his disability, okay, a manifestation of his disability. We can anticipate that.

So we're asking for your help in coming up with strategies on how to

address it. One way of doing it, which I think is great, are the individual speech sessions and the group sessions on just teaching him skills and interpretation on pragmatics, right, and perspective taking, et cetera, so I think that's great. And Ms. Swick clearly is confident, you know, and knows what -- and is competent that she understands him and has the strategies to support him is also great, okay. So from that perspective, that's one step.

But then the next step that we're asking about is what's going to happen when she -- if and when another situation occurs, okay, that -- where he's misinterpreting the situation, okay. We're not asking -- the ask right now is in part to notify the parents because they have a right to know that, right, but that's not the request that I'm asking for at this moment.

This is an IEP, an IEP meeting and we're asking for not the limitations on what you can't do and the probiems with it.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 43 of 146 PageID: 3165


We're asking for your ideas on how we can address it in the moment, okay. So it's not a matter of the parents contacting the district. It's hey, you have a bunch of staff, what are different ways that we can address it in the moment because we can anticipate that it's going to happen again.

DR. HOWLAND: And like I said, the team needs to meet to discuss that. So we won't be able to do that right now.

MS. L.T.: Ms. Holland, let me just give you some perspective. So we are all educators or in this field, mental health is important. Student A.T. doesn't suffer from anything very troubling or anything like that. But by the actions taken, anxiety has gone up. We had to address this privately because school doesn't address any of it.

You cannot just tell a child you are in trouble and there is no help coming to you, and he doesn't know why. So it's more like how to address Student A.T., not about let's meet the team in two years

and figure out how to do this. It's about at the moment when this happens, maybe, I'm just saying, Ms. Dagato is not the right person to talk to him, maybe somebody else. So the person that talks, that gives him the message is very important.

DR. HOWLAND: Does he have an anxiety diagnosis? I don't think that we were aware of that.

MS. L.T.: No, he doesn't have an anxiety diagnosis.

MS. FREEMAN: Anxiety is comorbid with autism on a regular basis. So when he doesn't understand the situation, when he's not prepared for the situation, anxiety comes along with that. So there's a ton of research about it and I can send it to you if I need to, but I don't think I do because I think we all know that, right?

DR. HOWLAND: Right. But currently he's classified as communication impaired, not autism.

MS. FREEMAN: I know, but he has an autism diagnosis.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 45 of 146 PageID: 3167


DR. HOWLAND: Right, but that doesn't -- those aren't the same things. You can have many diagnoses, but it depends on what's impacting. And while I don't doubt that, and we know anxiety can be comorbid with autism, but a lot of different things can. So without that medical diagnosis, which we would love to review so that we can absolutely incorporate that as well, that would actually be really, really helpful in this situation.

MS. L.T.: Mrs. Holland, as somebody who suffers from language and you keeps interrupting me and always talk down to me, I can tell you that somebody who has a disability with speech, even if it's a born one or one that is during life, has some type of anxiety. And he's a 15-year-old. So when you talk to people the way you guys sometimes talk to them, he probably, he's anxious. It doesn't mean he's an anxiety diagnosis and you know very well.

So you are an educator. We

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 46 of 146 PageID: 3168


all can agree that in certain situations people are anxious and the kids are anxious. So all we are saying is he gets anxious from the way he's addressed. Can he be addressed a little bit in a nicer way? That's all. Like it's easy when you talk because you are in your own language, I'm not. So I might sound anxious to you, doesn't mean that I am.

DR. HOWLAND: So with that you bring up a --

MS. L.T.: Student A.T. has language and speech disability. So when he gets anxious, he might talk a little bit different. And then he gets in more in trouble because he's speaking a little bit different.

DR. HOWLAND: So I'm hearing what you're saying and I am agreeing with you that he probably does get anxious when people are speaking to him because he doesn't really get the context, which would also be a manifestation of the autism, meaning that he could be misinterpreting

social cues at that time as well. And I feel that the staff that work with him daily would be better off to weigh in on that.

But again, if it's Student A.T. who is misinterpreting the cues and it's not the actual situations themselves, we would want to work to ensure that, you know, Student A.T. gets counseling after the situation to ensure that he understands what happened. And that's actually in part of our district regulations for student discipline as well, the counseling component.

MS. FREEMAN: So who is the -- thank you for that. Who is the counselor that he would be meeting with under those circumstances?

DR. HOWLAND: So that could either be the school counselor or the case manager. He has counseling. Didn't we talk about that last time, that it's in the IEP that he's getting counseling. But that counseling is a scheduled counseling session. This, obviously, would be ad hoc.

We wouldn't make him wait until the next counseling session for something like that.

That is something based on the known autism diagnosis that we absolutely could put in the IEP that after an incident, that he should meet with a counselor to help him work through and understand the situation. That absolutely makes sense.

MS. FREEMAN: And would it be with the counselor that he's currently meeting with, or would it be someone different?

DR. HOWLAND: I wouldn't want to just say only the counselor he's meeting with simply because if that person isn't there, let's say they get sick and they're out for three days, we wouldn't want Student A.T. to wait three days to meet with somebody.

But I mean in Colts Neck High School, I know very well that they wouldn't say, hey stranger, come meet with this kid real quick because it's in the IEP. It would be someone who is familiar with him

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 49 of 146 PageID: 3171


because, otherwise, that would just probably be more confusing for the student to say, hey, come meet with a stranger to recap what's going on here.

MS. FREEMAN: Yeah, I think we all agree on that, so thank you for that.

DR. HOWLAND: You could say Familiar counselor is something that we agree.

MS. FREEMAN: Right. So if we say somebody who's familiar with him and the IEP, I would like to say that. And then also the other piece is Mr. and Mrs. T. to be prepared for that because I don't know the timing in which you'd be meeting with the counselor. But what I can anticipate is somebody who is more routine oriented, it could be pulled out unnecessary -- I mean, I'm not going to say it's unnecessary, it probably is. But if he's not prepared for it, then it can really go downhill. So we need a way of preparing him for that.

DR. HOWLAND: So I would think, I would gather that, you know, I

think front-loading that, you are correct is important. So I think that a meeting at his next true counseling session to say, listen, you know -- and whoever works with him best to describe it, to let him know that that would be something that we want to make sure you understand, so we are going to meet with you afterwards.

And then as he's transitioning either from said disciplinary situation or during the disciplinary situation, that it is explicitly said to him that we're just going to recap and meet. I want to make sure you understand that, you know, you're not in trouble. Or you know what, this was a mistake and we're going to work on, you know, things like that.

Again, what a counselor would do with any child that exhibits an upset reaction after, you know, perceiving getting in trouble. And that makes a hundred percent sense. I know that our assistant principals do typically reach out to parents afterwards, whether it's via e-mail or a

phone call to let them know, you know, I met with your kid today, this is what happened. And that also, that's protocol.

It's the meeting beforehand or getting in touch beforehand, just so you know this is going to happen, you know, that's a little different. And I know that it is a sense, it causes a sense of anxiety for Student A.T. to be pulled out of class. That's pretty unavoidable. And that's something I do also feel the team would have to brainstorm on how to do that with him and for him. Because it's not like we can just wait, oh, it's a natural transition, you're walking to science, but go this way instead. That's going to mess him up just as much as pulling him out of class. He'll be like, no, I'm supposed to go here, Why are you making me go there. So that's something that the team needs to work with.

MS. L.T.: Also, Student A.T. is flexible. The only issue when Student A.T. is not flexible is when he's not sure what trouble is there. So is he being

pulled out of science or English or a class because he's in trouble, or because he's supposed to go there and something good might come out of it. This is where -- it's Student A.T.'s personality. That's where Student A.T. stands.

Student A.T. is not afraid to go to Ms. Swick in speech, it's not like he doesn't like her. But how about when he goes back, is he going to be in trouble from X, Y, Z teacher because he didn't complete the work now, and then it's trouble. So Student A.T. kind of internalizes it a little bit more than he should, instead of like -- and I tell him like, okay, you don't have to worry about it, you just continue. But he internalizes that and that's where.

MS. FREEMAN: He acts like a lawyer. He anticipates probiems.

DR. HOWLAND: Can I just ask one quick question, Ms. Fitzhenry, because you'll know the answer to this. So when any student returns from speech, or OT, or the

main office, et cetera, are they sent back with a pass so that, you know -- they're sent back with a pass, right?

MS. FITZHENRY: Yes.

DR. HOWLAND: So that pass would speak for Student A.T. that he's not getting in trouble. He was with Ms. Swick, he was with Ms. Dagato.

MS. FITZHENRY: Right. So typically kids check in with their teacher and then they go.

DR. HOWLAND: Right.

MS. FITZHENRY: They don't typically go directly to speech. But, you know, something to be proactive with What we could do is because Student A.T.'s schedule is such that he's in right now the gen ed courses, we could have all of those gen ed teachers come down and just have a brief meeting with them, with the special ed teachers, with Ms. Swick there to just go over what she's working on with him. And when he returns to class, you know, things that would make it easier for him to come

back to class while he's missed that, right.

And so that they're all aware and that if they have a question about it, they can reach out to her directly. If there's a continual issue with it, the teacher could reach out to her directly. When he comes back from speech, you know, he's missing the instructional part at the beginning of class. So, you know, we have to catch him up on that with the notes. Or he's coming back and they're in a lab and, you know, that's difficult for him, so I provided this as a modification, or whatever it is, or he's continuing to struggle if that's the issue.

But there could be a direct line then between Ms. Swick and the teacher, as opposed to a circle of saying the teacher is saying this, and then going to the case manager, and then the case manager then going to Ms. Swick, but Ms. Swick isn't in the building until, you know, Tuesday because she missed her -- because she's over at Marlboro or something like that.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 55 of 146 PageID: 3177


So it would just kind of facilitate that. And she'd be able to also answer questions with the whole group together as well. So I think that might be helpful as far as proactively setting him up for a positive experience.

MS. L.T.: I agree with that, thank you.

MS. REBELO: And in regards to the counseling, you know, right now he has not -- I've been checking in with him, we haven't been doing counseling really because that was declined. I am recommending for that to come back. It was previously in there two times a month for 20 minutes. So I would recommend to start it with that and it would be the same thing, you know.

I can come up with a schedule ahead of time, so you can prepare him for when he is going to come down. I can work with Ms. Swick so she can let me know the things that are going on in their sessions, so that I can kind of follow up with that as well and, you know, work on goals that are

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 56 of 146 PageID: 3178


aligned with what he's working with Ms. Swick as well.

MS. FREEMAN: Okay. So what is the difference between counseling and -- what you'd be working on in counseling and what Ms. Swick would be working on in her one-on-one speech sessions?

MS. REBELO: Counseling really addresses more of the social/emotional piece if there are things that are causing him anxiety, or if he's having any issues in his classes. Mrs. Swick, you know, you could talk a little bit more. But yours are more directly related to the expressive and receptive language goals, correct?

MS. SWICK: Yes.

MS. FREEMAN: But social thinking if we're doing that, it's also understanding situations and how to interpret situations, right?

MS. SWICK: Yeah. And I think that Ms. Rebelo and I could probably do a co-treat one time. I'm happy to have her come into my session, so that we are

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 57 of 146 PageID: 3179


definitely truly aligned in Student A.T.'s goals. And she can use the same language I'm using with him in our sessions, in her sessions. So I think that that might be a good idea maybe once a month, maybe we could do a co-treat.

MS. FREEMAN: Well, do you think he'll get intimidated by that?

MS. SWICK: Well, that's -- yeah, that's definitely a conversation we could try to have with him, but I'm open to the idea if he's open to it and he feels comfortable. If it's a source of anxiety for him, then, of course, I'm not going to put him in that situation. But it is something that we could definitely try to do.

MS. FREEMAN: Can we ask him what his thoughts are on it maybe before making a decision?

MS. SWICK: Sure.

MS. FREEMAN: Because I think that that would be important. I don't know if he's going to understand the differences.

I know that that's obviously what you're going to be working on. But on the flip side, at least in the interim, I don't know if he's going to be understanding the differences between the two. And he might just look at it as being redundant. Because, you know, talking about the situation and then obviously his feelings are going to come with those conversations and speech, I just don't know if he's going to think of it as redundant. And if he does, then we have to figure out another way of motivating him.

MS. SWICK: Okay.

MS. FREEMAN: So I don't know who wants to -- Ms. Swick maybe, I don't know if you want to take the lead on that in terms of talking to him and explaining the difference.

MS. SWICK: Sure.

MS. FREEMAN: Okay.

MS. SWICK: I just want to make sure that he's going to know that we will be starting speech up first, before I

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 59 of 146 PageID: 3181


go and just bring all this information to him. I don't want to stress him out either.

MS. FREEMAN: So when do you think that -- do you have any idea, I mean, I am not holding you to this right now, I mean I'll give you five minutes to come up with something, but when do you think, do you have any idea when you'll be pulling him out? So then Mr. and Mrs. T. can prepare him?

MS. SWICK: So I'm not in the building on B and C days, so it won't be this week. But next week, you know, I have some time I can see him. On D day, I can make an appointment, so that's Monday. D day I could try and find him and have these conversations. So that would be on Monday.

So over the weekend, you have time to talk to him or the rest of this week and over the weekend. So if there's something that's concerning to him, mom, you can reach out to me and let me know and we could kind of troubleshoot that before I speak with him on Monday.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 60 of 146 PageID: 3182


MS. L.T.: I will talk to him.

MS. SWICK: Okay.

MS. L.T.: Start the conversation. Whenever you can or whenever you find out exactly what class, roughly, you might be taking him, so I can ensure him that no penalty in the class is going to happen.

MS. SWICK: Right. And you know what, it is like towards the end of the year, so I don't -- I think that might also be a source of anxiety.

MS. L.T.: Well, he failed history. There is no chance of making history to pass for this marking period. So take him out of there as much as you want because nothing is going to change in the class. Nothing has changed, nothing will. So history is usually the end of the day. So use that six, seven minutes the best you can.

If it's any class or whatever class, just let me know so I just can give him that heads-up, that's all.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 61 of 146 PageID: 3183


MS. SWICK: Okay.
MS. L.T.: He likes you.
MS. SWICK: I know that he likes me. He greets me in the hallway and I think we have a good rapport, but I don't --
MS. L.T.: I don't think it's an issue at all.
MS. SWICK: Yeah. I just don't want to start a whole new thing and just start, you know, like we discussed, he likes his routine. I don't want to just come at him, hey, we have this whole new schedule, and then he doesn't want to come again. So I just want to make this a bit more positive experience.
MS. L.T.: He will not come during his gym, that's his only break. The only thing that he really enjoys, that and computer class.
MS. SWICK: He won't come during computers.
MS. L.T.: He loves the class. That's the one he enjoys the most, that he participates the most, that it's really

something Student A.T. loves.

MS. SWICK: Okay. I'll take a look at his schedule and I'll speak to him like I said on Monday, let him have a voice in it. Because when I did test him, I did give him his schedule and I said, these are the periods that work for me. What class would you prefer? Just so I didn't add any extra anxiety to him in coming.

So that's just maybe what we'll try to do. I'll look at his schedule, what days work for you, what periods? So then he has a voice and that he's not so anxious in attending and will be acceptive to the therapeutic process.

MS. L.T.: We appreciate that.

MS. FREEMAN: Thank you.

MS. REBELO: In regards to the counseling, would you like me to just continue checking in with him the way I've been doing? Or would you like to really start with the counseling component?

MS. L.T.: One more question. Is it two times a week, or is it four?

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 63 of 146 PageID: 3185


Because the IEP doesn't say twice a month, that's for sure.

MS. REBELO: For the speech or for the counseling?

MS. L.T.: The counseling.

MS. REBELO: The counseling says two times a month.

MS. L.T.: No, not in the IP that -- by the way, if you have a template from Freehold Regional, please share it with us because we have never seen an IEP from Freehold Regional. I still have the one from Colts Neck.

So the one that I have says 20 minutes in a seven-day cycle. So I don't know what's on your IEPs, I've never seen the amendments done or anything like that, so we have never received. And before my computer shuts down, I --

MS. FREEMAN: You got to get the power cord. Do you have a different IEP? I am with Ms. T., I don't have an IEP that says Freehold on top of it.

MS. REBELO: I think that's

the Stay Put, so I believe there hasn't.

MS. FREEMAN: Okay.

MS. REBELO: I mean we've created a draft that we're working through. We'd like to get to talk about our eligibility and programming.

MS. FREEMAN: That'd be great. But can we get that draft so we have something to review, so we can see it along with you, as opposed to on the screen, or at all, not at all?

MS. REBELO: I'm not sure. Somebody else will answer that question.

MS. FREEMAN: What would be the issue if everybody else is working from a draft that -- with us seeing it, too?

Anyone?

DR. HOWLAND: As long as it's definitely a draft. It says draft on the top, that's fine.

MS. FREEMAN: We hope it does because we want to see it, too.

DR. HOWLAND: And I apologize, you guys have to hear me clicking. I

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 65 of 146 PageID: 3187


thought I muted myself before and I didn't.

MS. REBELO: Can you just give me a second? I just got to share my screen then.

MS. FREEMAN: Well, I mean also e-mail it to us.

MS. L.T.: I will need to prInt It out because I'm processing in two languages and I have to follow what you say, keep notes, and check everything. So I will need to print it out. I cannot even see in the screen.

So before I forget, did we finIsh with the evaluations? Last IEP meeting, during the IP meeting I received an e-mail that corrected the title of the evaluation.

Can anybody hear me?

MS. FREEMAN: Ms. Rebelo, we really need to have you e-mail it to us. We can't see it on the screen.

MS. REBELO: Okay. You're golng to have to give me a couple minutes then, because I'm looking at IEP Direct,

which is a website. So I've got to download, process, and work through that. So you're going to have to give me a couple minutes if anyone wants to continue talking.

MS. L.T.: Ms. Fitzhenry or Ms. Holland, the e-mails from Frontline, who sends them out?

MS. FITZHENRY: Typically, well it depends on which e-mails they are. So some of the e-mails go through central office and some go through process tracking and things like that. Some go through the case manager.

MS. L.T.: Who changed the evaluation title as we were in a meeting here last week?

MS. FITZHENRY: So the title on that evaluation was, originally it was a psycho-ed, right? But because Mrs. Rojas went out when she broke her arm, she had completed the psychological piece. She had not completed the educational piece yet. So the educational piece was done separately.

So we just changed the --

nothing else changed, we just changed the title of that. It was an oversight that it wasn't the right title. She went out, you know, she had completed all of the testing, scored everything and whatnot. And she didn't have the opportunity to do the educational. So someone else did the educational.

Otherwise, if she was still here, she would have done both pieces and it would have been a psycho-ed.

MS. L.T.: What's the difference between a psycho-ed and an educational?

MS. FITZHENRY: Nothing. It's just that the same -- as far as the testing, nothing. It's just that the same person does the testing. So in a psycho-ed, the school psychologist who is certified to do both the educational piece and the psychological piece, does all of the testing.

When you have an educational, which is separate, a learning disabilities

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 68 of 146 PageID: 3190


consultant does that testing. The testing is the same, though.

MS. L.T.: I asked this question in February last year, how come nobody could respond to this?

MS. FITZHENRY: I --

MS. L.T.: I asked this in writing.

MS. FITZHENRY: In writing. My assumption is that that went through the attorneys because you had --

MS. L.T.: No, it came straight to you. Straight to you, to Mrs. Rojas, and I believe Ms. Howland, I'll check in my e-mails.

MS. FITZHENRY: Right. So --

MS. L.T.: I mailed it in the mail. I sent it in the e-mail I had because your initial consent paper didn't have anything checked on, had some boxes unrelated to whatever. So that was my question and nobody explained this. And then we do these evaluations on the list that you send me for consent, educational

and psychological are separate, are not the education. So if you wanted psychological or an educational, you should have asked for that.

But you got a consent for psychoeducation and there's no social part of any of them. Nobody interviews anybody. Nobody asks any question. Nobody gets our concerns. Nothing. It's just like these evaluations are just done. And we requested the scorecard. Did we get those that we requested last meeting?

MS. FITZHENRY: You requested what? Excuse me.

MS. L.T.: The score sheets.

MS. FITZHENRY: The score sheets, I believe you did, but we don't give out the protocols. The protocols are part of --

MS. L.T.: Give it to look at them because we were asking for tests.

MS. FITZHENRY: Yeah, I know that you were asking for those, but the protocols are part of the evaluation and

they're not shared.

MS. FREEMAN: So we are not -- so the two different points. I'm going to backtrack and then I'm going to come back for a moment.

So one would be the issue with last year, just for clarification, Mr. and Mrs. T. did ask when the district wasn't getting their consent for the evaluations, there's a correspondence asking for a follow-up meeting to discuss these evaluations and the need for it to answer any questions, as well as those e-mails. That was not responded to, so that meeting didn't take place. So that's one piece of it.

But also with respect to the last meeting, we're not asking -- I mean protocols can be shared to another professional and we can agree to keep that confidential. To the extent it needs to go through attorneys, it's fine. But we did have questions and Mr. and Mrs. T. did specifically ask for, to understand more of

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 71 of 146 PageID: 3193


his performance on the different tests. She did ask in the last meeting and nobody said that we are not going to give this to you in the next meeting. Nobody said we're not going to give it to you at all until today.

So we need to have some clarification on how he answered the questions to understand more about Student A.T.. So if you're not going to give the protocols, I understand that for other legal reasons, at least we would like more of a breakdown on the questions to review them to go over so to understand, you know, how it was answered, what kind of questions they were, to see if there are any nuances that they need to pay attention to.

MS. FITZHENRY: Sure. I mean that could be reviewed again because the protocols are now -- we have the protocols. At the meeting, Ms. Rebelo didn't have the protocols. So she can review the protocols and she can speak to each thing if you want her to speak to each thing and re-explain everything. But the evaluation was

explained.

MS. L.T.: The evaluation --

MS. FITZHENRY: I don't recall specifically, what you specifically asked for.

MS. L.T.: There was no scores of the psychological were not there. So I asked questions if they were done, as I recall now because I don't have a recording with me. And then she said she'll check and she'll get back to us.

MS. FITZHENRY: Okay.

MS. L.T.: And the educational part, we -- I looked at it because after you changed that, now it's not a psychoeducation now it was an educational. So that's the only test you did.

MS. FITZHENRY: Yeah, but that's the --

MS. L.T.: I would like to see the scores and discuss them. Because there's a huge discrepancy in the scores and, like huge between years, between independent evaluations. So between

subtests and we would like to see this to understand better his performance.

Like when we talk about sentence reading fluency, math calculations because now I saw a bigger issue, worse than actually it was even discussed.

MR. D'COSTA: Do you think the document request would be best to go through the attorney, if there is data that you're looking for specifically, Mrs. T., Hillary can put it in writing to me and I can get you a response.

MS. L.T.: Thank you.

MS. FREEMAN: How are we doing on that IEP?

MS. REBELO: So the question that was asked of me wasn't about protocols, it was about the GAI score. And I had explained that the were all completed. I don't know why the GAi score was not reported, but I do have that information. I brought it to this meeting, so I'm not sure if that's something you want.

MS. L.T.: I'm sorry you were

breaking down. What did you say?

MS. FREEMAN: The GAI score that you didn't have, right, Is that what I'm hearing?

MS. REBELO: Yes. I wasn't asked about protocols. I was asked about the GAI score and that I would get back and I brought that to this meeting to review.

MS. L.T.: So those subtests were run and were not reported, or they were not run?

MS. REBELO: Can you hear me? Sorry, I'm having a microphone issue. The GAI score is not something that's always reported, it's just one other piece of information. Generally, it's reported when there is a large discrepancy between the full scale IQ and the GAI score, as the GAI score takes out the working memory and the processing speed. It's just one additional piece of information.

The full scale IQ was an 84 and the GAi score was calculated out to be an 89. So they both fall in the low average

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 75 of 146 PageID: 3197


range. I cannot speak for the person who did the evaluation because I am not them, but I would assume because there was not a large discrepancy, it wasn't something that was specifically noted in the report, but that is the score 89 for the GAI.

MS. FREEMAN: Thank you.

MS. REBELO: You're welcome.

MS. L.T.: Thank you.

MS. FREEMAN: Are you able to send us the IEP, the draft?

MS. REBELO: Yep, I'm working on it. I'm filling out the e-mail now.

Can you spell your e-mail out, or put it in the chat box for me, Ms. Freeman?

MS. FREEMAN: It's Hillary, H-I-L-L-A-R-y@freemanlawoffices.com.

MS. REBELO: Okay. And I think I recall seeing something that Mr. or Mrs. T., one of your e-mail addresses was not correct. Am I remembering that correctly?

MS. L.T.: My husband's work

e-mail is incorrect.

MS. REBELO: Okay. So you have to go into the parent portal to fix that.

MS. L.T.: It doesn't give access to that. His e-mail is not even there. I think it's in your central portals. It's not -- I went three times, I looked around, I checked everything. Except my e-mail, there's no other e-mail there and there's no -- so I don't know how you got the e-mail. I mean I don't know how you got it. Probably was in some old e-mails, but it's not the correct one.

So my husband has the gmail one that he has been communicating with you whenever he communicates. That is his job and it's spelled incorrectly. It doesn't belong to him.

MS. REBELO: Okay. And you don't have access to that in the Genesis parent portal? It doesn't let you switch that?

MS. L.T.: When I go to

Genesis, it's only my e-mail. I don't see his e-mail to switch an e-mail, or to change an e-mail. So there's no other e-mail, but mine. So maybe I don't know, but I don't see it.

MS. REBELO: Okay, no problem. Can you spell out his e-mail then, so I have everybody?

MS. L.T.: A.T.1@gmail.com.

MS. REBELO: That's the number one?

MS. L.T.: Yes, the number one.

MS. REBELO: Thank you. Okay, all right. So now if we can move to the eligibility piece. Student A.T.'s classification has always been the communication impairment. So listening to what everybody is saying, I would like to explore the option of changing the classification to autism. I think that may be more encompassing of the different struggles that he's having.

MS. L.T.: We didn't receive

the draft.

MS. FREEMAN: I got it. I will forward it. And we agree to changing the classification might be appropriate.

MS. L.T.: Just give me a second because I'll need to print it out, so I can follow you.

MS. FREEMAN: I'm sorry, did you get the IEP, or do you want me to forward it to you?

MS. L.T.: I haven't received anything yet. It just came, hold on. Give me a second to take care of the printer and everything else.

MS. REBELO: No probiem. Thank you.

MS. L.T.: I apologize for delay, but I have a slow printer and it starts printing from the last pages. So I have only the five last pages, so give me a few more minutes.

MS. REBELO: Okay, no probiem.

MS. L.T.: Sorry for that. It took forever.

MS. REBELO: That's okay. No worries.

MS. L.T.: I guess technology sometimes is not as fast.

MS. REBELO: So for the eligibility portion of the meeting, you know, we'd like to say that Student A.T. remains eligible. Like I said, we'd like to change the classification to autism. It sounds like everyone is in agreement. Is there any opposition to this, or are we in agreement to that part of the meeting?

MS. FREEMAN: That's fine. Yes, we're in agreement.

MS. REBELO: Okay, great. So then that will conclude the eligibility piece and we will move on to the annual review piece and developing the IEP.

Our general education teacher had to go back to class. Did you want us to find another general education teacher to participate in the meeting, or would it be okay to proceed without them?

MS. FREEMAN: Can you find

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 80 of 146 PageID: 3202


another teacher?

MS. REBELO: Okay, we're just about coming up to lunchtime. So Mrs. Fitzhenry, how do you want to proceed?

MS. FITZHENRY: Why don't you start with the special ed teachers and I'll get ahold of somebody else.

MS. REBELO: Thank you. Alright, so I'm going to let you go Mr. Collier and talk about how he's been doing in class. I'm going to mute myself.

MR. COLLIER: Okay, check one, two, can everybody hear me?

MS. L.T.: Yes.

MS. FREEMAN: Yes.

MR. COLLIER: I'm an old boomer, so technology is a challenge.

I don't even know where to start after listening for an hour. I guess what I'm here to do is just report on how Student A.T. doing, yes, okay.

Student A.T. is doing well with the modifications that he's been given. He's completing his homework, he's

completing his classwork. What we've done is his classwork and homework obviously in his IEP has five days to get work in. So I was looking back to the issue of missing class to go to speech and I was thinking in my mind that that issue was resolved. Because five days to finish whatever classwork assignment was going on, it is true that he would have missed the direct instruction that may have explained how to do the classwork, which is of course an issue.

But I do recall explaining when he returned to class what was necessary to get the work done. And everything we do in class is available on Google classroom all of the time. The classwork is there, the class notes are there. The worksheets are typically there, uniess there is a technology issue such as with a pdf, which are not easily posted on the Google classroom, they're hard to reproduce and post.

All of the tests are modified,

study guides are provided. And Student A.T. is doing reasonably well on the assessments. He's able to, I believe I mentioned the strengths that Student A.T. can look at a graph and tell you, he can maybe identify the labels on the graph and he's able to extrapolate information from the graph and select the correct answer in multiple choice form, especially when the distractor is eliminated and there's three questions instead of four. Student A.T. can sometimes, I would say maybe 60 percent of the time, I don't have hard data, find the correct answer by selecting through the three choices.

What Student A.T. has not been able to do is articulate in the inclusion level class a three to five sentence paragraph explaining the reasons behind the data, make inferences that he can express and articulate, which is the bulk of what we do in a lab environmental science class. He will sometimes get stuck and having heard the agreement on the autism piece makes

sense to me. It rings true. I am by no means an expert in diagnosing anybody with anything, but I believe I kind of understand something when I see it. An example I would give is we will often have a do-now activity, which is simply to get us started, it's intended to take five minutes. We will ask the kids to respond to one or two simple questions. They will jot down an answer and it triggers a class discussion.

Student A.T. will have difficulty moving on from the one question. He wants to copy it down himself in writing. He wants to write it by hand, and then respond to the answers. And we've explained to him, or I have explained to him, that writing down the answer to that particular question on the do-now isn't necessary. It's okay if Student A.T. just simply listens to the discussion and maybe expresses if he has an answer, but we've had difficulty getting him to let go of it. So he's working on a do-now 15, 20 minutes into direct instruction and still looking for the

answers on the do-now.

So what I've done instead is I've just give him the answers, or we'll say they're posted online. And that's typically what we do. Don't worry about it, Student A.T., you and your mom can look at this tonight, we're going to put it online. Sometimes he's okay with that. But typically, he doesn't want to move on from that.

When the paraprofessional who is seated nearby, but doesn't hover, in all honesty is a woman, a warm and friendly person that I would want working with my own kids, she's wonderful. When she attempts to redirect back on task, Student A.T. for whatever reason, and I don't analyze the motives because I don't know what his motives are, but he'd rather she wasn't helping him.

Lately, he has been more receptive to having the paraprofessional help him. And it's typically when he's not quite sure, he'll ask for help, I don't know

how to do this or could you please help me answer this question? At times, he will ignore the paraprofessional and ask me, which I'm perfectly fine with, or he'll ask Mr. Holshu (ph), which is just as well too because he's a content expert. So, he will eventually move on.

What sometimes happens, which is what I've had probably the most difficulty with is, and this is a social piece I think that we were discussing early in the meeting with Ms. Swick, is that Student A.T. will ask questions that have nothing to do with class. He may turn around to a student in the back of the room and ask, weren't you in so-and-so middle school? What grade are you in? Where do you live? Were you in my fifth grade class? And at times, it's very disruptive and he's not easily directed back.

Other times when I think I can be at all flexible, I'll allow it because he's having a nice conversation with kids that he doesn't typically have conversations

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 86 of 146 PageID: 3208


with. I wouldn't even classify them as conversations because there's not a lot of back and forth, but the kids are polite and friendly and they try to be as receptive as they can. But at times, his questions can be a bit off-putting to them. It's not a disciplinary issue at all. I understand the situation and now that I've heard the discussion today, it makes more sense.

So I will do a little bit of that socialization help on my own and I will say I will redirect Student A.T.. One of the questions he asks is why do all the kids from Freehold Borough speak Spanish, which to a few of the Spanish kids in our class might be off-putting. And it's very difficult in front of 30 kids to try to explain how that question might be a bit awkward. I don't want to embarrass Student A.T. and I don't want to belabor it in front of 30 kids. I don't want to offend the Spanish kids who were insulted, and I don't want to interrupt the direct instruction.

I will go over and just talk

quietly and try to get Student A.T. to understand that my answer is about as much as we can expect to do. He will ask me almost on a daily basis, when is the last day of school? He'll ask me almost on a daily basis, did you think the pandemic year were a bad year, or was it a good year? And I've answered that question at least 20 times. And what I'll tell him is I agree with you, I thought it was terrible.

And they said, what do you think of -- or do you like masks? I say, no, I don't like masks and I'm glad we never have to wear them. And that question will happen once a week. At times, it becomes disruptive. And other times, it doesn't and we can get right back to the work at hand.

In terms of the academics, Student A.T. seems genuinely interested in the lab, environmental science subject matter, but has difficulty with the depth into which we go into it. He will often give one word answers that I would say if we were scoring on a standardized test, would

be almost unresponsive. They'll ask a lengthy question about the water cycle causes and effects of a multi-step process and his answer will be it is wet. And that might be the extent of his answer. Whereas if we ask multiple choice questions, he might be able to take a graph of the water cycle and memorize the graph or the diagram or the graphic organizer, and correctly identify a cloud as condensation. But the causes, effects, don't come as easily to them.

And that's basically what I'm seeing. I think I have a decent rapport with Student A.T.. He does say hello to me whenever I see him and I go out of my way to say hello to him. And he's always been very respectful to me. And I see him have a lot of positive interactions with kids. And I like Student A.T.. He's one of my favorite students, to be honest. I don't know if there's anything else I could share.

MS. FREEMAN: I have a question, but am I echoing all of a sudden?

So when you say he's having -- I heard what you were saying about the labs and the tests and elaborating beyond, you know, at least three to five sentences on the tests, is it your impression that he understands it and he is just having trouble expressing what's going on, or is it your impression that he doesn't understand it at all?

MR. COLLIER: Doesn't understand it at all, or at the barest minimum level. I don't believe he understands it and has difficulty articulating it, no.

MS. FREEMAN: What makes you say that?

MR. COLLIER: I question him and ask him to describe it. And it's informal, other than -- what makes me say that is the proof is in the information I'm given. The results on his paper. The results on his paper and the answers to his questions both in writing and orally, he hasn't articulated that he understands

what's going on more than a rudimentary level.

MS. FREEMAN: But the multiple choice questions he's able to answer correctly, or he is not getting that correctly? I'm sorry, you may have said.

MR. COLLIER: At times. It depends on the question. If it's an inferential, if it's a question asking you to make an inference to draw a conclusion, great difficulty with it. If it's a question that says which one of the following is condensation, clouds, the sun, or groundwater? He can memorize it and do that. And he's very good at recalling data and sequence in order.

But in terms of why, is the answer that I don't -- I don't get the answers to why questions. He can tell me who, he can tell me what, he can tell me when, he can tell me where. But why is the piece that trips him up. And in all honesty, everything in education in the last five years has been focused on the why.

It's the most important piece of our standards.

MS. FREEMAN: Okay. So I see that there's a proposal to change his class to an LLD. I'm confirming that was in science, too? I just have to go back.

MR. COLLIER: I believe that's what I recommended. I would have to defer to the team on that in terms of it's that true.

MS. REBELO: I think that overall --

MR. COLLIER: I'll mute myself.

MS. REBELO: And then turn your volume off.

MS. FREEMAN: So I do see that there was a proposal to change. Can you tell me what is it about the LLD class that you think might be appropriate, more appropriate?

MS. REBELO: Are you asking me, or are you asking Mr. Collier?

MS. FREEMAN: I don't know.

Whoever made the recommendation.

MS. REBELO: So overall, Student A.T.'s current levels, it really seems like this would be the best fit for him academic-wise. And where his levels are at and what the teachers are reporting, he's able to completely understand. His levels are commensurate with the LLD program. And that's why that would be the recommendation from the team.

MS. FREEMAN: Right. But what is it specifically about the LLD class that would make this -- would be appropriate for Student A.T.?

MS. REBELO: It's more of a modified curriculum. They move at a slower pace. There's more opportunities for him to be able to get that repetition of the material that you're not able to do in an ICR class that moves extremely quickly.

So for Student A.T.'s case, you know, the modifications are to the assignments, or to, you know, Mr. Collier talking about the multiple choice questions.

In the LLD classroom, they're modifying the curriculum to a level where it can be understood by somebody who is struggling at that level.

MS. FREEMAN: But how would it -- so he has difficulty with the abstract concepts, which is a more obviously language based, and I'm sure we all agree on that. So if it's more language based, how is the LLD class going to help him with the why?

MS. REBELO: Weil, I think it's not just language based. I mean I think this would be a good opportunity. I have our gen ed teacher, I know we told you we had to swap out Mrs. Turriziani, did I butcher your name?

MS. TURRIZIANI: It's Okay.

MS. REBELO: Who teaches math, So I don't think it's just a language base. So I'm going to slide the computer over to her and just have her talk a little bit about how he's doing in math, if that's okay.

MS. FREEMAN: Now, before we

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 94 of 146 PageID: 3216


do that, I really want to know how are we going to teach him the abstract language? What is it about the LLD class that would help him with the why. To go into math, I don't know what that's going to help with that.

MS. SWICK: Can I speak? I was just going to speak about the inferencing and the why. Obviously, we just discussed that that's a big issue for Student A.T.. But I know like in the LLD classroom, there's just so many visuals that are incorporated, especially in the science class. I'm not saying that you're not using them, Mr. Collier. But the graphs are a little bit more simpler. I think that we spoke about Student A.T. being so visual. And I think like having a ton of graphic organizers, a ton of repetition, it's easier for him to make the steps between like an inference -- from learning the information to an inference. Because there's just so many more opportunities and like Ms. Rebelo said, there's just so many more

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 95 of 146 PageID: 3217


opportunities for repetition. And I think that might be helpful to Student A.T. in that environment.

The visual supports, I think would definitely help him. Sorry, Mrs. Fitzhenry, I didn't mean to cut you off.

MS. FITZHENRY: No, that's all right. I mean the curricula is different as well. The curricula is based off of the dynamic learning map standards, or as you would call them standards. And so the curriculum is based on a level of appropriateness towards that content area.

So it's a different curricula than just the gen ed curriculum. Mr. Collier has taught in the LLD program before. And he's taught at that time, I believe it was earth science when you taught then. So, you know, he's familiar with the different levels. Just the pacing is so much different. The assessments, like Ms. Swick said, a ton of visuals within the assessments so that kids can make reference to those. It's a combination of all of

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 96 of 146 PageID: 3218


those things.

Right now, you know, he's in a gen ed class, you know, where the pacing is the pacing. So they can't accommodate the pacing because they move on to the next content, which builds upon what he learned before. So that makes it difficult for a child who's having some processing issues in understanding things to maintain that.

Even though he goes home and he works with his mom extensively, Mrs. T., works very hard with him to hand in all assignments and keep up everything. But I just don't feel as if, and Mr. Collier, I don't want to speak in your place, but feel as if he's really getting the essence of the content before the whole class has moved on.

MS. FREEMAN: Okay. So it sounds -- before we talk about a change in placement, I know the literal differences between the classes. Maybe I'm not making myself -- and I'm echoing. Nope, I'm not anymore. Okay, thank you.

MR. COLLIER: No, that was me

because I want to respond. It takes a moment or two to turn one mic off and obviously --

MS. FREEMAN: Okay, I didn't see that actually happening. But just quickly, so I understand, it's slower pacing, I understand --

MR. COLLIER: It's more than slower pacing. It is a difficult thing. It's an abstract thing. After doing it for 29 years, it's tough to describe. But I can help Student A.T. in the resource LLD setting much more than I can help him in the ICR.

In the ICR class, there are not only 32, 33 students, there's also 10 other classified students. And what I'm basically doing is coming over, assisting a student who needs a little bit of redirection, and moving on to the next kid. I'm checking for understanding, make sure they understand the assignment, and then they are tasked to kind of work independently. And then I'll come back and

make sure they're on the right track. Yeah, this is a good answer. No, that, you know, maybe you want to go here. And I'm moving around very frequently among many kids.

What I find myself having to do with Student A.T. is work almost one-on-one, which means, which is great, I can get it done, but I'm recreating the LLD class within the inclusion class, which is doable if I ignore the other nine kids.

Now, I am much better able to help Student A.T. in the LLD class. And as Ms. Fitzhenry said, I did teach that. And I go back to the water cycle because it's an easier example. In the LLD class, I wouldn't ask them to compare and contrast all of the components. I would simply ask them to identify them. And we might spend a week on the standard that asks why. It might take us a full week.

Whereas in an inclusion class, it might take 20 minutes. And then the second half of the class, now you on your own are independently writing sentences and

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 99 of 146 PageID: 3221


paragraphs to extrapolate the information and demonstrate your understanding. The LLD class is going to take a full week on a particular standard rather than 20 minutes.

And what's happening is Student A.T.'s missing the basics because the class has already moved on to the next step and he's almost three steps behind. The other bit is if we're working in a lab, which we frequently do, in an LLD class, I would direct the lab. It would be me and a smaller group of kids, maybe nine. We'd have the lab right in the middle, it would be hands-on. We'd all be making something that really demonstrates it. We would slow down. And everybody would have a piece.

I'd have paraprofessionals with me and we can really go deeper into a particular topic to help them understand why. And I can also slow down my pace to suit the class. If I see eight or nine kids aren't getting it yet, I put on the brakes and we'll come back tomorrow and review and go over it.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 100 of 146 PageID: 3222


Don't have that luxury in an ICR class because if 25 to 30 kids already understand it, they're ready to move on. The tests come and assessments come fast and furious. And that's probably across the board with not just science, especially in history or math, you're moving on. And we have to, you know, just in the nature of the class.

I love working with LLD one-on-one. And I would love to have him in an LLD class because I can really at that time overcome his communication barriers and I can really dive down and find out really what he does know, simply by talking to them. I have the time. When I have a classroom full of kids working quietly and silently, I can't sit next to Student A.T. for 20, 30 minutes individually and find out if he really does understand why. I can do that in a different environment.

MS. FREEMAN: So two things. One is what I've heard you saying, and please correct me if I'm wrong, but I think

what I heard you saying is that he has difficulty transitioning from one topic to another very easily because he perseverates on certain topics.

Is that fair?

MR. COLLIER: Very fair.

MS. FREEMAN: Yes.

MR. COLLIER: Almost constantly.

MS. FREEMAN: Okay. But I don't see that as a goal in his IEP addressing that. So --

MR. COLLIER: For me, I mean --

MS. FREEMAN: I'm not suggesting it should be coming from you. I mean maybe, but --

MR. COLLIER: No, no. I mean the way I would address that is I didn't see it in there either because all I saw in the IEP was a communication disorder. And his difficulties aren't a manifestation of a communication disorder.

MS. FREEMAN: Okay. So if

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 102 of 146 PageID: 3224


he's perseverating on something, I mean frankly I don't care about the classification. I understand your rationale and I understand that when you understand the diagnoses, then it makes things easier to understand certainly.

MR. COLLIER: Right.

MS. FREEMAN: But in terms of if perseveration is a challenge for him, then I think that that should be a goal in the IEP to help him transition, move off of topics. And my guess, just based on my experience in working with various schools including Freehold, is that a BCBA would be able to help with that, you know, helping him with transitions and stopping with the perseveration.

So in the last IEP meeting, Mr. Collier, I don't think you were here for that, this request, but I did make the request for the FBA as Dr. Howland had mentioned -- referenced earlier. And I was, frankly, the response that I got was, we hear you, stop perseverating on it, and

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 103 of 146 PageID: 3225


let's move on. But that still hasn't been done.

So, you know, I think with more information and with strategies to help him with that, I think we're in agreement on his challenge. That's a challenge for him. We understand that it's a challenge for you to help him move on if he's perseverating on it. And that would presumably keep him further behind because he's perseverating on that topic rather than moving forward with the class.

MR. COLLIER: I don't want to agree on behalf of the team. But I will say that the diagnosis matters because now it does give me the tools I need.

MS. FREEMAN: Diagnosis certainly matters.

MR. COLLIER: Right. Because without it, what I was doing -- we all as teachers do what we think the students need on our own, but we are also bound by the circumstances we're in. And if it would be very helpful if the circumstances of the

classification would enable us to have the tools that you're recommending are now -- could become available because of the diagnosis change.

MS. FREEMAN: I think the different discrepancy of what we're trying to say -- I think we're on the same page in terms of understanding his profile is really important.

Legally, the classification category shouldn't govern services. So I think that that's the discrepancy that we're talking, but I think ultimately the end goal is the same. I think we all agree that the teachers should understand his profile, understand that this is a challenge of his, and I think we all understand and agree that it's a need that needs to be addressed.

MR. COLLIER: And I would defer back to my colleagues here. I'm a teacher, I refer back to the team on that.

MS. FREEMAN: Yeah. So I think-- so I mentioned this before, I'm going to mention it again, we're all in

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 105 of 146 PageID: 3227


agreement that he has difficulty with transitions and perseveration. I think a BCBA, since nobody here has been able to address it as far as I know, a BCBA getting involved to help develop a plan to address the perseveration might be helpful for him and everybody else, frankly.

MS. SWICK: I can't speak about the behaviorist, but I can, you know, add this to something that we will be working on with Student A.T.. We can certainly add a goal about him transitioning from one activity to the next, maybe from more preferred to less preferred things, or moving from one activity in the classroom to the next. That's something I could definitely add in.

MS. FREEMAN: And apparently topics, topics of conversation.

MS. SWICK: Yes.

MS. FREEMAN: Transitioning topics.

MS. SWICK: Yes. So I could add those to the draft. Let me do that now.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 106 of 146 PageID: 3228


MR. COLLIER: And I feel like I need to wrap my piece up. I kind of stand by my recommendation of the LLD room as being the best place for me to accomplish what I think I need to accomplish to help Student A.T. the best.

MS. L.T.: One question, Mr. Collier. What do you mean you can help him? How does the LLD help Student A.T.? That's what I'm -- like is it more like the academic part, so he can pass and all this? Like how does it help his development? I'm just trying to understand.

MR. COLLIER: Everything. It's a smaller room with less people and I can give more of myself one-on-one, more often, more frequently, with the help of paraprofessionals that are typically in the room.

MS. L.T.: Why the paraprofessional cannot help him where he is?

MR. COLLIER: They can. But what's more difficult about it is an LLD

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 107 of 146 PageID: 3229


room is noisy and it's structured and the bits and pieces of what we do are smaller time bits. I student taught kindergarten and I learned time management skills from my cooperating teacher who's a kindergarten teacher.

And what we would do in the LLD class is we would chunk things down to 5, 10, 15 minute activities. Because at the end of 15 minutes, we can move on. And with nine kids, that really benefits those kids.

In a room full of 30, 35 kids, me constantly talking or anybody constantly talking to one or even two kids might be disruptive to the other 25, 30 kids in the room. It's a much more -- it's an environment I can control. And I can choose the activities to work closely with Student A.T.. I can modify it to suit the kids in the room and it helps them.

I think it can help him academically, socially, every way imaginable. What happens in the LLD room, if something happens socially with any of

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 108 of 146 PageID: 3230


the kids and it's distracting to them and they don't understand why, it doesn't matter, it could be a simple discipline issue where one kid says something inappropriate and didn't understand how it's inappropriate. We can take the time in an LLD room to discuss that for as long as we need.

If it's a kid who didn't understand that he accidentally insulted someone else, we've had those kinds of conversations. Where a kid might have -- a real situation that happened is they use the word Oriental to refer to someone Chinese. And we had to discuss how Oriental is not something we say anymore and it's considered pejorative and here's why, and why a Chinese kid might feel insulted by that. And it's not a term we use anymore. But my grandpa says that. And we can have the conversation and we can then address that piece where the kid. We're avoiding the discipline issues before they happen.

We can address it at the

classroom level before it becomes a formal harassment, or intimidator, or bullying issue. We can mitigate those things at that level. That's only one piece of what we do. But I think the reduced number of kids would be very helpful.

MS. FREEMAN: So the concern that my clients have is that he's not going to go. And he's going to walk out of the class, and then there'll be other bigger issues behaviorally, socially, emotionally, and he just won't go. So does anybody, again, I stand by my request and recommendation that we get the BCBA involved, which I don't know what the resistance is.

So if somebody could please tell me, I would really appreciate it, getting a BCBA involved, but also what is the plan in the event he doesn't go and he just walks out?

MS. REBELO: Okay, so we can certainly order and sign consent for an FBA. The concern with that is that an FBA and

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 110 of 146 PageID: 3232


coming up with a behavior plan, you know, there's going to be somebody pulling him and addressing him and is he earning his rewards or not? And I think at the first meeting it was made very clear that he doesn't want to be seen as different.

So I mean we can certainly sign off on an FBA and see what information comes out of that to help us moving forward. But I just want to be clear in understanding that this is another person who's going to be going in and kind of pulling him and working on --

MS. FREEMAN: Weil, FBA, I think an FBA, he's not being pulled, that's just observation. So I don't know that that's going to be the issue. And in terms of developing a behavior plan, there might be things that can be put into a behavior plan where he's not pulled for the reinforcement. So maybe if he responds to it -- well, we have no way of knowing right now whether this is going to be appropriate. I think we need the information before

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 111 of 146 PageID: 3233


determining whether it's appropriate.

But there are strategies that can be put in place like delayed reinforcement if that works for him. So he stayed on task for X amount of time and then at the end of the day, he got something. So he doesn't necessarily -- I don't know if delayed reinforcement will be enough for him, but there are things that can be put in place into a behavioral plan where he's not being pulled, if that's not going to work for him.

And, frankly, a behavioral plan that doesn't work for him that has recommendations that are not reinforcing is not going to work anyway. So that's why we need the BCBA involved. So it's not us making these recommendations. We have to collect the data and then come up with recommendations based on maybe a reinforcer assessment, or something like that.

MS. REBELO: Right. So he will be then pulled to be working on things like a reinforcer assessment or interview

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 112 of 146 PageID: 3234


with the behavioral --

MS. FREEMAN: Well, let's deal with that later. Let's first get the FBA.

MS. REBELO: Okay. So then we'll send home paperwork to order an FBA to see what happens.

MS. FREEMAN: Can you please do that today? Because last time I think the same thing happened and my clients never received the paperwork.

MS. REBELO: Well, we scheduled this meeting, part of this meeting as being a re-eval plan with the purpose of discussing that. So that's part of this meeting today. The last meeting wasn't a re-eval plan.

I also just want to say you had said about him not going. You know, our recommendation is that he continues in his current classes because we're so close to the end of the year that changing anything at this point would be very disruptive and that he can start the LLD program in the summer to transition slowly into and see how

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 113 of 146 PageID: 3235


it goes. So we would recommend that he would participate in our ESY program to transition into the program.

So you were asking for suggestions of things if he doesn't go, so this would be our way to try to ease him in slowly into the program. And that's the recommendation that we have.

MS. L.T.: I have a question. Student A.T. last year in a self-contained reading class workshop. How did that program work for Student A.T. last year, which is very close to this LLD programs and I have observed your LLD programs. So how did that program work last year? So you had an example of him being in a self-contained reading workshop program with four, I believe four kids and three aides in there.

MS. REBELO: I was not here last year when he was in that program, so I'd have to go through and see if I can find it.

MS. FITZHENRY: So first of all, that was not a self-contained program.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 114 of 146 PageID: 3236


That was a resource room program. Resource rooms are a smaller setting based on gen ed academic curriculum, so math, English, science, social studies. All of those courses have a smaller setting resource room where the pacing is adjusted, it's more scaffolded for the students.

The reading workshop is normally recommended for students who are having significant issues with comprehension and inferential reading. So we created a reading program to support that using resource, using Wilson Strategies, Linden Mu Bell (ph) Strategies, strategies from Rutgers Literacy Group.

So it happened to be that that class, I ran two sections of it last year, that class happened to be significantly smaller than the other one. Most resource room classes run between seven and eight up to twelve students with a para. The way the scheduling was, he just happened to be in a smaller class.

I know that he also had Mrs.

Prey in the ICR English class as well. So oftentimes most of the students in those classes are resource room students, so she also teaches the English 1. So it was like a combination of almost having, I don't want to say a double English, but the skills that she's seeing in her English class with the weaknesses there, then she supports in that resource room.

MS. L.T.: Is there any data that supports -- I'm sorry. Is there any data that supports any of this, all these programs that were used there, applied there, and how well did it work for Student A.T. and the improvement that they did in --

MS. FITZHENRY: So she does do the earlis (ph), so there should be some data on that where they conference and they keep data on each of the skills that they're working on. I would have to ask her about that, that she could come up with that data.

MS. L.T.: So as a -- because I call them self-contained. You put them different names, they are all the same, they

are self-contained. Or maybe, I'm sorry, correct me if I'm saying something wrong, I apologize.

The point is, when we put him in an LLD, in a resource, in -- I don't know because I didn't read of that, what skills if Student A.T. needs -- because we are talking, he's 16, he'll be an adult. What skills does Student A.T. learn in these classes that will benefit him as an adult?

Because he was -- we have an experience with a class, which I'm holding it LLD, to me that was an LLD class, what skills did he learn in this class? Okay, a pull out resource. What skills did he learn in this class that helped Student A.T. succeed in his other classes, or in life, or in everyday work?

MS. FITZHENRY: Right. So he was working on vocabulary development, reading comprehension, making inferences, making predictions, citing evidence for what his predictions are, basic, you know, reading skills beyond just sight vocabulary,

reading comprehension skills. That's really what it's based on.

MS. L.T.: And that program that is also written in your website, does that reflect in the classroom with the materials used in the classroom?

MS. FITZHENRY: Which program?

MS. L.T.: Workshop. The reason I'm asking this question is because when you guys speak about placements, and it doesn't matter which one they are, you talk in theory. But how do they translate in the classroom, I'm trying to understand. Because it's one thing to be written somewhere, what the LLD, the resource, the science classes, and how they present in the classroom.

MS. FITZHENRY: Okay.

MS. L.T.: So that's what I'm asking. I'm just trying to understand.

MS. FREEMAN: So I think the question -- I think the question is, you know, we're talking about -- the deficit that we're trying to address, it seems as

though is that he has difficulty with abstract language, right? He has trouble understanding the deeper concepts, the why, right?

MS. REBELO: Exactly.

MS. FREEMAN: So I think the question is how does the, and maybe you have to explain it to me like I'm a three-year-old, which I love that line, so I'll just keep on using it, how do you -- how does the LLD class teach the concept of abstract language, more so than the resource room or a gen ed class? I think I'm not an educator certainly, but how does -- so what will moving him, other than teaching him at a slower pace, how does that class actually teach him the abstract language?

MS. REBELO: I think that's kind of what Mr. Collier had stated. There's more time to explain things and just to be able to talk about the issues. In an ICR class, we're not going to be able to work on a perseverance goal. In an LLD classroom, that's something that we can work

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 119 of 146 PageID: 3241


on.

MS. FREEMAN: How do you teach abstract, you know, the ability to understand abstract language? Excuse me, let me rephrase that. How do you teach abstract concepts?

MS. FITZHENRY: So basically in the LLD, they're doing a multimodality approach, right? So they're providing the visual, they're providing the audio. They're providing the visual on the reinforcements where things are highlighted and underlined and broken up. They are chunking material. They are actually doing kinesthetic things, especially in science where they're touching the things, they're making the things, they're building the things, they're flying the things.

So they are doing all of these things to understand the standard that they're working on within the curriculum. So let's say for science, the curriculum is life science, which kind of parallels to a beginning stage of biology. And then

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 120 of 146 PageID: 3242


there's physical science, which has to do with more of a parallel to physics. There's life science too, which continues with the biology in more depth. And all of those things contribute to understanding the skill and the topic and the standard.

Oftentimes, some of the standards, instead of just a standard of analyze the difference between X and Y, the skill is identify X, identify Y, identify the characteristics of X, identify the characteristics of Y.

Now, we're going to take those characteristics and we're going to see which ones they have the same. And those things are broken up and scaffolded step by step by step. Whereas in a gen ed classroom, those things are not.

And although, Mr. Collier, I'm pretty sure, but I didn't hear all of Mr. Collier because I went to go get Ms. Turriziani, but within the time constraints of a gen ed class and the baseline expectations of what students know and

understand, for Mr. Collier to sit and go through all of these things with him, by the time he masters that, that class has already moved on to two other elements within that curriculum.

So where I know that, you know, you mentioned pacing, but pacing is a side effect of the fact that the work is scaffolded and it's a multimodality approach. And they have the opportunity to stop when students don't understand and to review. And they have the support that it's okay to pull a student to the side to go over something, or to have somebody there to prompt the student through, so they're actually engaged and paying attention to the video or what's being presented.

That's the basic premise, the difference between those. And they also deal with, like Mr. College said, like any social issue that comes up because they have the opportunity to stop and do either address it having a conversation or change it and to do a little mini lesson on that

because those are impromptu teaching moments; whereas in a gen ed class, that really does not happen.

MS. FREEMAN: Okay. I have an idea that I have to talk to my clients about, with my clients about. So we can't give you a response to this right now.

What I'm asking everybody here is to help. If they were to consider this, which I don't know that it is an option, how we're going to address what happens if he doesn't go, you know, that stands out. I don't know, you know, how to address that. So I can address other concepts. This part, if he doesn't go, then what are the options?

MR. D'COSTA: I'm sorry, Hillary, did you need some time to talk with your client about that?

MS. FREEMAN: No, I talked to my client about another thought that I had, but my thought, my plan, my idea doesn't include the issue of if he doesn't go. So I don't know how we're going to address that. So, you know, even if they were to try it,

which I don't know that they will, but if they were to try it, what would happen if he doesn't go to the class or if he walks out, is he going to get in trouble? What are we going to do if they were to try it, what are we going to do if he refuses?

MS. FITZHENRY: Well, if we are going to start the FBA, right, we can start working just looking at behaviors. If he's going to start speech, we can start with social stories and working to get him to be open to a different type of schedule. So Mrs. Swick can be working on social stories with him as well, you know, that this is a wonderful place and these classes are good and all of those type of things and create social stories around that, to have him open to that.

I'm going to be honest with you, I mean on a number of occasions, you know, he said I'm not going with those kids. So there's already something in his mind, which is a negative connotation. So I'm not quite sure where he's developed that

negative connotation from, but he has expressed that in the past.

MS. FREEMAN: Right. Which is, you know, he is in counseling to address. But that's a challenge that, you know, that everybody faces because he won't go out.

MS. FITZHENRY: Well, I mean we haven't had the FBA, so we're going to do the FBA. He hasn't been in speech for quite some time. Those things, you know, can be put in place. If you choose to do the counseling again in the IEP with the case manager, that's another thing.

We can choose to start to infuse him, you know, possibly into these classes. He does know some of these students. We can introduce him during ESY to some of the classes, even if he comes part-time, which is a very relaxed setting and a social setting as well where the kids do a lot of fun activities, so he might enjoy that.

But I mean once we get to that

place of like, oh, we're going to try this placement, then we can really start. I'm just brainstorming off the top of my head right now.

MS. L.T.: Can I just brainstorm a little bit, too?

MS. FITZHENRY: Sure.

MS. L.T.: You have been in several meetings with the previous district. And I think in the last one his, I believe it was his counselor and speech therapy, they both in a way described Student A.T. and as his parents have struggled with this too, with how Student A.T. perceives himself and how Student A.T. perceives displacement. And it has been a struggle for a while.

I agree with doing the BA starting with Ms. Swick, I don't have an issue with that. But this is an issue that didn't start this year, or the -- it has been always a probiem.

So just to give you a little bit, and you know very well what the probiems where, the probiems that they were

having and how they addressed it, this is not a new issue. And also that was the reason a paraprofessional plan was requested from us. Like what were they supposed to do in the classroom because we don't expect Mr. Collier or the other teachers to work one-on-one with Student A.T.. This was the reason. But we will talk and we'll look because I'm looking also the IEP, the goals, the everything.

We didn't have a chance to look at this. And just a quick question, the goals are for next year or for this year? What are these goals on here for? Because there are 26 pages and I haven't had a chance to follow what you're saying and read this.

MS. REBELO: So the goals on the IEP runs annually, so the date in there in the draft is just 15 days from today. And then that would go in through next year until the next annual review.

MS. SWICK: While we were talking, I did add two goals, so I can

either add them to the chat or give them to Ms. Rebelo and she could forward them over. But I just did add a goal about transition and also a goal about appropriate topics with classmates.

MS. REBELO: I have to go and change because we all agreed on the classification of autism, so I have to go in and edit the draft as well.

MS. SWICK: Okay. I just wanted to let you know.

MS. REBELO: So I will send out a new draft once those edits are complete.

MS. SWICK: Okay. Sorry.

MS. REBELO: No, thank you for doing that.

MS. FREEMAN: Okay. I hate to do this right now, but I think we need to. Can we, I think we need to all take a break, talk to our respective people, and then if you can please send the consent form for the FBA and the IEP, the revised IEP for us to consider. And then if we need to have

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 128 of 146 PageID: 3250


another meeting, we can. I hate to just close the meeting because I do feel like we're on a roll and we're in a better spot, but at the same time, I have another meeting.

So if we can wrap it up right now, and then we'll be in touch, I would appreciate it. Feel free to -- I mean, I think Mr. and Mrs. T., you know, are in agreement to start the speech. So feel free to do that.

This is being recorded. I can send you an e-mail confirming that. Feel free to do that because I think it's very important that that proceed. But in terms of the rest of the plan, you know, I think I need to talk to my clients about that. Okay?

So Ms. Rebelo, I think you're about to say that -- would I -- give the answer to my question, you know, are you able to send a revised IEP for us to review before without having another meeting, or do you feel comfortable with that?

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 129 of 146
PageID: 3251


MS. REBELO: So I'm just going to, from what I sent you an hour or so ago, I think Ms. Swick added some goals and then I'm going to put in the information about that we changed the classification.

I can probably get that to you before I leave today. And then the paperwork that we agreed for a re-eval plan of an FBA, I can get those in an e-mail before I leave.

MS. FREEMAN: Okay.

MS. SWICK: And I just want to confirm I will meet with Student A.T. on Monday, but I just want to make sure, mom, you're having those conversations that I'm coming, so that, you know, it's a seamless thing when I start with him on Monday. Okay, great.

MS. FREEMAN: I didn't get a chance, if you tell Mr. And Mrs. T. when, what period. They can start the conversations, but when he'll be pulled out, if you can let them know, you don't have to know the second. Like I said, you have

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 130 of 146 PageID: 3252


about seven and a half minutes to figure that out.

MS. REBELO: And I'll wait to hear from you as to whether or not you want to start the counseling.

MS. FREEMAN: Yeah, I think so.

MS. REBELO: Okay.

MS. FREEMAN: Is there anything else?

MS. REBELO: Can Ms. Swick e-mail the time when she figures it out?

MS. FREEMAN: Yes. I was kidding about the seven and a half minutes.

MS. REBELO: I think she's looking at the schedule. Alright, awesome. So I thank everybody for their time. I hope everybody has a good day.

MS. FREEMAN: I can't hear you.

MS. L.T.: Thank you.

MS. REBELO: Sorry, I'm just saying thank you. I hope everyone has a good day, enjoys the sun.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 131 of 146 PageID: 3253


MS. L.T.: Thank you, have a good day.

MS. FREEMAN: Thank you.

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 132 of 146 PageID: 3254


# C E R T I F I C A T E

I do hereby certify that I am a Notary Public in good standing, that the aforesaid meeting was transcribed by me to the best of my ability from audio recording; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 18th day of August, 2025.

/s/ Frances A. Valiante

____________________________

Notary Public

**/**

**/s** [1] - 131:11

**1**

**1** [1] - 114:4
**10** [2] - 96:16, 106:9
**14th** [1] - 6:8
**15** [4] - 82:23, 106:9, 106:10, 125:20
**15-year-old** [1] - 44:19
**16** [1] - 115:8
**18th** [1] - 131:8
**19** [1] - 1:19

**2**

**2** [1] - 4:1
**20** [9] - 15:11, 16:1, 54:15, 62:14, 82:23, 86:8, 97:22, 98:4, 99:19
**2023** [1] - 1:16
**2025** [2] - 1:19, 131:8
**215.880.3801** [1] - 1:23
**25** [2] - 99:2, 106:15
**26** [1] - 125:15
**29** [1] - 96:11

**3**

**3** [1] - 1:16
**30** [9] - 8:13, 9:19, 30:19, 85:17, 85:21, 99:2, 99:19, 106:12, 106:15
**32** [1] - 96:16
**33** [1] - 96:16
**35** [1] - 106:12
**3:24-cv-00822** [1] - 1:4

**5**

**5** [1] - 106:9

**6**

**60** [1] - 81:12
**63** [1] - 6:24

**7**

**71** [1] - 5:2

**8**

**84** [2] - 6:7, 73:22
**89** [2] - 73:24, 74:6
**8:15** [1] - 16:24

**A**

**A.T** [113] - 1:4, 1:5, 1:12, 1:16, 2:9, 4:21, 5:4, 7:10, 7:19, 7:22, 12:4, 12:10, 12:13, 13:3, 14:22, 15:5, 15:9, 15:12, 15:21, 17:7, 18:22, 18:23, 19:1, 19:3, 19:4, 19:5, 19:9, 19:15, 20:4, 20:5, 20:20, 20:22, 21:12, 21:15, 21:17, 21:20, 22:2, 22:7, 23:7, 24:3, 26:7, 26:18, 27:21, 28:11, 28:12, 28:14, 28:16, 28:20, 28:22, 28:24, 29:4, 29:8, 29:10, 30:13, 31:5, 31:7, 31:11, 31:13, 32:18, 32:22, 33:1, 34:18, 39:8, 42:14, 42:23, 45:12, 46:5, 46:8, 47:18, 50:9, 50:21, 50:23, 51:6, 51:7, 51:13, 52:6, 61:1, 78:7, 79:21, 79:22, 81:1, 81:4, 81:11, 81:16, 82:11, 82:19, 83:6, 83:16, 84:13, 85:20, 86:1, 86:19, 91:14, 93:17, 94:2, 96:12, 97:6, 97:12, 99:18, 105:6, 105:9, 112:10, 112:12, 114:15, 115:7, 115:9, 115:16, 124:12, 124:14, 124:15, 128:13
**A.T.** [18] - 2:4, 4:18, 8:10, 9:4, 16:19, 19:10, 19:15, 19:24, 23:11, 34:6, 70:9, 85:12, 87:15, 87:20, 93:11, 104:11, 106:19, 125:7
**A.T.'s** [10] - 8:18, 14:19, 15:7, 51:5, 52:16, 56:1, 76:16, 91:3, 91:21, 98:6
**A.T.1@gmail.com** [1] - 76:9
**abilities** [1] - 14:3
**ability** [2] - 118:3, 131:5
**able** [19] - 8:1, 14:11, 42:10, 54:2, 74:10, 81:3, 81:6, 81:17, 87:7, 89:4, 91:7, 91:18, 91:19, 97:11, 101:15, 104:3, 117:21, 117:22, 127:22
**Absolutely** [1] - 23:5
**absolutely** [3] - 44:9, 47:4, 47:8
**abstract** [9] - 92:6, 93:2, 96:10, 117:2, 117:12, 117:17, 118:3, 118:4, 118:6
**academic** [4] - 13:9, 91:5, 105:11, 113:3
**academic-wise** [1] - 91:5
**academically** [1] - 106:22
**academics** [1] - 86:18
**accept** [2] - 19:4, 19:5
**acceptive** [1] - 61:14
**access** [2] - 75:6, 75:21
**accidentally** [1] - 107:10
**accommodate** [1] - 95:4
**accommodation** [1] - 11:4
**accomplish** [2] - 105:4, 105:5
**according** [1] - 19:22
**accurate** [1] - 36:5
**accurately** [1] - 35:21
**Action** [1] - 1:4
**action** [1] - 131:6
**actions** [1] - 42:16
**activities** [3] - 106:9, 106:18, 123:22
**activity** [4] - 13:23, 82:6, 104:13, 104:15
**acts** [1] - 51:19
**actual** [1] - 46:6
**ad** [1] - 46:24
**adapted** [1] - 24:3
**add** [8] - 61:8, 104:10, 104:12, 104:17, 104:24, 125:24, 126:1, 126:3
**added** [1] - 128:3
**adding** [2] - 8:15, 9:6
**additional** [3] - 8:16, 9:7, 73:20
**address** [23] - 21:8, 28:6, 31:24, 35:15, 36:8, 41:1, 42:2, 42:6, 42:18, 42:19, 42:23, 100:19, 104:4, 104:5, 107:21, 107:24, 116:24, 120:23, 121:11, 121:13, 121:14, 121:23, 123:5
**addressed** [5] - 3:21, 45:4, 103:18, 125:1
**addresses** [2] - 55:9, 74:21
**addressing** [3] - 32:11, 100:12, 109:3
**adjusted** [1] - 113:6
**administration** [4] - 30:3, 30:6, 31:19, 39:20
**administrative** [6] - 19:16, 26:2, 26:15, 32:15, 34:15, 40:8
**adult** [2] - 115:8, 115:10
**adults** [4] - 22:6, 27:4, 34:17, 34:24
**advance** [1] - 18:5
**advocate** [1] - 28:23
**advocated** [1] - 28:16
**affect** [1] - 30:22
**aforesaid** [1] - 131:4
**afraid** [2] - 37:8, 51:7
**afternoon** [1] - 32:24
**afterwards** [2] - 49:8, 49:24
**ago** [1] - 128:2
**agree** [14] - 9:5, 10:14, 45:1, 48:6, 48:9, 54:7, 69:20, 77:3, 86:9, 92:8, 102:14, 103:14, 103:17, 124:17
**agreed** [2] - 126:7, 128:8
**agreeing** [1] - 45:19
**agreement** [10] - 9:16, 13:5, 18:2, 78:10, 78:12, 78:14, 81:24, 102:5, 104:1, 127:10
**ahead** [2] - 18:12, 54:19
**ahold** [1] - 79:7
**aide** [1] - 19:21
**aides** [1] - 112:18
**aligned** [2] - 55:1, 56:1
**allow** [1] - 84:22
**allowing** [1] - 38:18
**Almost** [1] - 100:8
**almost** [7] - 40:6, 86:4, 86:5, 87:1, 97:6, 98:8, 114:5
**Alright** [2] - 79:9, 129:16
**amendments** [1] - 62:17
**amount** [1] - 110:5
**analyze** [2] - 83:17, 119:9
**animal** [1] - 5:18
**annual** [3] - 2:3, 78:17, 125:22
**annually** [1] - 125:19
**answer** [17] - 51:23, 54:3, 63:13, 69:12, 81:8, 81:14, 82:9, 82:17, 82:21, 84:2, 86:2, 87:4, 87:5, 89:4, 89:18, 97:2, 127:21
**answered** [3] - 70:7, 70:14, 86:8
**answers** [6] - 82:15, 83:1, 83:3, 86:23, 88:22, 89:19
**anticipate** [4] - 40:18, 40:22, 42:7, 48:16
**anticipates** [1] - 51:20
**anxiety** [12] - 42:17, 43:8, 43:11, 43:16, 44:5, 44:18, 44:22, 50:8, 55:11, 56:13, 59:12, 61:9
**Anxiety** [1] - 43:12
**anxious** [8] - 44:21, 45:2, 45:3, 45:8, 45:14, 45:20, 61:14
**anyway** [1] - 110:16
**apologize** [4] - 2:13, 63:23, 77:17, 115:3
**applied** [1] - 114:13
**applies** [1] - 35:4
**apply** [2] - 33:18, 34:6
**appointment** [1] - 58:15
**appreciate** [4] - 17:18, 61:16, 108:18, 127:8
**approach** [4] - 28:4, 28:19, 118:9, 120:10
**appropriate** [13] - 6:21, 6:22, 9:3, 22:14, 27:7, 39:12, 77:4, 90:20, 90:21, 91:13, 109:23, 110:1, 126:4
**appropriateness** [1] - 94:13
**area** [1] - 94:13
**arise** [2] - 15:22, 29:21
**arm** [1] - 65:20
**articulate** [2] - 81:17, 81:21
**articulated** [1] - 88:24

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 134 of 146 PageID: 3256



**articulating** [1] - 88:14
**aspects** [1] - 24:5
**assess** [1] - 25:10
**assessment**[9]- 5:1, 6:4, 6:9, 6:13, 6:16, 6:23, 8:14, 110:21, 110:24
**assessments**[5] - 4:17, 81:2, 94:21, 94:23, 99:4
**assignment**[3] - 13:17, 80:8, 96:22
**assignments** [3]- 16:3, 91:23, 95:13
**assistant** [6] - 22:22, 27:18, 28:1, 32:23, 33:3, 49:22
**assisting** [1] - 96:18
**associated** [2] - 5:7, 5:16
**assume**[1] - 74:3
**assumption**[1] - 67:10
**attempts** [1] - 83:15
**attend** [1]- 12:23
**attendance**[1] - 17:9
**attending** [1] - 61:14
**attention** [2] - 70:16, 120:16
**attorney** [5] - 2:17, 29:9, 33:8, 33:9, 72:9
**attorneys** [3] - 32:9, 67:11, 69:22
**Audio** [1]- 1:15
**audio** [3]- 1:17, 118:10, 131:5
**August**[2]- 1:19, 131:8
**autism** [10] - 43:13, 43:22, 43:24, 44:6, 45:23, 47:4, 76:21, 78:9, 81:24, 126:8
**available** [2] - 80:16, 103:3
**average** [4] - 6:8, 6:14, 7:1, 73:24
**averaging** [1] - 10:5
**avoiding** [1] - 107:22
**aware** [2] - 43:9, 53:2
**awesome** [1] - 129:16
**awkward** [1] - 85:19

## B

**BA**[1] - 124:17
**background** [1]- 29:13
**backtrack**[1] - 69:4
**bad** [1] - 86:7
**barest** [1] - 88:11
**barrier** [3] - 13:1, 13:13, 14:8
**barriers** [1] - 99:13
**base** [1] - 92:19
**based** [12]- 17:22, 39:17, 47:3, 92:8, 92:9, 92:12, 94:9, 94:12, 101:12, 110:20, 113:2, 116:2
**baseline** [2] - 14:3, 119:23
**basic** [2] - 115:23, 120:18
**basics** [1] - 98:6
**basis** [3] - 43:13, 86:4, 86:6
**BCBA**[6] - 101:14, 104:3, 104:4, 108:14, 108:19, 110:17
**become** [1]- 103:3
**becomes** [3] - 17:10, 86:15, 108:1
**beforehand** [2] - 50:4, 50:5
**begin** [1] - 4:14
**beginning** [2] - 53:9, 118:24
**behalf** [2]- 1:5, 102:14
**behavior** [4] - 31:23, 109:1, 109:18, 109:20
**behavioral** [3]- 110:10, 110:13, 111:1
**behaviorally** [1] - 108:11
**behaviorist**[2] - 32:11, 104:9
**behaviors** [1] - 122:9
**behind** [3] - 81:19, 98:8, 102:10
**belabor** [1] - 85:20
**Bell** [1]- 113:14
**belong** [1] - 75:19
**below** [3] - 6:7, 6:14, 6:24
**benefit** [1] - 115:10
**benefits** [1] - 106:11
**best**[9] - 7:24, 10:16, 49:4, 59:20, 72:8, 91:4, 105:4, 105:6, 131:5
**better** [9] - 16:5, 22:7, 24:22, 28:4, 36:24, 46:3, 72:2, 97:11, 127:3
**between** [15] - 27:2, 35:5, 53:17, 55:4, 57:5, 66:13, 71:23, 71:24, 73:17, 93:20, 95:21, 113:20, 119:9, 120:19
**beyond** [2] - 88:3, 115:24
**big** [1]- 93:10
**bigger**[2]- 72:5, 108:10
**biggest** [2]- 13:1, 13:13
**biology** [2] - 118:24, 119:4
**BIP** [2] - 39:19, 40:1
**bit** [27] - 6:12, 15:21, 16:4, 20:1, 20:14, 22:1, 22:7, 23:3, 23:24, 27:14, 28:4, 28:18, 45:5, 45:14, 45:16, 51:14, 55:13, 60:14, 85:6, 85:10, 85:18, 92:21, 93:16, 96:19, 98:9, 124:6, 124:23
**bits** [2] - 106:2, 106:3
**block** [1] - 17:1
**BOARD**[1] - 1:8
**board** [2] - 32:4, 99:6
**Board** [1] - 34:3
**body** [1]- 24:14
**boomer** [1] - 79:17
**born** [1] - 44:17
**Borough** [1] - 85:14
**bound** [1] - 102:22
**box** [1] - 74:15
**boxes** [1] - 67:20
**brainstorm** [2]- 50:12, 124:6
**brainstorming** [1]- 124:3
**brakes** [1] - 98:22
**break** [2] - 60:17, 126:20
**breakdown** [1] - 70:12
**breaking** [2] - 14:24, 73:1
**brief** [1] - 52:19
**bring** [4]- 7:9, 39:10, 45:11,58:1
**broke** [1] - 65:20
**broken** [2]- 118:13, 119:16
**brought** [4] - 26:9, 29:15, 72:22, 73:8
**building** [3] - 53:22, 58:12, 118:17
**builds** [1] - 95:6
**bulk**[1] - 81:21
**bullying** [1] - 108:2
**bunch** [1]- 42:4
**butcher** [1] - 92:16

## C

**calculated** [1] - 73:23
**calculations** [1] - 72:4
**camera** [1] - 2:14
**cannot** [6] - 20:3, 22:9, 42:20, 64:11, 74:1, 105:21
**care** [2] - 77:13, 101:2
**case** [11]-2:7, 14:16, 15:16, 27:15, 33:7, 46:19, 53:19, 53:20, 65:13, 91:21, 123:13
**caseload** [1] - 29:18
**catch** [3] - 18:16, 19:7, 53:10
**category** [2] - 5:8, 103:11
**causes** [3] - 50:8, 87:3, 87:11
**causing** [1] - 55:10
**central** [2] - 65:10, 75:7
**certain** [4] - 19:24, 36:17, 45:1, 100:4
**certainly** [6] - 101:6, 102:18, 104:12, 108:23, 109:7, 117:14
**certified** [1] - 66:19
**certify** [1] - 131:3
**cetera** [2] - 41:6, 52:1
**challenge** [7] - 79:17, 101:9, 102:6, 102:7, 103:16, 123:5
**challenges** [2] - 27:1, 35:7
**chance** [4] - 59:14, 125:11, 125:16, 128:20
**change** [10] - 39:1, 59:17, 76:2, 78:9, 90:4, 90:18, 95:19, 103:4, 120:23, 126:7
**changed** [7] - 59:18, 65:14, 65:24, 66:1, 71:15, 128:5
**changes** [1]- 37:14
**changing** [3] - 76:20, 77:3, 111:21
**characteristics** [3] - 119:11, 119:12, 119:14
**charge** [1]- 22:17
**chat**[2]- 74:15, 126:1
**check** [5] - 52:10, 64:10, 67:14, 71:10, 79:12
**checked** [2] - 67:20, 75:9
**checking** [3] - 54:11, 61:20, 96:21
**child** [12]- 20:20, 21:13, 21:15, 21:23, 30:17, 36:1, 38:10, 38:14, 38:18, 42:20, 49:19, 95:8
**child's** [1]- 30:22
**Chinese** [2] - 107:14, 107:17
**choice** [4] - 81:8, 87:6, 89:4, 91:24
**choices** [1] - 81:15
**choose** [3] - 106:17, 123:12, 123:15
**chunk** [1] - 106:8
**chunking** [1] - 118:14
**circle** [1] - 53:18
**circumstance** [1] - 32:6
**circumstances** [4] - 34:11, 46:17, 102:23, 102:24
**citing** [1] - 115:22
**civil** [1] - 1:4
**clarification** [2] - 69:7, 70:7
**clarify** [3] - 26:2, 29:15, 32:15
**Clarinet** [1] - 5:22
**class** [83] - 9:2, 11:18, 12:21, 18:7, 18:13, 18:23, 18:24, 19:7, 36:13, 39:8, 39:13, 50:9, 50:17, 51:1, 52:23, 53:1, 53:9, 59:5, 59:7, 59:18, 59:22, 59:23, 60:19, 60:22, 61:7, 78:20, 79:11, 80:5, 80:14, 80:16, 80:18, 81:18, 81:22, 82:10, 84:14, 84:18, 85:15, 90:4, 90:19, 91:12, 91:20, 92:10, 93:3, 93:14, 95:3, 95:17, 96:15, 97:9, 97:12, 97:15, 97:21, 97:23, 98:3, 98:7, 98:10, 98:21, 99:2, 99:9, 99:12, 102:12, 106:8, 108:10, 112:11, 113:17, 113:18, 113:23, 114:1, 114:7, 115:12, 115:13, 115:14, 115:16, 117:11,

117:13, 117:16, 117:22, 119:23, 120:3, 121:2, 122:3
**classes**[15] - 13:10, 14:5, 19:2, 19:21, 55:12, 95:21, 111:20, 113:20, 114:3, 115:10, 115:17, 116:16, 122:15, 123:17, 123:19
**classification** [10]- 39:18, 76:17, 76:21, 77:4, 78:9, 101:3, 103:1, 103:10, 126:8, 128:5
**classified** [2] - 43:21, 96:17
**classify** [1] - 85:1
**classmates** [1]- 126:5
**classroom** [16] - 29:21, 31:3, 80:16, 80:22, 92:1, 93:12, 99:17, 104:15, 108:1, 116:5, 116:6, 116:13, 116:17, 117:24, 119:17, 125:5
**classwork** [6] - 8:23, 80:1, 80:2, 80:8, 80:11, 80:17
**clear** [3] - 40:15, 109:5, 109:10
**cleared** [1] - 19:8
**clearly**[1]- 41:7
**clicking** [1] - 63:24
**client** [2] - 121:18, 121:20
**client's** [1] - 2:17
**clients** [5] - 108:8, 111:9, 121:5, 121:6, 127:17
**close** [3]- 111:20, 112:13, 127:2
**closely**[1] - 106:18
**cloud** [1] - 87:10
**clouds** [1]- 89:13
**co** [2] - 55:23, 56:6
**co-treat** [2] - 55:23, 56:6
**colleagues** [1]- 103:20
**collect** [1] - 110:19
**collectively** [1] - 34:18
**College** [1]- 120:20
**Collier** [16] - 3:4, 3:7, 3:13, 79:10, 90:23, 91:23, 93:15, 94:16, 95:14, 101:19, 105:8, 117:19, 119:19, 119:21, 120:1, 125:6
**COLLIER** [21] - 3:16, 79:12, 79:16, 88:10, 88:17, 89:7, 90:7, 90:13, 95:24, 96:8, 100:6, 100:8, 100:13, 100:18, 101:7, 102:13, 102:19, 103:19, 105:1, 105:14, 105:23
**Colts** [2] - 47:20, 62:13
**combination** [2] - 94:24, 114:5
**comfortable** [4] - 13:9, 16:21, 56:13, 127:24
**coming** [15] - 12:16, 13:4, 16:21, 18:11, 22:24, 28:6, 40:24, 42:22, 53:11, 61:9, 79:3, 96:18, 100:16, 109:1, 128:16
**commensurate** [1]- 91:8
**comment** [1] - 8:2
**comments** [1] - 8:6
**commercials** [1] - 24:9
**communicate** [1]- 17:12
**communicates** [1] - 75:17
**communicating** [1]- 75:16
**communication** [10] - 16:5, 19:8, 31:12, 33:14, 33:20, 43:21, 76:18, 99:13, 100:21, 100:23
**comorbid** [2] - 43:13, 44:6
**compare** [1] - 97:16
**competent** [1] - 41:8
**complain** [1] - 27:19
**complete** [3] - 31:12, 51:11, 126:14
**completed** [4] - 65:21, 65:22, 66:4, 72:19
**completely** [2] - 31:4, 91:7
**completing** [2]- 79:24, 80:1
**component** [2] - 46:13, 61:22
**components** [2]- 23:20, 97:17
**comprehension** [3]- 113:10, 115:21, 116:1
**comprehensive**[1]- 6:16
**computer** [3] - 60:19, 62:19, 92:20
**computers** [1] - 60:21
**concept** [1] - 117:11
**concepts** [4]- 92:7, 117:3, 118:6, 121:14
**concern** [8] - 12:13, 29:1, 35:23, 37:20, 37:24, 38:4, 108:7, 108:24
**concerned** [2] - 18:22, 18:24
**concerning** [2] - 20:19, 58:21
**concerns** [2] - 35:22, 68:9
**conclude** [1] - 78:16
**conclusion** [1] - 89:10
**condensation** [2]- 87:10, 89:13
**conducive** [1] - 39:6
**conduct** [2] - 38:12, 40:6
**conference** [1]- 114:18
**confident** [1] - 41:7
**confidential** [1] - 69:21
**confirm** [1] - 128:13
**confirming** [2] - 90:5, 127:13
**confusing** [1] - 48:2
**connection** [1]- 20:10
**connotation** [2]- 122:23, 123:1
**consent**[9] - 15:14, 31:14, 67:19, 67:24, 68:5, 69:9, 108:23, 126:22
**consequence** [3] - 38:16, 38:17
**consider** [3] - 39:15, 121:9, 126:24
**considered** [1]- 107:16
**constantly** [4] - 28:14, 100:9, 106:13
**constraints** [1] - 119:22
**consult** [3] - 25:16, 29:20, 35:24
**consultant**[1] - 67:1
**consulted** [1] - 29:17
**consulting** [1]- 19:13
**contact** [2] - 19:14, 36:11
**contacted** [1] - 36:11
**contacting** [1]- 42:3
**contained** [5] - 112:10, 112:16, 112:24, 114:23, 115:1
**content** [4] - 84:6, 94:13, 95:6, 95:17
**context** [3]- 6:20, 36:19, 45:22
**continual** [1] - 53:5
**continuation** [1]- 2:2
**continue** [3] - 51:17, 61:20, 65:4
**continues** [2] - 111:19, 119:3
**continuing** [1] - 53:14
**contrast**[1] - 97:16
**contribute** [1] - 119:5
**control** [1]- 106:17
**conversation**[11]- 13:11, 13:21, 18:3, 18:5, 38:15, 56:10, 59:4, 84:23, 104:19, 107:20, 120:23
**conversations** [9] - 12:23, 39:4, 57:9, 58:17, 84:24, 85:2, 107:12, 128:15, 128:22
**cooperating** [1]- 106:5
**coordinating** [1] - 37:6
**copy** [1]- 82:13
**cord** [1] - 62:21
**Correct**[1] - 21:1
**correct** [9] - 21:6, 49:1, 55:15, 74:22, 75:14, 81:8, 81:14, 99:24, 115:2
**corrected** [1] - 64:16
**correctly** [5] - 28:10, 74:23, 87:9, 89:5, 89:6
**correspondence** [1]- 69:10
**counsel** [3] - 2:22, 10:24, 131:5
**counseling** [22] - 15:23, 22:24, 46:8, 46:12, 46:20, 46:22, 46:23, 47:2, 49:3, 54:10, 54:12, 55:4, 55:5, 61:19, 61:22, 62:4, 62:5, 62:6, 123:4, 123:13, 129:5
**Counseling** [1] - 55:8
**counselor** [10] - 26:6, 46:15, 46:19, 47:6, 47:10, 47:14, 48:8, 48:16, 49:18, 124:11
**couple** [2] - 64:23, 65:3
**course** [2] - 56:14, 80:11
**courses** [2] - 52:18, 113:5
**COURT**[1] - 1:1
**Court**[1]- 1:18
**create** [1] - 122:17
**created** [2] - 63:4, 113:11
**credit** [2] - 5:21, 8:8
**cross** [1]- 21:3
**CST**[1] - 19:13
**cues** [3] - 22:1, 46:1, 46:5
**current** [2] - 91:3, 111:20
**curricula** [3] - 94:8, 94:9, 94:14
**curriculum** [10] - 23:14, 24:20, 91:16, 92:2, 94:12, 94:15, 113:3, 118:21, 118:22, 120:5
**Curtis** [1] - 2:21
**cut** [1] - 94:6
**cycle** [12]- 8:13, 10:3, 11:9, 11:10, 11:12, 11:15, 11:18, 25:13, 62:15, 87:2, 87:8, 97:14
**cycles** [3] - 9:21, 11:3, 11:5

## D

**D'COSTA**[4] - 35:20, 37:17, 72:7, 121:16
**d'COSTA**[1]- 2:21
**D'Costa** [1]- 2:21
**DAGATO**[1] - 2:24
**Dagato** [3] - 3:1, 43:3, 52:8
**daily** [3] - 46:2, 86:4, 86:6
**Danielle** [1]- 2:24
**data** [10]- 72:9, 81:13, 81:20, 89:15, 110:19, 114:10, 114:12, 114:18, 114:19, 114:21
**date** [1] - 125:19
**dates** [1] - 29:6
**days** [15] - 10:6, 10:11, 11:19, 11:20, 11:23, 15:10, 25:12, 33:10, 47:17, 47:18,

58:12, 61:12, 80:3, 80:7, 125:20
**deal** [2] - 111:2, 120:20
**decent** [1] - 87:14
**decision** [2] - 30:17, 56:20
**decisions** [1] - 30:21
**declined** [1]- 54:13
**deeper** [2] - 98:18, 117:3
**Defendant** [1]- 1:9
**defer** [3] - 10:24, 90:8, 103:20
**deficit** [1] - 116:23
**Definitely** [1] - 24:2
**definitely** [18] - 5:4, 5:6, 5:16, 10:7, 10:14, 23:6, 23:9, 23:20, 23:21, 24:4, 24:7, 29:16, 56:1, 56:10, 56:16, 63:19, 94:5, 104:17
**delay** [1] - 77:18
**delayed**[2] - 110:3, 110:8
**demonstrate** [1] - 98:2
**demonstrates**[1] - 98:15
**department** [1] - 35:24
**depth** [2] - 86:21, 119:4
**describe** [3] - 49:5, 88:18, 96:11
**described** [1] - 124:12
**describing** [2] - 6:12, 38:8
**detention** [11] - 19:15, 20:4, 25:8, 32:19, 32:20, 32:22, 33:1, 33:4, 33:5, 33:15, 37:3
**detentions** [4] - 22:16, 32:19, 34:10, 40:7
**determination** [1]- 40:11
**determining** [1]- 110:1
**develop** [1] - 104:5
**developed** [1] - 122:24
**developing** [2]- 78:18, 109:18
**development**[2] - 105:12, 115:20
**diagnoses** [2]- 44:3, 101:5
**diagnosing** [1] - 82:2
**Diagnosis** [1]- 102:17
**diagnosis** [8] - 43:8, 43:11, 43:24, 44:8, 44:22, 47:4, 102:15, 103:4
**diagram** [1] - 87:8
**dialogue** [1] - 24:11
**difference** [10] - 34:22, 34:23, 37:11, 37:14, 37:16, 55:4, 57:19, 66:13, 119:9, 120:19
**differences** [3] - 56:24, 57:5, 95:20
**different** [24] - 4:17, 11:21, 27:8, 27:11, 40:17, 42:5, 44:6, 45:15, 45:17, 47:12, 50:7, 62:21, 69:3, 70:1, 76:22, 94:8, 94:14, 94:20, 94:21, 99:21, 103:6, 109:6, 114:24, 122:12
**difficult** [5] - 53:12, 85:17, 95:7, 96:9, 105:24
**difficulties** [1] - 100:22
**difficulty** [11] - 35:6, 82:12, 82:22, 84:10, 86:21, 88:13, 89:11, 92:6, 100:2, 104:1, 117:1
**Dillon** [2] - 26:5, 33:12
**direct** [5] - 53:16, 80:9, 82:24, 85:23, 98:11
**Direct** [1] - 64:24
**directed** [1] - 84:20
**directly** [5]- 19:17, 52:14, 53:4, 53:6, 55:14
**disabilities** [3] - 20:18, 21:11, 66:24
**disability** [8] - 19:18, 32:1, 34:12, 34:13, 40:21, 40:22, 44:16, 45:13
**disappointing** [1] - 22:16
**disaster**[1] - 31:13
**disciplinary** [4] - 38:7, 49:10, 49:11, 85:7
**discipline** [3] - 46:12, 107:3, 107:22
**disconnected** [1]- 20:7
**discrepancy** [5]- 71:22, 73:17, 74:4, 103:6, 103:12
**discuss** [5] - 42:9, 69:11, 71:21, 107:7, 107:15
**discussed** [3] - 60:10, 72:6, 93:10
**discussing**[2]- 84:11, 111:14
**discussion**[4]- 16:20, 82:10, 82:20, 85:9
**disorder** [2] - 100:21, 100:23
**displacement**[1] - 124:15
**disruptive** [4] - 84:19, 86:16, 106:15, 111:22
**distracting** [1]- 107:1
**distractor**[1] - 81:9
**District** [1]- 2:23
**DISTRICT**[3]- 1:1, 1:1, 1:8
**district** [8] - 15:16, 37:7, 38:24, 39:2, 42:4, 46:11, 69:8, 124:9
**district's** [1] - 37:19
**dive** [1] - 99:14
**do-now** [4] - 82:5, 82:18, 82:23, 83:1
**doable** [1]- 97:10
**document** [2] - 37:19, 72:8
**documentation** [2] - 26:3, 26:16
**documenting** [1]- 37:23
**done** [11]- 36:24, 62:17, 65:23, 66:10, 68:10, 71:8, 80:1, 80:15, 83:2, 97:8, 102:2
**double** [1] - 114:6
**doubt** [1] - 44:5
**down** [15] - 26:7, 26:17, 39:11, 44:14, 52:19, 54:20, 62:19, 73:1, 82:9, 82:13, 82:17, 98:16, 98:20, 99:14, 106:8
**downhill** [1] - 48:21
**download** [1] - 65:2
**Dr**[1] - 101:21
**DR** [18] - 3:12, 38:4, 40:4, 42:8, 43:7, 43:20, 44:1, 45:10, 45:18, 46:18, 47:13, 48:7, 48:23, 51:21, 52:5, 52:12, 63:18, 63:23
**draft** [11] - 63:4, 63:8, 63:16, 63:19, 74:11, 77:1, 104:24, 125:20, 126:9, 126:13
**draw**[1]- 89:10
**due** [5] - 38:6, 38:9, 38:11, 38:19, 40:13
**during** [10] - 15:22, 16:21, 18:19, 44:17, 49:11, 60:17, 60:21, 64:15, 123:18
**dynamic** [1] - 94:10

## E

**e-mail** [25] - 30:11, 31:1, 33:7, 49:24, 64:6, 64:16, 64:20, 67:18, 74:13, 74:14, 74:21, 75:1, 75:6, 75:10, 75:12, 76:1, 76:2, 76:3, 76:7, 127:13, 128:9, 129:12
**e-mails** [7] - 30:16, 65:6, 65:9, 65:10, 67:15, 69:13, 75:13
**earlis** [1] - 114:17
**early** [4] - 13:17, 13:18, 84:11
**earning** [1] - 109:3
**earth** [1] - 94:18
**ease** [1] - 112:6
**easier** [6] - 6:13, 24:22, 52:24, 93:19, 97:15, 101:5
**easily** [4] - 80:21, 84:20, 87:11, 100:3
**easy** [1] - 45:6
**echoing** [2] - 87:24, 95:22
**Ed** [1] - 34:3
**ed** [17]- 2:13, 52:17, 52:18, 52:20, 65:19, 66:11, 66:13, 66:18, 79:6, 92:14, 94:15, 95:3, 113:2, 117:13, 119:17, 119:23, 121:2
**edit** [1] - 126:9
**edits** [1] - 126:13
**EDUCATION**[1] - 1:8
**education** [6] - 3:8, 22:18, 68:2, 78:19, 78:21, 89:23
**educational** [11]- 65:22, 65:23, 66:7, 66:8, 66:14, 66:20, 66:23, 67:24, 68:3, 71:13, 71:16
**educator** [2] - 44:24, 117:14
**educators** [1] - 42:13
**effect** [1] - 120:8
**effects** [2] - 87:3, 87:11
**eight** [2]- 98:21, 113:20
**either** [6] - 46:19, 49:10, 58:2, 100:20, 120:22, 126:1
**elaborate** [1] - 9:18
**elaborating** [1] - 88:3
**electives** [1] - 12:17
**elementary** [1] - 24:1
**elements** [1] - 120:4
**eligibility** [6] - 2:3, 39:18, 63:6, 76:16, 78:6, 78:16
**eligible** [1] - 78:8
**eliminated** [1] - 81:10
**embarrass** [1] - 85:19
**emotionally** [1]- 108:11
**enable** [1] - 103:1
**encompassing** [1]- 76:22
**end** [6] - 59:10, 59:19, 103:13, 106:10, 110:6, 111:21
**engaged** [1] - 120:16
**English** [8] - 4:1, 9:2, 51:1, 113:3, 114:1, 114:4, 114:6, 114:7
**enjoy** [1] - 123:23
**enjoys** [3] - 60:18, 60:23, 129:24
**ensure** [3] - 46:7, 46:9, 59:6
**entire** [1] - 36:8
**entitled** [1] - 38:24
**environment**[3]- 94:3, 99:21, 106:17
**environmental** [4] - 3:7, 3:22, 81:22, 86:20
**especially** [9] - 16:17, 17:10, 22:8, 22:15, 32:8, 81:9, 93:13, 99:6, 118:15
**essence**[1] - 95:16
**ESY** [2] - 112:2, 123:18
**et** [2] - 41:6, 52:1
**eval** [3] - 111:13, 111:16, 128:8
**evaluation** [10] - 4:7, 4:11, 35:9, 64:17, 65:15, 65:18, 68:24, 70:24, 71:2, 74:2
**evaluations** [10] - 4:6,

18:19, 29:6, 29:7, 64:14, 67:23, 68:10, 69:9, 69:12, 71:24
**evaluator** [1] - 23:18
**evaluators** [1] - 18:20
**event** [1] - 108:20
**eventually** [3] - 14:21, 15:9, 84:7
**everyday**[1] - 115:18
**everywhere** [1] - 35:5
**evidence** [1] - 115:22
**evident** [1] - 35:8
**exact**[1]- 5:17
**exactly** [4] - 5:19, 33:12, 59:5, 117:5
**example** [5] - 7:14, 21:10, 82:4, 97:15, 112:16
**examples** [2] - 5:11, 5:20
**except** [2] - 28:8, 75:9
**Excuse** [2] - 68:14, 118:4
**exhibits** [1] - 49:19
**expect** [3]- 18:15, 86:3, 125:5
**expectation**[1]- 14:1
**expectations** [3] - 16:6, 16:7, 119:24
**experience** [4] - 54:6, 60:15, 101:13, 115:12
**expert** [2] - 82:2, 84:6
**explain** [7] - 20:2, 25:19, 36:19, 70:23, 85:18, 117:8, 117:20
**explained** [7] - 20:2, 67:22, 71:1, 72:19, 80:10, 82:15, 82:16
**explaining** [5] - 14:15, 21:17, 57:18, 80:13, 81:19
**explanation** [1] - 14:21
**explicitly** [1] - 49:12
**explore** [1] - 76:20
**exploring** [1] - 38:8
**express** [1] - 81:20
**expressed** [2] - 8:3, 123:2
**expresses** [1] - 82:21
**expressing** [1] - 88:7
**expression** [1] - 26:10
**expressive**[3] - 4:19, 8:19, 55:14
**extensively**[1] - 95:11
**extent** [3] - 18:10, 69:21, 87:5
**extra** [1] - 61:9
**extrapolate** [2] - 81:7, 98:1
**extremely** [1] - 91:20
**eyeglasses** [1]-7:20

## F

**face** [1] - 8:6
**faces** [2] - 35:8, 123:6
**facilitate** [1] - 54:2
**fact** [4] - 30:14, 36:16, 39:18, 120:8
**fail** [1] - 19:2
**failed** [2] - 19:1, 59:13
**failing** [2] - 18:24, 19:4
**failure** [1] - 19:5
**fair** [3]- 22:10, 100:5, 100:6
**fall** [2] - 10:11, 73:24
**falls** [1] - 6:7
**Familiar** [1] - 48:8
**familiar** [4] - 23:18, 47:24, 48:11, 94:19
**far** [6] - 30:2, 37:12, 37:15, 54:5, 66:16, 104:4
**fast** [2] - 78:4, 99:4
**favorite** [2] - 14:5, 87:20
**FBA** [14] - 40:1, 101:21, 108:23, 108:24, 109:8, 109:14, 109:15, 111:3, 111:5, 122:8, 123:9, 123:10, 126:23, 128:9
**fear**[2] - 18:16, 27:23
**February** [1]- 67:4
**feedback** [4] - 3:9, 3:19, 7:16, 17:16
**feelings** [3] - 7:17, 8:1, 57:8
**few** [4] - 13:15, 16:24, 77:21, 85:15
**field** [1]- 42:13
**fifth** [1] - 84:18
**figure** [4] - 24:10, 43:1, 57:12, 129:1
**figures** [1]- 129:12
**figuring** [1]- 18:5
**file** [1] - 1:17
**filling** [1] - 74:13
**fine** [4] - 63:20, 69:22, 78:13, 84:4
**finish** [2] - 64:14, 80:7
**finished** [1] - 13:17
**first**[11] - 4:10, 4:18, 7:2, 12:3, 13:15, 17:1, 17:17, 57:24, 109:4, 111:3, 112:23
**fit** [3] - 7:24, 8:5, 91:4
**FITZHENRY** [30]- 2:11, 11:17, 29:14, 52:4, 52:9, 52:13, 65:8, 65:17, 66:15, 67:6, 67:9, 67:16, 68:13, 68:16, 68:22, 70:17, 71:3, 71:12, 71:18, 79:5, 94:7, 112:23, 114:16, 115:19, 116:7, 116:18, 118:7, 122:7, 123:8, 124:7
**Fitzhenry** [6]- 2:12, 51:22, 65:5, 79:4, 94:6, 97:13
**five** [15] - 11:15, 11:18, 11:23, 12:9, 13:18, 33:11, 58:6, 77:20, 80:3, 80:7, 81:18, 82:7, 88:4, 89:24
**five-day** [1] - 11:15
**fix** [1]- 75:3
**fixed** [1]- 2:15
**flexible** [4] - 17:5, 50:22, 50:23, 84:22
**flip** [1]- 57:2
**flow** [1]- 39:6
**fluency** [1]- 72:4
**flying** [1]- 118:18
**focused** [1] - 89:24
**follow** [9] - 22:22, 22:23, 29:22, 33:18, 54:23, 64:9, 69:11, 77:7, 125:16
**follow-up** [4] - 22:22, 22:23, 29:22, 69:11
**following** [2] - 31:7, 89:13
**follows** [1] - 35:3
**foot** [1]- 5:18
**FOR** [1]- 1:1
**forever**[1] - 77:24
**Forget** [1]- 27:24
**forget** [1] - 64:13
**form** [3] - 40:12, 81:9, 126:22
**formal** [1] - 108:1
**forth** [1]- 85:3
**forward** [5] - 77:3, 77:10, 102:11, 109:9, 126:2
**four** [9] - 6:10, 7:5, 7:7, 10:9, 12:9, 61:24, 81:11, 112:17, 112:18
**Frances** [2] - 1:17, 131:11
**frankly** [4] - 101:2, 101:23, 104:7, 110:13
**free** [3] - 127:8, 127:10, 127:14
**Freehold** [6] - 2:22, 62:10, 62:12, 62:23, 85:14, 101:14
**FREEHOLD** [1]- 1:7
**FREEMAN** [94] - 2:16, 3:2, 3:10, 9:5, 10:18, 10:21, 11:11, 12:1, 17:19, 20:6, 20:11, 23:13, 25:1, 26:22, 31:18, 33:22, 34:7, 36:6, 37:21, 40:14, 43:12, 43:23, 46:14, 47:9, 48:5, 48:10, 51:19, 55:3, 55:17, 56:7, 56:18, 56:22, 57:15, 57:21, 58:3, 61:17, 62:20, 63:2, 63:7, 63:14, 63:21, 64:5, 64:19, 69:2, 72:14, 73:2, 74:7, 74:10, 74:17, 77:2, 77:8, 78:13, 78:24, 79:15, 87:23, 88:15, 89:3, 90:3, 90:17, 90:24, 91:11, 92:5, 92:24, 95:18, 96:4, 99:22, 100:7, 100:10, 100:15, 100:24, 101:8, 102:17, 103:5, 103:22, 104:18, 104:21, 108:7, 109:14, 111:2, 111:7, 116:21, 117:6, 118:2, 121:4, 121:19, 123:3, 126:18, 128:11, 128:19, 129:6, 129:9, 129:13, 129:19, 130:3
**Freeman**[2]- 2:17, 74:16
**frequently** [3] - 97:4, 98:10, 105:17
**Friday** [1] - 32:23
**friend** [4]- 7:19, 7:21, 7:23, 7:24
**friendly** [2] - 83:13, 85:4
**friends** [3] - 7:5, 7:6, 7:11
**front** [3] - 49:1, 85:17, 85:20
**front-loading** [1]- 49:1
**Frontline** [1] - 65:6
**full** [7] - 40:6, 73:18, 73:22, 97:20, 98:3, 99:17, 106:12
**fun** [1] - 123:22
**function** [1] - 6:1
**functional** [1]- 9:3
**furious** [1] - 99:5
**future** [1] - 19:12

## G

**GAI**[9]- 72:18, 72:20, 73:2, 73:7, 73:14, 73:18, 73:23, 74:6
**Garcia** [1] - 23:19
**gather** [1] - 48:24
**gen** [10] - 52:17, 52:18, 92:14, 94:15, 95:3, 113:2, 117:13, 119:17, 119:23, 121:2
**general** [2] - 78:19, 78:21
**Generally** [1] - 73:16
**generally** [1] - 21:14
**Genesis** [2] - 75:21, 76:1
**genuinely** [1] - 86:19
**given** [3] - 37:4, 79:23, 88:21
**glad** [1]- 86:13
**glasses** [1]- 7:21
**gmail** [1] - 75:15
**goal** [7] - 100:11, 101:10, 103:13, 104:12, 117:23, 126:3, 126:4
**goals** [10] - 21:8, 54:24, 55:15, 56:2, 125:9, 125:13, 125:14, 125:18, 125:24, 128:3
**Google** [2] - 80:16, 80:21
**govern** [1] - 103:11
**grade** [2] - 84:17, 84:18
**grandpa** [2] - 22:2, 107:19
**graph** [5] - 81:5, 81:6, 81:7, 87:7, 87:8
**graphic** [2] - 87:9, 93:18
**graphs** [1] - 93:15
**great** [11] - 2:1, 4:4, 4:16, 41:2, 41:6, 41:10, 63:7, 78:15, 89:11, 97:7, 128:18
**greets** [1]- 60:4
**groundwater** [1] -

89:14
**Group** [1]- 113:15
**group** [9] - 8:13, 9:10, 10:15, 11:10, 11:22, 12:7, 41:3, 54:3, 98:12
**groups** [1] - 24:8
**guess** [9] - 9:19, 10:2, 10:12, 16:19, 19:23, 34:7, 78:3, 79:19, 101:12
**guesses** [1]- 5:5
**guidance** [1] - 28:9
**guides** [1] - 81:1
**guys** [4] - 10:13, 44:20, 63:24, 116:10
**gym**[7]- 12:18, 12:19, 16:8, 16:9, 16:12, 60:17

## H

**H-I-L-L-A-R-y@ freemanlawoffices. com** [1] - 74:18
**half** [3] - 97:23, 129:1, 129:14
**hallway** [2] - 29:21, 60:4
**hallways** [1]-31:7
**hand** [4]- 82:14, 86:17, 95:12, 131:7
**hands** [1] - 98:14
**hands-on** [1] - 98:14
**hang** [1] - 20:14
**happier** [1] - 24:22
**happy** [2] - 23:10, 55:23
**harassing** [1] - 31:6
**harassment**[1] - 108:2
**hard** [5] - 19:4, 21:9, 80:22, 81:13, 95:12
**hate** [2] - 126:18, 127:1
**head** [1]- 124:3
**heads** [1] - 59:24
**heads-up** [1] - 59:24
**health** [3] - 17:8, 30:22, 42:14
**hear** [10] - 3:4, 3:10, 63:24, 64:18, 73:12, 79:13, 101:24, 119:20, 129:4, 129:19
**heard** [7] - 20:3, 34:16, 81:23, 85:8, 88:2, 99:23, 100:1
**hearing** [3] - 3:3, 45:18, 73:4
**hello** [2] - 87:15, 87:17
**help** [30] - 28:16, 40:23, 42:21, 47:6, 83:23, 83:24, 84:1, 85:11, 92:10, 93:4, 93:5, 94:5, 96:12, 96:13, 97:12, 98:19, 101:11, 101:15, 102:4, 102:8, 104:5, 105:5, 105:8, 105:9, 105:12, 105:17, 105:21, 106:21, 109:9, 121:9
**helped** [1]- 115:16
**helpful** [9]- 8:17, 8:24, 9:4, 44:11, 54:5, 94:2, 102:24, 104:6, 108:6
**helping** [2] - 83:20, 101:15
**helps** [1] - 106:20
**Henry** [1] - 30:15
**hereby** [1]- 131:3
**Hi** [5]- 2:24, 3:24, 4:13, 12:2, 26:1
**high** [2]- 16:18, 21:14
**HIGH**[1] - 1:7
**High** [2] - 2:22, 47:20
**highlighted** [1] - 118:12
**Hillary** [6] - 2:16, 29:16, 35:20, 72:10, 74:17, 121:17
**himself** [2] - 82:13, 124:14
**history** [5] - 37:13, 59:14, 59:15, 59:19, 99:7
**hoc** [1] - 46:24
**hold** [2] - 33:12, 77:12
**holding** [2]- 58:5, 115:12
**Holland** [3] - 42:11, 44:12, 65:6
**Holshu** [1]- 84:5
**home** [5] - 16:6, 30:18, 32:24, 95:10, 111:5
**homework** [2] - 79:24, 80:2
**honest** [2] - 87:21, 122:19
**honestly** [1] - 24:17
**honesty** [2] - 83:13, 89:23
**hope** [3] - 63:21, 129:17, 129:23
**hopeful** [1] - 14:11
**hoping** [1] - 9:9
**hour** [2]- 79:19, 128:2
**hover** [1] - 83:12
**HOWLAND** [18] - 3:12, 38:4, 40:4, 42:8, 43:7, 43:20, 44:1, 45:10, 45:18, 46:18, 47:13, 48:7, 48:23, 51:21, 52:5, 52:12, 63:18, 63:23
**Howland** [4] - 30:16, 33:8, 67:14, 101:21
**huge** [2] - 71:22, 71:23
**hundred** [2] - 20:21, 49:21
**hurting** [2] - 7:17, 7:24
**husband** [1] - 75:15
**husband's** [1] - 74:24

## I

**ICR** [6] - 91:20, 96:14, 96:15, 99:2, 114:1, 117:22
**idea** [8] - 25:4, 31:24, 56:5, 56:12, 58:4, 58:8, 121:5, 121:21
**ideally** [1] - 18:9
**ideas** [1] - 42:1
**identify** [7] - 81:5, 87:10, 97:18, 119:10, 119:11
**IEP** [36] - 1:15, 25:6, 30:3, 30:8, 31:19, 35:11, 35:14, 35:21, 36:1, 41:22, 46:21, 47:5, 47:23, 48:12, 62:1, 62:11, 62:22, 64:14, 64:24, 72:15, 74:11, 77:9, 78:18, 80:3, 100:11, 100:21, 101:11, 101:18, 123:13, 125:9, 125:19, 126:23, 127:22
**IEPs** [1] - 62:16
**ignore** [2] - 84:3, 97:10
**ignored** [1] - 28:17
**imaginable** [1] - 106:23
**impacting** [1] - 44:4
**impaired** [1] - 43:22
**impairment** [1] - 76:18
**impairments** [1] - 8:18
**important** [8] - 15:20, 42:14, 43:6, 49:2, 56:23, 90:1, 103:9, 127:15
**impression** [2] - 88:5, 88:8
**impromptu** [1]- 121:1
**improvement**[1] - 114:15
**IN** [1]- 1:1
**inappropriate** [5] - 21:19, 21:21, 21:24, 107:5, 107:6
**Inaudible** [2] - 16:15, 40:3
**incident** [2] - 38:7, 47:5
**include** [1] - 121:22
**included** [1]- 18:4
**including** [3]- 15:16, 18:21, 101:14
**inclusion** [3] - 81:17, 97:9, 97:21
**incorporate** [1] - 44:9
**incorporated** [1] - 93:13
**incorrect** [1] - 75:1
**incorrectly** [1] - 75:18
**independent** [1] - 71:24
**independently** [2] - 96:24, 97:24
**individual** [8] - 8:16, 8:22, 9:10, 9:11, 9:18, 11:9, 11:22, 41:2
**individually** [2] - 1:4, 99:19
**individuals** [2]- 10:14, 11:8
**inference** [3] - 89:10, 93:21, 93:22
**inferences** [2] - 81:20, 115:21
**inferencing** [2] - 24:8, 93:9
**inferential** [2] - 89:9, 113:11
**informal** [1] - 88:19
**information** [12] - 58:1, 72:21, 73:16, 73:21, 81:7, 88:20, 93:21, 98:1, 102:4, 109:8, 109:24, 128:4
**infuse** [2] - 23:15, 123:16
**initial** [1] - 67:19
**input** [4] - 30:6, 35:12, 37:12, 37:22
**instead** [7] - 11:15, 21:16, 50:15, 51:14, 81:11, 83:2, 119:8
**instruction** [5] - 15:13, 36:23, 80:10, 82:24, 85:23
**instructional** [2] - 17:4, 53:8
**insulted** [3] - 85:22, 107:10, 107:18
**insulting** [3] - 8:7, 19:19, 19:22
**intended** [1] - 82:7
**intention** [1] - 20:22
**intentions** [1] - 25:15
**interaction** [1] - 12:11
**interactions** [1]- 87:19
**interested** [2] - 86:19, 131:6
**interfere** [1] - 17:8
**interim** [1]- 57:3
**internalizes** [2] - 51:13, 51:17
**INTERNATIONAL** [1] - 1:23
**interpret** [1] - 55:20
**interpretation**[1]- 41:4
**interpreting** [1]- 27:12
**interrupt** [1] - 85:23
**interrupting** [1]- 44:14
**interview** [1] - 110:24
**interviews** [1] - 68:7
**intimidated** [1] - 56:8
**intimidator** [1]- 108:2
**introduce** [2] - 2:6, 123:18
**introduction** [1]- 12:4
**invite** [3] - 7:5, 7:13
**involved** [5] - 23:3, 104:5, 108:15, 108:19, 110:17
**IP** [2]- 62:8, 64:15
**IPO** [1] - 19:11
**IQ**[2]- 73:18, 73:22
**issue** [32] - 12:18, 15:21, 17:11, 24:19, 26:4, 26:16, 29:19, 37:5, 38:22, 39:3, 50:22, 53:5, 53:15, 60:7, 63:15, 69:6, 72:5, 73:13, 80:4, 80:6, 80:12, 80:20, 85:7, 93:10, 107:4, 108:3, 109:17, 120:21, 121:22, 124:19, 125:2
**issues** [9] - 12:12, 17:8, 37:6, 55:11, 95:8, 107:22, 108:11, 113:10, 117:21
**item** [1] - 7:15
**items** [1]- 7:3

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 139 of 146 PageID: 3261



## J

**jail** [1] - 28:3
**January** [1] - 32:18
**JERSEY** [1] - 1:1
**job** [1]- 75:17
**joined** [1] - 27:15
**joking** [1] - 16:14
**jot** [1]- 82:9
**Joworisak** [2] - 26:6, 28:8
**juvenile** [1] - 24:1

## K

**Kathy** [1] - 3:24
**keep** [6] - 64:10, 69:20, 95:13, 102:9, 114:19, 117:10
**keeps** [1]- 44:14
**Kelly** [1] - 2:11
**Kelsey**[1] - 2:7
**kid** [13] - 19:22, 22:4, 22:10, 22:18, 47:22, 50:2, 96:20, 107:4, 107:9, 107:12, 107:18, 107:22
**kidding** [1] - 129:14
**kids** [33] - 12:21, 21:11, 24:18, 45:2, 52:10, 82:8, 83:15, 84:23, 85:3, 85:13, 85:15, 85:17, 85:21, 85:22, 87:19, 94:23, 97:4, 97:10, 98:12, 98:21, 99:2, 99:17, 106:11, 106:12, 106:14, 106:15, 106:19, 107:1, 108:5, 112:18, 122:21, 123:21
**kin** [1]- 131:5
**kind** [23] - 7:15, 7:21, 8:14, 10:6, 10:24, 13:11, 18:22, 24:2, 24:16, 24:19, 26:11, 31:10, 51:13, 54:1, 54:23, 58:23, 70:14, 82:3, 96:23, 105:2, 109:12, 117:19, 118:23
**kindergarten** [2] - 106:3, 106:5
**kinds** [1] - 107:11
**kinesthetic**[1]- 118:15
**knowing** [2]- 25:10, 109:22
**knowledgeable** [1] - 20:16
**known** [1] - 47:4
**knows** [4]- 18:15, 22:2, 22:3, 41:8

## L

**L.T**[77]-2:20, 4:15, 12:2, 14:14, 15:2, 16:14, 17:6, 17:14, 18:18, 20:15, 21:3, 22:13, 23:12, 27:13, 30:9, 32:17, 33:23, 40:3, 42:11, 43:10, 44:12, 45:12, 50:21, 54:7, 59:1, 59:3, 59:13, 60:2, 60:6, 60:16, 60:22, 61:16, 61:23, 62:5, 62:8, 64:7, 65:5, 65:14, 66:12, 67:3, 67:7, 67:12, 67:17, 68:15, 68:20, 71:2, 71:6, 71:13, 71:20, 72:13, 72:24, 73:9, 74:9, 74:24, 75:5, 75:24, 76:9, 76:12, 76:24, 77:5, 77:11, 77:17, 77:23, 78:3, 79:14, 105:7, 105:20, 112:9, 114:10, 114:22, 116:3, 116:8, 116:19, 124:5, 124:8, 129:21, 130:1
**I.T** [2] - 2:20, 36:10
**lab** [7]- 3:22, 53:11, 81:22, 86:20, 98:9, 98:11, 98:13
**labels** [1] - 81:6
**labs** [1] - 88:2
**language** [20] - 6:17, 6:18, 6:19, 8:19, 24:14, 35:9, 44:13, 45:7, 45:13, 55:15, 56:2, 92:7, 92:9, 92:12, 92:19, 93:2, 117:2, 117:12, 117:17, 118:4
**languages** [1] - 64:9
**large** [2]- 73:17, 74:4
**last** [29] - 4:5, 6:15, 12:4, 12:10, 22:19, 28:9, 34:3, 40:5, 46:21, 64:14, 65:16, 67:4, 68:12, 69:7, 69:18, 70:2, 77:19, 77:20, 86:4, 89:23, 101:18, 111:8, 111:15, 112:10, 112:12, 112:15, 112:20, 113:17, 124:10
**Lately** [1] - 83:21
**laugh** [1] - 23:19
**Laugh** [1] - 24:16
**lawyer**[1]- 51:20
**lead** [1] - 57:17
**learn** [3] - 115:9, 115:14, 115:15
**learned** [2] - 95:6, 106:4
**learning** [5] - 36:23, 39:14, 66:24, 93:21, 94:10
**least** [6] - 16:12, 32:7, 57:3, 70:11, 86:8, 88:4
**leave** [4] - 20:13, 30:18, 128:7, 128:10
**left** [2] - 4:12, 20:8
**legal** [1] - 70:10
**Legally** [1] - 103:10
**lengthy** [1]- 87:2
**less** [2]- 104:14, 105:15
**lesson** [1]- 120:24
**letter** [3] - 10:6, 17:15, 32:22
**level** [9]- 16:18, 81:18, 88:12, 89:2, 92:2, 92:4, 94:12, 108:1, 108:4
**levels** [4] - 91:3, 91:5, 91:7, 94:20
**Libby** [1] - 2:18
**life** [4] - 44:17, 115:17, 118:23, 119:3
**limitations** [1] - 41:23
**Linden** [1] - 113:13
**line** [2] - 53:17, 117:9
**lines** [1] - 27:2
**list**[2] - 11:7, 67:23
**listen** [2] - 38:14, 49:3
**listening** [2] - 76:18, 79:19
**listens** [1] - 82:20
**Literacy** [1] - 113:15
**literal** [1]- 95:20
**live** [2] - 33:16, 84:18
**LLC**[1]- 1:23
**LLD** [33] - 90:5, 90:19, 91:8, 91:12, 92:1, 92:10, 93:3, 93:11, 94:16, 96:12, 97:8, 97:12, 97:15, 98:2, 98:10, 99:10, 99:12, 105:3, 105:9, 105:24, 106:8, 106:23, 107:7, 111:23, 112:13, 112:14, 115:5, 115:13, 116:15, 117:11, 117:23, 118:8
**loading** [1] - 49:1
**log** [1]-3:13
**look** [10] - 24:4, 40:6, 57:6, 61:3, 61:11, 68:20, 81:4, 83:6, 125:8, 125:12
**looked** [4]- 5:12, 5:14, 71:14, 75:9
**looking** [15] - 4:24, 5:10, 5:17, 6:3, 6:10, 7:8, 7:20, 40:10, 64:24, 72:10, 80:4, 82:24, 122:9, 125:9, 129:16
**looks** [3] - 4:21, 6:19, 13:8
**loop** [1] - 3:19
**lost** [2]- 5:21, 8:8
**love** [4] - 44:8, 99:10, 99:11, 117:9
**loved** [1] - 20:16
**loves** [2] - 60:22, 61:1
**low** [1]- 73:24
**lunch** [2] - 16:21, 40:7
**lunchtime** [1] - 79:3
**luxury** [1] - 99:1

## M

**mail** [26] - 30:11, 31:1, 33:7, 49:24, 64:6, 64:16, 64:20, 67:18, 74:13, 74:14, 74:21, 75:1, 75:6, 75:10, 75:12, 76:1, 76:2, 76:3, 76:7, 127:13, 128:9, 129:12
**mailed** [1]- 67:17
**mails** [7] - 30:16, 65:6, 65:9, 65:10, 67:15, 69:13, 75:13
**main** [3] - 12:13, 12:22, 52:1
**maintain** [1] - 95:9
**management** [1] - 106:4
**manager** [10] - 2:8, 14:16, 15:16, 27:16, 33:7, 46:20, 53:20, 65:13, 123:14
**manifestation** [5] - 32:1, 40:10, 40:21, 45:23, 100:22
**manifestations** [1]- 34:12
**map** [1] - 94:10
**marked** [1] - 40:8
**marking** [1] - 59:15
**Marlboro** [1]- 53:24
**masks** [2] - 86:12, 86:13
**masters** [1] - 120:3
**matches** [1] - 15:7
**material** [2] - 91:19, 118:14
**materials** [1] - 116:6
**math** [7] - 11:20, 72:4, 92:18, 92:22, 93:4, 99:7, 113:3
**matter** [4] - 42:3, 86:21, 107:3, 116:11
**matters** [2] - 102:15, 102:18
**mean** [28] - 10:12, 16:19, 20:23, 34:9, 44:21, 45:8, 47:20, 48:18, 58:4, 58:6, 63:3, 64:5, 69:18, 70:17, 75:12, 92:12, 94:6, 94:8, 100:14, 100:17, 100:18, 101:1, 105:8, 109:7, 122:20, 123:8, 123:24, 127:8
**meaning** [1] - 45:24
**means** [2]- 82:2, 97:7
**medical** [1] - 44:7
**meet**[12] - 15:4, 17:24, 39:20, 42:9, 42:24, 47:6, 47:18, 47:22, 48:3, 49:7, 49:13, 128:13
**Meeting** [2] - 1:12, 1:16
**meeting** [46] - 2:3, 4:5, 18:8, 20:8, 30:12, 31:15, 32:8, 36:18, 36:21, 37:2, 40:5, 41:22, 46:16, 47:11, 47:14, 48:15, 49:2, 50:4, 52:20, 64:15, 65:15, 68:12, 69:11, 69:14, 69:18, 70:2, 70:4, 70:20, 72:22, 73:8, 78:6, 78:12, 78:22, 84:12, 101:18, 109:4, 111:12, 111:15, 127:1, 127:2, 127:5, 127:23, 131:4
**meetings** [5] - 14:16, 15:4, 34:3, 37:7, 124:9
**meets** [1]- 11:18
**memorize** [2] - 87:8, 89:14

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 140 of 146 PageID: 3262


**memory** [1] - 73:19
**mental** [2] - 30:22, 42:13
**mention** [1] - 103:24
**mentioned** [5] - 19:18, 81:3, 101:22, 103:23, 120:7
**mess** [1]- 50:16
**message** [7] - 14:18, 14:19, 14:20, 27:11, 35:1, 43:6
**met** [2]- 12:3, 50:1
**mic** [1] - 96:2
**Michelle** [1] - 23:19
**microphone** [2] - 3:14, 73:13
**microscope** [1] - 5:23
**middle** [2] - 84:16, 98:13
**might** [35] - 8:24, 10:8, 12:24, 14:8, 22:7, 27:6, 31:24, 36:3, 36:14, 36:21, 40:15, 45:7, 45:14, 51:4, 54:4, 56:4, 57:5, 59:6, 59:11, 77:4, 85:16, 85:18, 87:5, 87:7, 90:20, 94:2, 97:18, 97:20, 97:22, 104:6, 106:14, 107:12, 107:18, 109:19, 123:22
**miked** [1] - 3:20
**mind** [2] - 80:6, 122:22
**mine** [2] - 3:20, 76:4
**mini** [1]- 120:24
**minimum** [3] - 10:23, 11:2, 88:12
**minute** [1]- 106:9
**minutes** [24] - 8:13, 9:19, 13:16, 13:18, 15:12, 16:1, 17:1, 30:19, 54:15, 58:6, 59:20, 62:15, 64:23, 65:4, 77:21, 82:7, 82:23, 97:22, 98:4, 99:19, 106:10, 129:1, 129:14
**misconduct** [1]- 40:13
**misinterpret** [1] - 36:3
**misinterpreting** [5] - 40:17, 40:20, 41:16, 45:24, 46:5
**miss** [4] - 16:1, 16:8, 18:9, 18:13
**missed** [7] - 15:12, 18:6, 18:7, 31:13, 53:1, 53:23, 80:9
**missing** [7] - 15:11, 17:2, 17:3, 18:10, 53:8, 80:4, 98:6
**mistake** [2] - 33:15, 49:16
**misunderstands**[1] - 23:9
**mitigate** [1] - 108:3
**model** [2] - 24:2, 24:16
**modification** [1]- 53:13
**modifications** [2]- 79:23, 91:22
**modified** [2] - 80:24, 91:16
**modify** [1] - 106:19
**modifying** [1]- 92:1
**mom** [6] - 2:20, 29:4, 58:21, 83:6, 95:11, 128:14
**moment** [6] - 41:21, 42:2, 42:6, 43:2, 69:5, 96:2
**moments** [1]- 121:2
**Monday** [8] - 33:3, 33:5, 58:15, 58:17, 58:24, 61:4, 128:14, 128:17
**month** [4] - 54:15, 56:5, 62:1, 62:7
**morning** [1]- 17:10
**mornings** [1]- 17:7
**Most**[1] - 113:19
**most** [6] - 9:4, 60:23, 60:24, 84:9, 90:1, 114:2
**motivating** [1] - 57:13
**motives** [2] - 83:18, 83:19
**move** [12] - 37:18, 76:15, 78:17, 83:9, 84:7, 91:16, 95:5, 99:3, 101:11, 102:1, 102:8, 106:10
**moved** [3] - 95:17, 98:7, 120:4
**moves** [1] - 91:20
**moving** [8] - 82:12, 96:20, 97:3, 99:7, 102:11, 104:15, 109:9, 117:15
**MR** [27] - 2:9, 2:21, 3:16, 35:20, 37:17, 72:7, 79:12, 79:16, 88:10, 88:17, 89:7, 90:7, 90:13, 95:24, 96:8, 100:6, 100:8, 100:13, 100:18, 101:7, 102:13, 102:19, 103:19, 105:1, 105:14, 105:23, 121:16
**MS** [300]- 2:1, 2:11, 2:16, 2:18, 2:20, 2:24, 3:2, 3:6, 3:10, 3:24, 4:3, 4:13, 4:15, 4:16, 9:5, 10:2, 10:18, 10:20, 10:21, 11:6, 11:11, 11:14, 11:17, 12:1, 12:2, 12:15, 14:14, 14:23, 15:2, 16:11, 16:14, 16:16, 17:6, 17:13, 17:19, 18:18, 20:6, 20:9, 20:11, 20:15, 21:1, 21:3, 22:12, 22:13, 23:5, 23:12, 23:13, 23:16, 25:1, 25:23, 26:1, 26:22, 29:14, 30:9, 31:18, 32:14, 32:17, 33:22, 33:23, 34:7, 36:6, 37:21, 40:3, 40:14, 42:11, 43:10, 43:12, 43:23, 44:12, 45:12, 46:14, 47:9, 48:5, 48:10, 50:21, 51:19, 52:4, 52:9, 52:13, 54:7, 54:9, 55:3, 55:8, 55:16, 55:17, 55:21, 56:7, 56:9, 56:18, 56:21, 56:22, 57:14, 57:15, 57:20, 57:21, 57:22, 58:3, 58:11, 59:1, 59:2, 59:3, 59:9, 59:13, 60:1, 60:2, 60:3, 60:6, 60:8, 60:16, 60:20, 60:22, 61:2, 61:16, 61:17, 61:18, 61:23, 62:3, 62:5, 62:6, 62:8, 62:20, 62:24, 63:2, 63:3, 63:7, 63:12, 63:14, 63:21, 64:2, 64:5, 64:7, 64:19, 64:22, 65:5, 65:8, 65:14, 65:17, 66:12, 66:15, 67:3, 67:6, 67:7, 67:9, 67:12, 67:16, 67:17, 68:13, 68:15, 68:16, 68:20, 68:22, 69:2, 70:17, 71:2, 71:3, 71:6, 71:12, 71:13, 71:18, 71:20, 72:13, 72:14, 72:16, 72:24, 73:2, 73:5, 73:9, 73:12, 74:7, 74:8, 74:9, 74:10, 74:12, 74:17, 74:19, 74:24, 75:2, 75:5, 75:20, 75:24, 76:6, 76:9, 76:10, 76:12, 76:14, 76:24, 77:2, 77:5, 77:8, 77:11, 77:15, 77:17, 77:22, 77:23, 78:1, 78:3, 78:5, 78:13, 78:15, 78:24, 79:2, 79:5, 79:8, 79:14, 79:15, 87:23, 88:15, 89:3, 90:3, 90:11, 90:15, 90:17, 90:22, 90:24, 91:2, 91:11, 91:15, 92:5, 92:11, 92:17, 92:18, 92:24, 93:7, 94:7, 95:18, 96:4, 99:22, 100:7, 100:10, 100:15, 100:24, 101:8, 102:17, 103:5, 103:22, 104:8, 104:18, 104:20, 104:21, 104:23, 105:7, 105:20, 108:7, 108:22, 109:14, 110:22, 111:2, 111:4, 111:7, 111:11, 112:9, 112:19, 112:23, 114:10, 114:16, 114:22, 115:19, 116:3, 116:7, 116:8, 116:18, 116:19, 116:21, 117:5, 117:6, 117:18, 118:2, 118:7, 121:4, 121:19, 122:7, 123:3, 123:8, 124:5, 124:7, 124:8, 125:18, 125:23, 126:6, 126:10, 126:12, 126:15, 126:16, 126:18, 128:1, 128:11, 128:12, 128:19, 129:3, 129:6, 129:8, 129:9, 129:11, 129:13, 129:15, 129:19, 129:21, 129:22, 130:1, 130:3
**Mu** [1] - 113:13
**multi** [1]- 87:3
**multi-step** [1] - 87:3
**multimodality** [2] - 118:8, 120:9
**multiple** [4]- 81:8, 87:6, 89:3, 91:24
**mute** [3] - 3:9, 79:11, 90:13
**muted** [1] - 64:1

## N

**name** [2] - 28:9, 92:16
**names** [1] - 114:24
**natural** [1] - 50:14
**nature** [1] - 99:8
**navigate** [1] - 24:23
**nearby** [1] - 83:12
**necessarily**[1] - 110:7
**necessary** [3] - 32:9, 80:14, 82:18
**Neck** [2] - 47:20, 62:13
**need** [30] - 9:17, 16:19, 17:6, 22:7, 23:1, 23:2, 39:15, 39:23, 43:18, 48:22, 64:7, 64:11, 64:20, 69:12, 70:6, 70:16, 77:6, 102:16, 102:21, 103:18, 105:2, 105:5, 107:8, 109:24, 110:17, 121:17, 126:19, 126:20, 126:24, 127:17
**needed** [2] - 5:19, 14:2
**needs** [9] - 23:8, 24:3, 28:22, 42:9, 50:20, 69:21, 96:19, 103:18, 115:7
**negative** [2] - 122:23, 123:1
**negotiating** [1]- 13:16
**never** [14]- 12:3, 14:20, 15:2, 15:5, 17:14, 21:12, 27:19, 30:23, 33:1, 62:11, 62:16, 62:18, 86:13, 111:9
**NEW**[1]- 1:1
**new** [4] - 60:9, 60:12, 125:2, 126:13
**next** [15] - 13:8, 41:12, 47:1, 49:3, 58:13, 70:4, 95:5, 96:20, 98:7, 99:18, 104:13, 104:16, 125:13, 125:21, 125:22
**nice** [1] - 84:23
**Nice**[2] - 2:8, 4:1
**nicely** [1] - 28:11
**nicer** [1] - 45:5
**nine** [4] - 97:10, 98:12, 98:21, 106:11
**nobody** [12]- 15:15, 19:23, 28:8, 28:10, 28:24, 30:14, 37:24,

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 141 of 146 PageID: 3263


67:5, 67:22, 70:2, 104:3
**Nobody** [4] - 68:7, 68:8, 70:4
**noisy** [1] - 106:1
**none** [2] - 28:7, 39:16
**normally** [1] - 113:9
**Notary** [3] - 1:18, 131:4, 131:12
**noted** [1] - 74:5
**notes** [4] - 12:8, 53:10, 64:10, 80:18
**nothing** [6] - 38:10, 59:17, 59:18, 66:1, 66:17, 84:14
**Nothing** [3] - 59:18, 66:15, 68:9
**noticed** [2] - 18:20, 18:21
**notify** [1] - 41:18
**November** [2] - 32:19, 32:20
**nuances** [1] - 70:15
**number** [5] - 37:5, 76:10, 76:12, 108:5, 122:20
**numerous** [1] - 12:22

## O

**O.T** [1] - 1:4
**observation** [1] - 109:16
**observed** [1] - 112:14
**Obviously** [1] - 93:9
**obviously** [7] - 16:18, 46:24, 57:1, 57:8, 80:2, 92:7, 96:3
**occasions** [1] - 122:20
**occupational** [1] - 3:1
**occurs** [1] - 41:15
**October** [2] - 12:6, 21:11
**OF** [2] - 1:1, 1:8
**off-putting** [2] - 85:6, 85:16
**offend** [2] - 16:15, 85:21
**offer** [1] - 38:2
**offered** [1] - 37:24
**office** [6] - 22:21, 28:8, 28:10, 39:11, 52:1, 65:11
**offices** [1] - 28:7
**official** [1] - 131:7
**officially** [1] - 23:21
**often** [3] - 82:5, 86:22, 105:17
**oftentimes** [1] - 114:2
**Oftentimes** [1] - 119:7
**old** [3] - 75:13, 79:16, 117:9
**once** [7] - 9:22, 9:23, 16:22, 56:5, 86:15, 123:24, 126:13
**One** [6] - 36:18, 41:1, 61:23, 85:12, 99:23, 105:7
**one** [78] - 4:9, 4:18, 4:19, 4:22, 5:20, 5:22, 6:5, 7:11, 8:12, 9:7, 9:10, 9:11, 9:19, 10:15, 10:19, 11:1, 11:10, 11:22, 15:21, 17:20, 19:15, 19:16, 19:20, 21:10, 23:23, 27:8, 32:21, 34:22, 35:6, 36:6, 36:9, 37:5, 37:22, 41:11, 44:17, 51:22, 55:7, 55:23, 60:23, 62:12, 62:14, 69:6, 69:15, 73:15, 73:20, 74:21, 75:14, 75:16, 76:11, 76:13, 79:12, 82:8, 82:12, 86:23, 87:20, 89:12, 96:2, 97:7, 99:11, 100:2, 104:13, 104:15, 105:16, 106:14, 107:4, 108:4, 113:19, 116:11, 116:14, 124:10, 125:7
**one-on-one** [5] - 55:7, 97:7, 99:11, 105:16, 125:7
**ones** [1] - 119:15
**online** [2] - 83:4, 83:7
**open** [4] - 56:11, 56:12, 122:12, 122:18
**opportunities** [3] - 91:17, 93:23, 94:1
**opportunity** [6] - 25:21, 36:23, 66:6, 92:13, 120:10, 120:22
**opposed** [3] - 25:17, 53:18, 63:10
**opposition** [1] - 78:11
**option** [3] - 39:22, 76:20, 121:10
**options** [1] - 121:15
**orally** [1] - 88:23
**order** [3] - 89:16, 108:23, 111:5
**organizer** [1] - 87:9
**organizers** [1] - 93:19
**Oriental** [2] - 107:14, 107:15
**oriented** [1] - 48:17
**originally** [1] - 65:18
**OT** [1] - 51:24
**Otherwise** [1] - 66:9
**otherwise** [1] - 48:1
**outcome** [1] - 131:6
**outlined** [1] - 38:20
**outside** [2] - 23:18, 35:15
**overall** [3] - 8:9, 90:12, 91:2
**overcome** [1] - 99:13
**oversight** [1] - 66:2
**own** [5] - 45:7, 83:14, 85:11, 97:24, 102:22

## P

**pace** [3] - 91:17, 98:20, 117:16
**pacing** [9] - 94:20, 95:3, 95:4, 95:5, 96:7, 96:9, 113:6, 120:7
**page** [2] - 16:8, 103:7
**pages** [3] - 77:19, 77:20, 125:15
**pandemic** [1] - 86:6
**paper** [3] - 67:19, 88:21, 88:22
**paperwork** [3] - 111:5, 111:10, 128:8
**para** [1] - 113:21
**paragraph** [1] - 81:19
**paragraphs** [1] - 98:1
**parallel** [1] - 119:2
**parallels** [1] - 118:23
**paraprofessional** [6] - 31:3, 83:11, 83:22, 84:3, 105:21, 125:3
**paraprofessionals** [3] - 22:8, 98:17, 105:18
**parcel** [1] - 38:19
**parent** [10] - 15:14, 20:20, 30:20, 37:24, 38:8, 38:13, 39:3, 39:21, 75:3, 75:22
**parents** [11] - 32:8, 35:23, 36:18, 37:3, 37:7, 38:23, 39:9, 41:18, 42:3, 49:23, 124:13
**parents'** [1] - 35:22
**part** [18] - 19:6, 21:9, 22:20, 24:16, 38:19, 41:17, 46:10, 53:8, 68:6, 68:18, 68:24, 71:14, 78:12, 105:11, 111:12, 111:14, 121:14, 123:20
**part-time** [1] - 123:20
**partially** [1] - 36:14
**participate** [3] - 14:11, 78:22, 112:2
**participated** [1] - 13:15
**participates** [1] - 60:24
**particular** [3] - 82:17, 98:4, 98:19
**parts** [1] - 18:7
**party** [6] - 7:6, 7:8, 7:10, 7:12, 7:13, 131:6
**pass** [5] - 52:2, 52:3, 52:5, 59:15, 105:11
**passed** [1] - 34:5
**past** [3] - 17:22, 26:9, 123:2
**paw** [1] - 5:17
**pay** [1] - 70:16
**paying** [1] - 120:16
**pdf** [1] - 80:20
**PE** [1] - 13:6
**peer** [1] - 7:16
**peers** [1] - 12:11
**pejorative** [1] - 107:17
**penalty** [1] - 59:7
**people** [10] - 24:11, 26:9, 27:4, 27:9, 34:1, 44:19, 45:2, 45:21, 105:15, 126:21
**per** [4] - 10:19, 11:2, 11:13, 24:21
**perceived** [1] - 40:13
**perceives** [2] - 124:14, 124:15
**perceiving** [1] - 49:20
**percent** [3] - 20:21, 49:22, 81:12
**percentile** [3] - 5:3, 6:9, 7:2
**perception** [2] - 27:19, 28:3
**perfectly** [3] - 10:15, 20:2, 84:4
**performance** [2] - 70:1, 72:2
**period** [2] - 59:15, 128:21
**periods** [2] - 61:7, 61:12
**perseverance** [1] - 117:23
**perseverates** [1] - 100:3
**perseverating** [4] - 101:1, 101:24, 102:8, 102:10
**perseveration** [4] - 101:9, 101:17, 104:2, 104:6
**person** [10] - 8:7, 27:8, 34:22, 43:4, 43:5, 47:15, 66:17, 74:1, 83:14, 109:11
**person's** [1] - 23:9
**personality** [1] - 51:5
**perspective** [9] - 9:15, 23:10, 26:24, 27:1, 27:5, 27:14, 41:5, 41:11, 42:12
**ph** [3] - 84:5, 113:14, 114:17
**phone** [2] - 31:1, 50:1
**phrase** [1] - 10:13
**physical** [1] - 119:1
**physics** [1] - 119:2
**pick** [3] - 8:4, 10:6, 30:14
**picked** [1] - 5:6
**picks** [1] - 7:21
**picture** [8] - 4:19, 4:21, 4:23, 5:8, 5:12, 5:14, 6:6, 6:11
**pictures** [1] - 6:10
**piece** [23] - 30:7, 36:15, 48:13, 55:9, 65:21, 65:22, 65:23, 66:20, 66:21, 69:15, 73:15, 73:21, 76:16, 78:17, 78:18, 81:24, 84:11, 89:22, 90:1, 98:16, 105:2, 107:21, 108:4
**pieces** [2] - 66:10, 106:2
**place** [13] - 30:4, 31:21, 36:7, 36:17, 37:2, 69:15, 95:15, 105:4, 110:3, 110:10, 122:15, 123:12, 124:1
**placement** [2] - 95:20, 124:2
**placements** [1] - 116:10
**Plaintiffs** [1] - 1:6
**plan** [17] - 2:4, 18:6, 31:23, 34:8, 104:5, 108:20, 109:1, 109:18, 109:20, 110:10, 110:14, 111:13, 111:16, 121:21, 125:3, 127:16, 128:8

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 142 of 146 PageID: 3264



**play** [1] - 18:16
**point** [10] - 6:11, 19:13, 22:11, 28:20, 34:9, 35:10, 37:18, 37:20, 111:22, 115:4
**points** [1] - 69:3
**polite** [1] - 85:3
**poor** [1] - 33:20
**portal** [2] - 75:3, 75:22
**portals** [1] - 75:8
**portion** [1] - 78:6
**position** [1] - 28:18
**positive** [3] - 54:6, 60:15, 87:19
**possibly** [1] - 123:16
**post** [1] - 80:23
**posted** [2] - 80:21, 83:4
**power** [1] - 62:21
**pragmatic** [3] - 6:18, 9:15, 23:8
**pragmatics** [2] - 23:4, 41:5
**predict** [1] - 24:12
**predictions** [2] - 115:22, 115:23
**prefer** [1] - 61:8
**preferred** [2] - 104:14
**premature** [1] - 38:18
**premise** [1] - 120:18
**prepare** [6] - 18:8, 18:14, 29:7, 36:12, 54:19, 58:9
**prepared** [3] - 43:15, 48:14, 48:20
**preparing** [1] - 48:22
**present** [2] - 16:3, 116:16
**presented** [1] - 120:17
**presumably** [1] - 102:9
**pretend** [1] - 7:18
**pretty** [2] - 50:10, 119:20
**prevent** [1] - 33:21
**previous** [2] - 19:11, 124:9
**previously** [2] - 14:1, 54:14
**Prey** [1] - 114:1
**principal** [6] - 22:22, 27:18, 28:1, 32:23, 33:3
**principals** [1] - 49:23
**print** [3] - 64:8, 64:11, 77:6
**printer** [2] - 77:13, 77:18
**printing** [1] - 77:19
**privately** [1] - 42:18
**proactive** [1] - 52:15
**proactively** [1] - 54:5
**problem** [7] - 12:16, 24:18, 31:11, 76:6, 77:15, 77:22, 124:21
**problems** [6] - 24:23, 33:13, 41:24, 51:20, 124:24
**procedure** [1] - 38:20
**procedures** [3] - 30:4, 34:2, 34:4
**proceed** [3] - 78:23, 79:4, 127:15
**proceeds** [1] - 39:2
**process** [9] - 33:24, 38:6, 38:9, 38:11, 38:19, 61:15, 65:2, 65:11, 87:3
**processing** [3] - 64:8, 73:20, 95:8
**product** [1] - 40:20
**productive** [1] - 16:10
**products** [1] - 34:11
**Professional**[1] - 1:18
**professional** [3] - 21:16, 31:4, 69:20
**profile** [2] - 103:8, 103:15
**program** [17] - 23:15, 40:12, 91:8, 94:16, 111:23, 112:2, 112:3, 112:7, 112:12, 112:15, 112:17, 112:20, 112:24, 113:1, 113:12, 116:3, 116:7
**programming** [3] - 11:7, 37:18, 63:6
**programs** [3] - 112:13, 112:14, 114:13
**prompt** [1] - 120:15
**proof** [1] - 88:20
**proper** [1] - 32:10
**proposal** [2] - 90:4, 90:18
**proposing** [1] - 37:19
**protocol** [1] - 50:3
**protocols** [12] - 30:4, 68:18, 68:24, 69:19, 70:10, 70:19, 70:21, 72:17, 73:6
**provide** [1] - 8:2
**provided** [2] - 53:13, 81:1
**providing** [3] - 118:9, 118:10, 118:11
**psycho** [4] - 65:19, 66:11, 66:13, 66:18
**psycho-ed** [4] - 65:19, 66:11, 66:13, 66:18
**psychoeducation** [2] - 68:6, 71:15
**psychological** [5] - 65:21, 66:21, 68:1, 68:2, 71:7
**psychologist** [1] - 66:19
**Public** [3] - 1:19, 131:4, 131:12
**pull** [3] - 12:17, 115:15, 120:13
**pulled** [14] - 12:19, 13:6, 15:23, 18:19, 19:20, 36:13, 48:18, 50:9, 51:1, 109:15, 109:20, 110:11, 110:23, 128:22
**pulling** [5] - 12:18, 50:17, 58:8, 109:2, 109:12
**punish** [2] - 22:18, 36:17
**punished** [6] - 28:15, 29:11, 31:22, 32:2, 32:7, 36:4
**punishing** [3] - 25:18, 35:18, 36:16
**punishment** [5] - 25:9, 26:15, 27:5, 32:16, 34:16
**punishments** [1] - 32:3
**purely**[1] - 11:3
**purpose** [1] - 111:13
**Put** [1] - 63:1
**put** [23] - 8:11, 16:6, 20:4, 25:5, 31:20, 31:21, 35:14, 36:7, 37:1, 47:5, 56:15, 72:11, 74:15, 83:7, 98:22, 109:19, 110:3, 110:9, 114:23, 115:4, 123:12, 128:4
**putting** [4] - 25:5, 30:2, 85:6, 85:16

## Q

**questions** [21] - 4:14, 9:8, 32:21, 33:9, 54:3, 69:13, 69:23, 70:8, 70:12, 70:14, 71:8, 81:10, 82:9, 84:13, 85:5, 85:13, 87:6, 88:23, 89:4, 89:19, 91:24
**quick** [4] - 5:11, 47:23, 51:22, 125:12
**quickly** [2] - 91:20, 96:6
**quietly** [2] - 86:1, 99:17
**quite** [3] - 83:24, 122:24, 123:10

## R

**ran** [1] - 113:17
**range** [4] - 6:8, 6:14, 7:1, 74:1
**rapport** [2] - 60:5, 87:14
**rather** [7] - 9:10, 11:2, 18:15, 25:21, 83:19, 98:4, 102:11
**rationale** [1] - 101:3
**re** [5] - 2:4, 70:23, 111:13, 111:16, 128:8
**re-eval** [3] - 111:13, 111:16,128:8
**re-explain** [1] - 70:23
**re-val** [1] - 2:4
**reach** [4] - 49:23, 53:4, 53:6, 58:22
**reaching** [1] - 39:9
**react**[1] - 24:13
**reaction** [1] - 49:20
**read** [5] - 23:17, 34:2, 35:5, 115:6, 125:17
**reading** [10] - 27:1, 72:4, 112:11, 112:17, 113:8, 113:11, 113:12, 115:21, 115:24, 116:1
**ready** [2] - 39:10, 99:3
**real** [2] - 47:23, 107:13
**really** [32] - 7:10, 8:17, 11:16, 17:22, 19:3, 38:9, 40:10, 44:10, 45:22, 48:21, 54:12, 55:8, 60:18, 60:24, 61:21, 64:20, 91:3, 93:1, 95:16, 98:15, 98:18, 99:12, 99:14, 99:20, 103:8, 106:11, 108:18, 116:1, 121:3, 124:2
**reason** [5] - 29:9, 83:17, 116:9, 125:3, 125:8
**reasonably** [1] - 81:2
**reasons** [3] - 31:5, 70:11, 81:19
**Rebelo** [14] - 2:7, 22:20, 23:6, 23:11, 27:13, 32:17, 33:5, 34:14, 55:22, 64:19, 70:20, 93:23, 126:2, 127:19
**REBELO** [59] - 2:1, 3:6, 4:3, 11:6, 11:14, 26:1, 32:14, 54:9, 55:8, 61:18, 62:3, 62:6, 62:24, 63:3, 63:12, 64:2, 64:22, 72:16, 73:5, 73:12, 74:8, 74:12, 74:19, 75:2, 75:20, 76:6, 76:10, 76:14, 77:15, 77:22, 78:1, 78:5, 78:15, 79:2, 79:8, 90:11, 90:15, 90:22, 91:2, 91:15, 92:11, 92:18, 108:22, 110:22, 111:4, 111:11, 112:19, 117:5, 117:18, 125:18, 126:6, 126:12, 126:16, 128:1, 129:3, 129:8, 129:11, 129:15, 129:22
**recalling** [1] - 89:15
**recap** [2] - 48:3, 49:13
**receive** [2] - 26:14, 76:24
**received** [4] - 62:18, 64:15, 77:11, 111:10
**recently** [1] - 27:15
**receptive** [4] - 6:5, 55:15, 83:22, 85:4
**recommend** [4] - 8:10, 8:15, 54:16, 112:1
**recommendation** [6] - 91:1, 91:9, 105:3, 108:14, 111:19, 112:8
**recommendations** [3] - 110:15, 110:18, 110:20
**recommended** [3] - 23:24, 90:8, 113:9
**recommending** [4] - 8:12, 9:6, 54:13, 103:2
**record** [1] - 15:15
**recorded** [1] - 127:12
**recording** [2] - 71:9, 131:5
**recreating** [1] - 97:8
**redirect**[2] - 83:16, 85:12
**redirection** [1] - 96:20
**reduced** [1] - 108:5
**redundant** [2] - 57:6, 57:11

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 143 of 146
PageID: 3265


**refer** [2] - 103:21, 107:14
**reference** [1] - 94:23
**referenced** [1] - 101:22
**referring** [1] - 26:5
**reflect** [1] - 116:5
**reflects** [1] - 35:22
**refused** [5] - 12:13, 14:22, 15:5, 15:10, 30:10
**refuses** [1] - 122:6
**refusing** [1] - 30:13
**regard** [1] - 17:21
**regards** [2] - 54:9, 61:18
**REGIONAL** [1] - 1:7
**Regional** [3] - 2:22, 62:10, 62:12
**regular** [1] - 43:13
**regulations** [3] - 33:17, 34:4, 46:11
**reinforcement** [3] - 109:21, 110:4, 110:8
**reinforcements** [1] - 118:12
**reinforcer** [2] - 110:20, 110:24
**reinforcing** [1] - 110:15
**related** [1] - 55:14
**relationship** [1] - 28:21
**relaxed** [1] - 123:20
**relayed** [1] - 14:18
**remains** [1] - 78:8
**remembering** [1] - 74:22
**removed** [1] - 40:11
**repeat** [1] - 14:24
**repeatedly** [1] - 15:3
**repetition** [3] - 91:18, 93:19, 94:1
**rephrase** [1] - 118:5
**report** [5] - 8:11, 21:4, 23:17, 74:5, 79:20
**reported** [5] - 18:18, 72:21, 73:10, 73:15, 73:16
**Reporter** [1] - 1:18
**reporting** [1] - 91:6
**REPORTING** [1] - 1:23
**representation** [4] - 38:23, 38:24, 39:4, 39:5
**reproduce** [1] - 80:22
**request** [12] - 4:8, 9:8, 15:17, 31:17, 39:16, 40:15, 40:16, 41:20, 72:8, 101:20, 101:21, 108:13
**requested** [5] - 30:11, 68:10, 68:12, 68:13, 125:3
**requesting** [1] - 35:24
**research** [1] - 43:17
**resistance** [2] - 17:23, 108:16
**resolved** [1] - 80:6
**resource** [11] - 96:12, 113:1, 113:5, 113:13, 113:19, 114:3, 114:9, 115:5, 115:15, 116:15, 117:12
**Resource** [1] - 113:1
**respect** [2] - 31:18, 69:17
**respectful** [1] - 87:18
**respective** [1] - 126:21
**respond** [5] - 30:11, 67:5, 82:8, 82:15, 96:1
**responded** [3] - 15:17, 30:15, 69:14
**responds** [1] - 109:21
**response** [5] - 4:23, 31:16, 72:12, 101:23, 121:7
**responsible** [1] - 34:1
**rest** [2] - 58:19, 127:16
**results** [2] - 88:21, 88:22
**returned** [1] - 80:14
**returns** [2] - 51:24, 52:23
**review** [12] - 2:3, 4:10, 44:8, 63:9, 70:12, 70:21, 73:8, 78:18, 98:23, 120:12, 125:22, 127:22
**reviewed** [3] - 4:6, 8:14, 70:18
**reviewing** [1] - 4:7
**reviews** [1] - 4:9
**revised** [2] - 126:23, 127:22
**reward** [1] - 28:7
**rewards** [1] - 109:3
**rings** [1] - 82:1
**rise** [1] - 40:9
**Robelo** [1] - 27:20
**Rojas** [4] - 30:15, 30:24, 65:19, 67:14
**roll** [1] - 127:3
**room** [20] - 2:5, 3:18, 26:23, 27:3, 84:15, 105:3, 105:15, 105:19, 106:1, 106:12, 106:16, 106:20, 106:23, 107:7, 113:1, 113:5, 113:20, 114:3, 114:9, 117:13
**rooms** [1] - 113:2
**roughly** [1] - 59:5
**routine** [2] - 48:17, 60:11
**rudimentary** [1] - 89:1
**rules** [3] - 33:17, 35:3, 35:4
**run** [3] - 73:10, 73:11, 113:20
**runs** [3] - 11:14, 16:24, 125:19
**Rutgers** [1] - 113:15
**Ryan** [2] - 3:23, 3:24
**RYAN** [1] - 3:24

## S

**sat** [2] - 26:7, 26:17
**saw** [3] - 20:7, 72:5, 100:20
**scaffolded** [3] - 113:7, 119:16, 120:9
**scale** [2] - 73:18, 73:22
**scenario** [2] - 7:18
**schedule** [12] - 10:10, 11:14, 13:4, 13:8, 52:16, 54:18, 60:13, 61:3, 61:6, 61:11, 122:12, 129:16
**scheduled** [2] - 46:23, 111:12
**scheduling** [1] - 113:22
**school** [19] - 14:22, 15:10, 16:18, 16:23, 21:10, 21:12, 21:14, 22:17, 24:2, 26:6, 30:13, 34:2, 34:4, 40:7, 42:18, 46:19, 66:19, 84:17, 86:5
**SCHOOL** [1] - 1:8
**School** [2] - 2:22, 47:21
**schools** [1] - 101:13
**science** [21] - 3:7, 3:23, 5:24, 9:1, 15:24, 16:1, 50:15, 51:1, 81:22, 86:20, 90:6, 93:13, 94:18, 99:6, 113:4, 116:16, 118:15, 118:22, 118:23, 119:1, 119:3
**score** [14] - 5:2, 6:7, 6:24, 68:15, 68:16, 72:18, 72:20, 73:2, 73:7, 73:14, 73:18, 73:19, 73:23, 74:6
**scorecard** [1] - 68:11
**scored** [3] - 5:2, 6:23, 66:5
**scores** [3] - 71:6, 71:21, 71:22
**scoring** [1] - 86:24
**screen** [4] - 63:10, 64:3, 64:12, 64:21
**se** [1] - 24:21
**seal** [1] - 131:7
**seamless** [1] - 128:16
**seated** [1] - 83:12
**second** [7] - 6:4, 36:15, 64:3, 77:6, 77:13, 97:23, 128:24
**sections** [1] - 113:17
**see** [31] - 2:8, 3:5, 4:1, 12:3, 24:5, 28:6, 28:17, 58:14, 63:9, 63:22, 64:11, 64:21, 70:15, 71:20, 72:1, 76:1, 76:5, 82:4, 87:16, 87:18, 90:3, 90:17, 96:5, 98:21, 100:11, 100:19, 109:8, 111:6, 111:24, 112:21, 119:14
**seeing** [4] - 63:16, 74:20, 87:14, 114:7
**segregated** [1] - 30:18
**select** [1] - 81:8
**selecting** [1] - 81:14
**self** [5] - 112:10, 112:16, 112:24, 114:23, 115:1
**self-contained** [5] - 112:10, 112:16, 112:24, 114:23, 115:1
**send** [10] - 28:2, 33:7, 43:17, 67:24, 74:11, 111:5, 126:12, 126:22, 127:13, 127:22
**sending** [2] - 27:10, 35:1
**sends** [1] - 65:7
**Senior** [1] - 2:10
**sense** [6] - 47:8, 49:22, 50:8, 82:1, 85:9
**sent** [7] - 29:8, 33:2, 33:8, 52:1, 52:3, 67:18, 128:2
**sentence** [2] - 72:4, 81:18
**sentences** [2] - 88:4, 97:24
**separate** [2] - 66:24, 68:1
**separately** [1] - 65:23
**sequence** [1] - 89:16
**services** [2] - 8:10, 103:11
**session** [12] - 8:16, 8:23, 9:7, 10:16, 14:12, 15:23, 16:24, 29:4, 46:24, 47:2, 49:3, 55:24
**sessions** [16] - 11:22, 12:6, 12:7, 12:8, 12:9, 13:20, 17:3, 22:24, 24:6, 24:15, 41:3, 54:22, 55:7, 56:3, 56:4
**setting** [6] - 54:5, 96:13, 113:2, 113:5, 123:20, 123:21
**seven** [13] - 9:21, 11:3, 11:5, 11:16, 11:19, 11:24, 33:10, 33:11, 59:20, 62:15, 113:20, 129:1, 129:14
**seven-day** [4] - 9:21, 11:5, 11:16, 62:15
**several** [4] - 14:16, 15:4, 31:1, 124:9
**shape** [1] - 40:12
**share** [3] - 62:10, 64:3, 87:22
**shared** [2] - 69:1, 69:19
**sheets** [2] - 68:15, 68:17
**shown** [2] - 5:5, 37:13
**shuts** [1] - 62:19
**sick** [1] - 47:16
**side** [7] - 14:19, 15:3, 15:6, 15:7, 57:3, 120:8, 120:13
**sight** [1] - 115:24
**sign** [2] - 108:23, 109:8
**significant** [3] - 8:18, 23:8, 113:10
**significantly** [2] - 6:24, 113:18
**silent** [2] - 24:9, 24:10
**silently** [1] - 99:18
**simple** [2] - 82:8, 107:3
**simpler** [1] - 93:16
**simply** [6] - 4:21, 47:15, 82:6, 82:19, 97:17, 99:15

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 144 of 146 PageID: 3266


**sit** [2] - 99:18, 120:1
**sitting** [1] - 39:13
**situation** [19] - 6:20, 26:13, 35:6, 36:9, 36:20, 36:21, 41:14, 41:16, 43:14, 43:15, 44:11, 46:9, 47:8, 49:10, 49:11, 56:15, 57:8, 85:8, 107:13
**situations** [9] - 29:20, 35:15, 36:13, 40:18, 40:19, 45:1, 46:6, 55:19, 55:20
**six** [1] - 59:20
**skill** [2] - 119:5, 119:10
**skills** [13] - 8:20, 9:12, 9:13, 41:4, 106:4, 114:6, 114:19, 115:6, 115:9, 115:14, 115:15, 115:24, 116:1
**slide** [1] - 92:20
**Slinkies** [1] - 5:15
**slow** [3] - 77:18, 98:15, 98:20
**slower** [4] - 91:16, 96:6, 96:9, 117:16
**slowly** [2] - 111:24, 112:7
**smaller** [7] - 98:12, 105:15, 106:2, 113:2, 113:5, 113:19, 113:23
**smart** [1] - 9:20
**so-and-so** [1] - 84:16
**social** [17] - 6:19, 6:20, 8:19, 9:14, 22:1, 23:14, 24:23, 46:1, 55:17, 68:6, 84:10, 113:4, 120:21, 122:11, 122:13, 122:17, 123:21
**social/emotional** [1] - 55:9
**socialization** [1]- 85:11
**socially** [3] - 106:22, 106:24, 108:11
**soldiers** [1] - 5:13
**solution** [2] - 32:12, 38:2
**solve** [1] - 37:5
**solving** [1] - 24:18
**someone** [6] - 24:12, 47:11, 47:24, 66:7, 107:11, 107:14
**Sometimes** [2] - 33:18, 83:8
**sometimes** [9]- 9:23, 9:24, 12:5, 22:6, 44:20, 78:4, 81:12, 81:23, 84:8
**somewhere** [1] - 116:15
**sorry** [9] - 3:4, 14:23, 14:24, 72:24, 77:8, 89:6, 114:11, 115:1, 121:16
**Sorry** [6] - 33:23, 73:13, 77:23, 94:5, 126:15, 129:22
**sound** [1] - 45:8
**sounds** [3] - 25:23, 78:10, 95:19
**source** [2] - 56:13, 59:12
**space** [1]- 10:4
**Spanish** [3] - 85:14, 85:15, 85:22
**speaking** [2] - 45:16, 45:21
**special** [4] - 2:12, 3:8, 52:20, 79:6
**specific** [3] - 5:9, 5:10, 6:3
**specifically** [8] - 6:17, 23:17, 69:24, 71:4, 72:10, 74:5, 91:12
**speech** [46]- 2:19, 4:7, 4:10, 8:10, 11:21, 12:12, 12:14, 12:16, 14:1, 15:11, 15:12, 15:18, 15:24, 17:15, 17:17, 19:17, 20:17, 23:1, 23:3, 30:1, 30:9, 30:10, 30:12, 30:19, 30:23, 31:5, 31:13, 35:8, 35:16, 41:2, 44:16, 45:13, 51:8, 51:24, 52:14, 53:7, 55:7, 57:10, 57:24, 62:3, 80:5, 122:10, 123:10, 124:11, 127:10
**speed**[1] - 73:20
**spell** [2] - 74:14, 76:7
**spelled** [1]- 75:18
**spend** [2]- 12:20, 97:18
**spoken** [5] - 6:17, 25:2, 26:4, 36:2, 39:21
**spot** [1] - 127:3
**springs** [1] - 5:14
**staff** [3] - 22:17, 42:5, 46:2
**stage** [1] - 118:24
**stand** [2] - 105:2, 108:13
**standard** [8] - 5:2, 6:6, 6:23, 97:19, 98:4, 118:20, 119:6, 119:8
**standardized** [1] - 86:24
**standards** [4] - 90:2, 94:10, 94:11, 119:8
**standing** [1] -131:4
**stands** [2] - 51:6, 121:12
**Start** [1] - 59:3
**start** [20] - 4:15, 16:24, 54:16, 60:9, 60:10, 61:22, 79:6, 79:19, 111:23, 122:8, 122:9, 122:10, 123:15, 124:2, 124:20, 127:10, 128:17, 128:21, 129:5
**started** [3] - 4:7, 12:5, 82:6
**starting** [2] - 57:24, 124:18
**starts** [2] - 29:1, 77:19
**statement** [1] - 8:2
**STATES**[1]- 1:1
**statue** [1] - 5:13
**Stay** [1] - 63:1
**stayed**[1]- 110:5
**step** [7] - 41:11, 41:12, 87:3, 98:8, 119:16, 119:17
**steps** [4] - 31:21, 35:13, 93:20, 98:8
**still** [10] - 6:13, 8:6, 17:2, 22:18, 31:14, 33:6, 62:12, 66:9, 82:24, 102:1
**stop** [3]- 101:24, 120:11, 120:22
**stopping** [1]- 101:16
**stories** [3] - 122:11, 122:14, 122:17
**story** [3]- 15:3, 15:7, 15:8
**straight** [2] - 21:22, 67:13
**Straight** [1] - 67:13
**stranger** [2] - 47:22, 48:3
**strategies** [6] - 37:1, 40:24, 41:9, 102:4, 110:2, 113:14
**Strategies** [2]- 113:13, 113:14
**strategy** [2] - 36:7, 36:9
**strengths** [1] - 81:4
**stress** [1] - 58:2
**strict** [1]- 35:4
**strong** [1] - 5:4
**structured** [1] - 106:1
**struggle** [2] - 53:14, 124:16
**struggled** [3] - 7:4, 7:15, 124:13
**struggles** [1] - 76:23
**struggling** [1] - 92:3
**stuck** [1] - 81:23
**student** [13] - 26:3, 26:23, 36:2, 36:3, 38:9, 46:11, 48:2, 51:24, 84:15, 96:19, 106:3, 120:13, 120:15
**Student** [135] - 2:4, 4:17, 4:20, 5:4, 7:10, 7:19, 7:22, 8:10, 8:18, 9:4, 12:4, 12:10, 12:13, 13:3, 14:19, 14:22, 15:5, 15:7, 15:9, 15:12, 15:21, 16:19, 17:7, 18:21, 18:23, 19:1, 19:3, 19:4, 19:5, 19:9, 19:10, 19:14, 19:15, 19:24, 20:4, 20:5, 20:20, 20:22, 21:12, 21:14, 21:17, 21:20, 22:2, 22:7, 23:7, 23:11, 24:3, 26:7, 26:18, 27:21, 28:11, 28:12, 28:14, 28:16, 28:19, 28:22, 28:23, 29:4, 29:8, 29:10, 30:12, 31:5, 31:6, 31:11, 31:13, 32:18, 32:22, 33:1, 34:6, 34:18, 39:8, 42:14, 42:23, 45:12, 46:4, 46:8, 47:17, 50:9, 50:21, 50:22, 51:5, 51:6, 51:7, 51:13, 52:6, 52:16, 56:1, 61:1, 70:8, 76:16, 78:7, 79:21, 79:22, 81:1, 81:4, 81:11, 81:16, 82:11, 82:19, 83:5, 83:16, 84:13, 85:12, 85:19, 86:1, 86:19, 87:15, 87:20, 91:3, 91:14, 91:21, 93:11, 93:17, 94:2, 96:12, 97:6, 97:12, 98:6, 99:18, 104:11, 105:6, 105:9, 106:18, 112:10, 112:12, 114:14, 115:7, 115:9, 115:16, 124:12, 124:14, 124:15, 125:7, 128:13
**students** [15] - 8:22, 29:17, 38:5, 87:21, 96:16, 96:17, 102:21, 113:7, 113:9, 113:21, 114:2, 114:3, 119:24, 120:11, 123:18
**studies** [1] - 113:4
**study** [2] - 36:1, 81:1
**subject** [1] - 86:20
**subtest** [1] - 6:18
**subtests** [2] - 72:1, 73:9
**succeed** [1] - 115:17
**sudden** [1] - 87:24
**suffer** [1] - 42:15
**suffers** [1]- 44:13
**suggesting** [1]- 100:16
**suggestion** [2]- 11:1, 17:20
**suggestions** [3]- 38:1, 38:3, 112:5
**suit** [2] - 98:21, 106:19
**summer** [1] - 111:24
**sun** [2] - 89:13, 129:24
**supervisor**[1] - 2:12
**supervisors** [1]- 21:5
**support** [4] - 23:10, 41:10, 113:12, 120:12
**supports** [4] - 94:4, 114:8, 114:11, 114:12
**supposed** [4] - 39:13, 50:18, 51:3, 125:4
**swallow** [2] - 26:10, 26:12
**swap** [1] - 92:15
**swick**[1] - 30:24
**SWICK** [39] - 2:18, 4:13, 4:16, 10:2, 10:20, 12:15, 14:23, 16:11, 16:16, 17:13, 20:9, 21:1, 22:12, 23:5, 23:16, 25:23, 55:16, 55:21, 56:9, 56:21, 57:14, 57:20, 57:22, 58:11, 59:2, 59:9, 60:1, 60:3, 60:8, 60:20, 61:2, 93:7, 104:8, 104:20, 104:23, 125:23,

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 145 of 146 PageID: 3267



126:10, 126:15, 128:12
**Swick** [26] - 2:18, 4:8, 12:2, 14:15, 29:16, 31:2, 31:10, 36:21, 41:7, 51:8, 52:7, 52:21, 53:17, 53:21, 54:21, 55:2, 55:6, 55:12, 57:16, 84:12, 94:22, 122:13, 124:18, 128:3, 129:11
**switch** [2] - 75:22, 76:2

**T**

**talks** [1] - 43:5
**target**[1] - 5:8
**task** [2] - 83:16, 110:5
**tasked** [1] - 96:23
**taught** [4] - 94:16, 94:17, 94:18, 106:3
**teach** [7] - 9:13, 93:2, 97:13, 117:11, 117:17, 118:2, 118:5
**teacher**[17] - 3:8, 3:23, 4:1, 18:12, 21:4, 51:11, 52:10, 53:6, 53:17, 53:18, 78:19, 78:21, 79:1, 92:14, 103:21, 106:5, 106:6
**teachers** [8] - 22:15, 52:19, 52:21, 79:6, 91:6, 102:21, 103:15, 125:6
**teaches** [2] - 92:18, 114:4
**teaching** [4] - 25:20, 41:4, 117:15, 121:1
**team** [12] - 19:13, 36:1, 36:2, 39:16, 42:9, 42:24, 50:11, 50:20, 90:9, 91:10, 102:14, 103:21
**technology** [4] - 39:12, 78:3, 79:17, 80:20
**template** [1] - 62:9
**term** [1] - 107:19
**terms** [8]- 57:18, 86:18, 89:17, 90:9, 101:8, 103:8, 109:18, 127:15
**terrible** [1] - 86:10
**test**[11] - 4:19, 4:20, 5:3, 5:21, 6:6, 6:15, 7:3, 29:13, 61:5, 71:17, 86:24
**testing** [6] - 66:4, 66:16, 66:18, 66:22, 67:1
**tests** [6] - 68:21, 70:1, 80:24, 88:3, 88:5, 99:4
**texts** [1] - 29:4
**That'd** [1] - 63:7
**THE** [2]- 1:1, 1:1
**themselves** [2]- 2:6, 46:6
**theory** [1] - 116:12
**therapeutic** [1] - 61:15
**therapist** [6] - 2:19, 3:1, 17:16, 20:17, 23:3
**therapy** [3] - 15:6, 17:17, 124:11
**there'll** [1] - 108:10
**thereof** [1]- 131:6
**thinking** [4] - 9:14, 23:14, 55:18, 80:5
**thinks** [2]- 28:2, 30:7
**thoughts** [1] - 56:19
**three** [27]- 3:18, 4:17, 5:3, 9:24, 10:5, 10:8, 11:21, 13:1, 14:12, 16:17, 25:12, 25:13, 27:3, 27:4, 27:9, 31:15, 34:24, 47:17, 47:18, 75:8, 81:10, 81:15, 81:18, 88:4, 98:8, 112:18, 117:9
**three-year-old** [1] - 117:9
**timeline** [2] - 32:20, 33:11
**timing** [1] - 48:15
**title** [5] - 64:16, 65:15, 65:17, 66:2, 66:3
**T J**[1]- 1:23
**today** [7] - 50:2, 70:5, 85:9, 111:8, 111:15, 125:20, 128:7
**together** [2] - 23:6, 54:4
**tomorrow** [1]- 98:23
**ton** [4] -43:17, 93:18, 93:19, 94:22
**tonight** [1]- 83:7
**took**[3]- 15:14, 31:14, 77:24
**tools** [2] - 102:16, 103:2
**top** [4] - 20:19, 62:23, 63:20, 124:3
**topic** [6] - 18:4, 37:23, 98:19, 100:2, 102:11, 119:6
**topics** [6] - 100:4, 101:12, 104:19, 104:22, 126:4
**touch** [2] - 50:5, 127:7
**touching** [1] - 118:16
**tough** [1] - 96:11
**towards** [2] - 59:10, 94:13
**track**[1] - 97:1
**tracking** [1] - 65:11
**trained** [1] - 23:21
**transcribed** [2]- 1:16, 131:4
**Transcription** [2]- 1:12, 1:15
**transition** [5] - 50:14, 101:11, 111:24, 112:3, 126:3
**transitioning** [5]- 35:6, 49:9, 100:2, 104:12, 104:21
**transitions** [2] - 101:16, 104:2
**translate** [1] - 116:12
**traumatize** [1] - 30:17
**traumatized** [1] - 32:24
**treat**[2]- 55:23, 56:6
**treated** [1] - 28:11
**tremendously** [2]- 17:9, 19:1
**TRENTON**[1] - 1:2
**triggers** [1] - 82:10
**trips** [1] - 89:22
**trouble** [19] - 3:3, 27:12, 27:24, 29:3, 29:5, 35:2, 35:16, 42:21, 45:16, 49:15, 49:21, 50:24, 51:2, 51:10, 51:12, 52:7, 88:6, 117:2, 122:4
**troubleshoot** [1]- 58:23
**troubling** [1] - 42:15
**true** [4] - 49:3, 80:9, 82:1, 90:10
**truly** [1] - 56:1
**trumpet** [1] - 5:23
**trusts** [1]- 28:24
**try** [15]- 2:14, 22:5, 24:10, 56:11, 56:16, 58:16, 61:11, 85:4, 85:17, 86:1, 112:6, 121:24, 122:2, 122:5, 124:1
**trying** [10]- 5:21, 18:1, 18:15, 28:20, 33:21, 103:6, 105:13, 116:13, 116:20, 116:24
**Tuesday** [1] - 53:22
**turn** [4] - 3:20, 84:14, 90:15, 96:2
**Turriziani** [2] - 92:15, 119:22
**TURRIZIANI** [1] - 92:17
**twelve** [1]- 113:21
**twice** [5] - 9:22, 10:23, 11:2, 16:22, 62:1
**two** [29] - 9:10, 9:18, 10:7, 10:14, 11:8, 11:9, 11:20, 11:21, 11:23, 32:19, 34:3, 37:10, 40:6, 40:7, 42:24, 54:15, 57:5, 61:24, 62:7, 64:8, 69:3, 79:13, 82:8, 96:2, 99:22, 106:14, 113:17, 120:4, 125:24
**type** [4] - 25:8, 44:18, 122:12, 122:16
**Typically** [1] - 65:8
**typically** [10] - 16:13, 49:23, 52:10, 52:14, 80:19, 83:4, 83:9, 83:23, 84:24, 105:18

**U**

**ugly** [1] - 7:22
**ultimately** [1] - 103:13
**unavoidable** [1]- 50:10
**under** [3] - 32:6, 34:10, 46:16
**underlined** [1] - 118:13
**understood** [3] - 20:3, 20:18, 92:3
**unexpected** [1] - 36:14
**unfortunately** [1]- 29:23
**UNITED** [1] - 1:1
**unless** [2] - 3:21, 80:19
**unnecessary**[2]- 48:18, 48:19
**unrelated** [1]- 67:21
**unresponsive**[1] - 87:1
**up** [41]-3:20, 6:2, 7:11, 8:6, 10:12, 13:4, 14:24, 18:11, 18:16, 19:7, 22:22, 22:23, 24:24, 26:9, 29:15, 29:22, 40:1, 40:24, 42:17, 45:11, 50:16, 53:10, 54:5, 54:18, 54:23, 57:24, 58:6, 59:24, 69:11, 79:3, 89:22, 95:13, 105:2, 109:1, 110:19, 113:20, 114:21, 118:13, 119:16, 120:21, 127:6
**upset**[2] - 13:24, 49:19

**V**

**val** [1] - 2:4
**Valiante** [2] - 1:17, 131:11
**various** [2] - 36:12, 101:13
**via** [1] - 49:24
**VICINAGE** [1] - 1:2
**video** [1]- 120:17
**videoing** [1]- 24:9
**visual** [4] - 93:17, 94:4, 118:10, 118:11
**visuals** [2]- 93:12, 94:22
**vocabulary** [5] - 4:19, 6:6, 9:1, 115:20, 115:24
**voice** [2]- 61:4, 61:13
**volume** [1] - 90:16

**W**

**wait** [4] - 47:1, 47:18, 50:14, 129:3
**waiting** [2] - 39:3, 39:5
**walk** [2] - 12:20, 108:9
**walking** [1] - 50:15
**walks** [2] - 108:21, 122:3
**wants** [4]- 57:16, 65:4, 82:13, 82:14
**warm** [1] - 83:13
**warning** [6] - 19:17, 26:2, 26:15, 32:15, 34:16, 40:8
**warrant**[1] - 40:9
**watch** [1]-24:9
**water** [3] - 87:2, 87:7, 97:14
**ways** [1]-42:5
**weaknesses**[1]- 114:8
**wear** [2] - 7:9, 86:14
**website** [2] - 65:1, 116:4
**week** [26] - 8:12, 9:22, 9:24, 10:5, 10:7, 10:19, 10:23, 11:2,

Case 3:25-cv-01728-ZNQ-JTQ Document 34-4 Filed 12/19/25 Page 146 of 146 PageID: 3268


11:13, 11:15, 11:16, 13:2, 14:13, 16:17, 16:22, 25:12, 58:13, 58:19, 61:24, 65:16, 86:15, 97:19, 97:20, 98:3
**weekend** [2] - 58:18, 58:20
**weeks** [1] - 10:8
**weigh** [1] - 46:3
**welcome** [3] - 20:11, 35:12, 74:8
**wet** [1] - 87:4
**whatnot** [1] - 66:5
**wheelchair** [5] - 21:13, 21:16, 21:18, 22:3, 22:5
**whereas** [1]- 121:2
**Whereas** [3] - 87:5, 97:21, 119:17
**whole** [6] - 15:13, 19:13, 54:3, 60:9, 60:12, 95:17
**Wilson** [1]- 113:13
**Winner's** [1] - 23:19
**wise** [1] - 91:5
**WITNESS** [1]- 131:7
**woman** [1] - 83:13
**wonder** [1] - 34:5
**wonderful** [3] - 37:15, 83:15, 122:15
**wondering** [2]- 25:2, 25:5
**word** [11] - 4:19, 4:23, 5:5, 5:10, 5:17, 5:20, 6:3, 6:5, 6:11, 86:23, 107:14
**wording** [1] - 35:14
**words** [1] - 5:6
**works** [5] - 19:3, 49:4, 95:11, 95:12, 110:4
**worksheets** [1]- 80:18
**workshop** [3] - 112:11, 112:17, 113:8
**Workshop** [1] - 116:8
**world** [1] - 33:16
**worries** [2] - 19:6, 78:2
**worry** [2] - 51:16, 83:5
**worse** [2] - 32:4, 72:5
**would've** [1] - 34:21
**wound** [1] - 8:6
**wrap** [2] - 105:2, 127:6
**write** [4] - 10:17, 14:2, 14:4, 82:14
**writing** [8] - 13:22, 67:8, 67:9, 72:11, 82:13, 82:17, 88:23, 97:24
**written** [3] - 31:9, 116:4, 116:14
**wrote** [2] - 15:14, 33:7

## Y

**y@freemanlawoffices.com** [1] - 74:18
**year**[21] - 12:5, 12:10, 13:8, 29:24, 59:11, 67:4, 69:7, 86:6, 86:7, 111:21, 112:10, 112:12, 112:15, 112:20, 113:17, 117:9, 124:20, 125:13, 125:14, 125:21
**years** [5] - 40:6, 42:24, 71:23, 89:24, 96:11
**yourself**[1] - 18:21

## Z

**zero** [2] - 16:2, 16:9